# UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| John Colt Landreth, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | )    **Civil Action No.** _____ |
| | ) |
| Keith R. Leigh,  Pool, Leigh & Kopko, | ) |
| P.C. (formerly known as Pool & Leigh, | ) |
| P.C.), an Illinois professional | ) |
| corporation,   Robert M. Eschbach, | ) |
| and the City of Ottawa, Illinois, | ) |
| a municipal corporation, | ) |
| | ) |
| **Defendants.** | ) |

### COMPLAINT AT LAW AND JURY DEMAND

Plaintiff, **John Colt Landreth**, by his attorneys, Myers, Berry, O'Conor & Kuzma, Ltd.,

complaining of the defendants, **Keith R. Leigh**, **Pool**, **Leigh & Kopko, P.C.** (formerly known as

Pool & Leigh, P.C.), an Illinois professional corporation, **Robert M. Eschbach** and the **City of**

**Ottawa, Illinois**, an Illinois municipal corporation, states as follows:

### Jurisdiction and Venue

1.      This action arises, in part, under a federal statute, 42 U.S.C. §1983.

2.      All defendants reside in this judicial district.

**Allegations Common to All Counts**

The allegations in paragraphs 3 through 121 are common to all counts and are incorporated in each count as if set forth therein.  Each of the exhibits attached to this Complaint is incorporated herein to the same extent as if set forth *verbatim*.

## Parties

3.    Plaintiff **John Colt Landreth** ("*Landreth*") is a real estate developer and broker.

4.    Defendant **Keith R. Leigh** ("*Leigh*") is an attorney who, on information and belief, was at all times alleged herein licensed and in good standing in the State of Illinois.

5.    Leigh is, and at all times alleged herein was, an experienced attorney.   On information and belief, Leigh has practiced law continuously since October 1973.

6.    At all times alleged herein, Leigh held himself out as a competent attorney.

7.    At all times alleged herein, Leigh held himself out as having special expertise in municipal and local government law.

8.    Defendant **Pool, Leigh & Kopko, P.C.** ("*Pool, Leigh & Kopko*") is an Illinois corporation.  At all times alleged herein prior to February 1, 2006, Pool, Leigh & Kopko, P.C. was known by its former corporate name of "Pool & Leigh, P.C."  On or about February 1, 2006, Pool & Leigh, P.C. changed its corporate name to "Pool, Leigh & Kopko, P.C."  On information and belief, at all times alleged herein, Pool & Leigh, P.C. (now known as "Pool, Leigh & Kopko, P.C.") was organized as a professional corporation under the Professional Service Corporation Act (805 ILCS 10/1 *et seq.*) and provided professional legal services through its shareholders, directors, officers and employees.

9.      On information and belief, at all times alleged herein prior to February 1, 2006, Pool & Leigh, P.C. (now known as "Pool, Leigh & Kopko, P.C.") was associated with Raymond P. Fabricius, P.C., another professional corporation.

10.     On information and belief, at all times alleged herein prior to February 1, 2006, Pool & Leigh, P.C. (now known as "Pool, Leigh & Kopko, P.C.") did business under the name "Pool, Leigh & Fabricius."

11.     Hereinafter, "Pool, Leigh & Kopko" refers to and includes "Pool & Leigh, P.C." or "Pool, Leigh & Fabricius," as the context requires.

12.     On information and belief, at all times alleged herein, Leigh was the sole shareholder, director and officer of Pool, Leigh & Kopko.

13.     Defendant **City of Ottawa, Illinois** (the "*City*") is, and at all times alleged herein was, an Illinois municipal corporation and body politic operating under the provisions of the Illinois Municipal Code, 65 ILCS 5/1-1-1 *et seq.*

14.     At all times alleged herein, Pool, Leigh & Kopko was, or held itself out to be, "corporation counsel" to the City.

15.     On information and belief, at all times alleged herein, there was in effect a "professional services agreement" between the City and Pool, Leigh & Kopko which designated Pool & Leigh, P.C. as "corporation counsel."

16.     On information and belief, at all times alleged herein, Leigh was the duly appointed and acting City Attorney for the City of Ottawa, Illinois.

17.     On information and belief, at all times alleged herein, in addition to acting as City Attorney for the City of Ottawa, Leigh represented other municipal and local governmental bodies on a regular basis.

18.     On information and belief, at all times alleged herein, in addition to representing the City of Ottawa as "corporation counsel," Pool, Leigh & Kopko represented other municipal and local governmental bodies on a regular basis.

19.     On information and belief, at all times alleged herein, the majority of Leigh's practice was devoted to representing municipal and local governmental bodies, with the City being his largest client.

20.     Defendant **Robert M. Eschbach** ("*Eschbach*") was elected to the Office of Mayor of the City of Ottawa in April 1999. He has served as Mayor continuously since that date.

21.     On information and belief, at all times alleged herein, Eschbach was a licensed attorney in good standing in the State of Illinois.

22.     Prior to being elected Mayor, Eschbach had practiced law in Ottawa for more than 20 years.

23.     After being elected Mayor, Eschbach has continued to practice law in the City of Ottawa.

**Factual Allegations Common to All Counts**

*Section 8-1-7 of the Illinois Municipal Code*

24.    At all times alleged herein, there was in effect in the State of Illinois Section 8-1-7 of the Illinois Municipal Code ("*Section 8-1-7*").  Section 8-1-7 is set forth in its entirety in Exhibit "A" to this Complaint.  Insofar as Section 8-1-7 is relevant to this action, it provides in pertinent part:

> § 8-1-7.
>
> Sec. 8-1-7. (a) Except as provided otherwise in this Section, no contract shall be made by the corporate authorities, or by any committee or member thereof, and no expense shall be incurred by any of the officers or departments of any municipality, whether the object of the expenditure has been ordered by the corporate authorities or not, unless an appropriation has been previously made concerning that contract or expense. Any contract made, or any expense otherwise incurred, in violation of the provisions of this section shall be null and void as to the municipality, and no money belonging thereto shall be paid on account thereof.  *   *   *
>
> (b) Notwithstanding any provision of this Code to the contrary, the corporate authorities of any municipality may make contracts for a term exceeding one year and not exceeding the term of the mayor or president holding office at the time the contract is executed, relating to: (1) the employment of a municipal manager, administrator, engineer, health officer, land planner, finance director, attorney, police chief or other officer who requires technical training or knowledge; (2) the employment of outside professional consultants such as engineers, doctors, land planners, auditors, attorneys or other professional consultants who require technical training or knowledge; (3) the provision of data processing equipment and services; or (4) the provision of services which directly relate to the prevention, identification or eradication of disease. In such case the corporate authorities shall include in the annual appropriation ordinance for each fiscal year, an appropriation of a sum of money sufficient to pay the amount which, by the terms of the contract, is to become due and payable during the current fiscal year.

25.    On information and belief, at all times alleged herein, Leigh, an experienced attorney with a concentration in municipal and local government law, was familiar with Section 8-1-7.

26.     At all times alleged herein, the members of the Ottawa City Council were Eschbach, Edward V. Whitney ("*Whitney*"), Wayne A. Eichelkraut, Jr. ("*Eichelkraut*"), William E. Walsh ("*Walsh*") and Dale F. Baxter ("*Baxter*").

27.     On information and belief, at all times alleged herein, Leigh was an agent or employee of Pool, Leigh & Kopko and was acting as such within the scope of his employment.

28.     At all times alleged herein, Eschbach was the Mayor of the City of Ottawa and was acting as such within the scope of his office.

---

*Events Leading up to Execution of Consulting Agreement*

29.     On February 26, 2003, Eschbach and then City Engineer and Director of Community Development, Gary Pike ("*Pike*"), met with Landreth to discuss industrial development opportunities in Ottawa and to explore how the City might utilize Landreth's experience and expertise to promote commercial and industrial development in Ottawa, particularly within an industrial park located in the City of Ottawa (the "*Ottawa Industrial Park*").

30.     Between February 26, 2003 and approximately July 31, 2003, the City and Landreth negotiated the terms of an agreement whereby the City hired Landreth to provide consulting, development and marketing services designed to increase and promote the commercial, industrial and economic base of the City.

31.     On information and belief, within a short time after Eschbach and Pike met with Landreth on February 26, 2003, the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) knew that the City was negotiating the terms of a consulting agreement with Landreth.

32.    On April 26, 2003, as required by Section 8-2-9 of the Illinois Municipal Code (65 ILCS 5/8-2-9), the City Council passed Ordinance No. 28-2003 approving and adopting its annual appropriation ordinance for the fiscal year commencing May 1, 2003 and ending April 30, 2004.

33.    The City did not appropriate for the Consulting Agreement in its annual appropriation ordinance for the fiscal year commencing May 1, 2003 and ending April 30, 2004.

34.    Pool, Leigh & Kopko undertook to represent both the City and Landreth in drafting the Consulting Agreement, as Section 15 of the Consulting Agreement reflects:

> 15.    <u>Disclosure</u>.  The parties have jointly utilized the law firm of Pool, Leigh & Fabricius with respect to this Agreement, and each party acknowledges this fact and hereby expressly authorizes such representation.
>
> *  *  *

35.    Landreth was not represented by separate counsel during the negotiation or drafting of the Consulting Agreement.

36.    Leigh, and Pool, Leigh & Kopko, knew that Landreth was not represented by separate counsel during the negotiation or drafting of the Consulting Agreement.

37.    During the negotiation and drafting of the Consulting Agreement, Landreth communicated with Pike and Leigh by telephone, fax and e-mail.

38.    Neither Leigh, nor Pool, Leigh & Kopko, discussed Section 8-1-7 or the implications of a municipality's failure to strictly comply with Section 8-1-7 with Landreth – either during the negotiation or drafting of the Consulting Agreement or at any time thereafter.

39.    Leigh, and Pool, Leigh & Kopko, knew that in order for the Consulting Agreement to be a lawful obligation of the City – "binding, valid and specifically enforceable according to its terms" against the City – Section 8-1-7 required the City Council to appropriate for the Consulting Agreement *before* the agreement was executed.

40.     Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) knew that in order for the Consulting Agreement to be a lawful obligation of the City – "binding, valid and specifically enforceable according to its terms" against the City – Section 8-1-7 required the City Council to appropriate for the Consulting Agreement *before* the agreement was executed.

41.     That the City had not made a previous appropriation for the Consulting Agreement was a material fact and a fact basic to the transaction since it went to the very validity of the contract itself.

42.     After April 26, 2003 – while the City and Landreth were negotiating the terms of the Consulting Agreement – Leigh, and Pool, Leigh & Kopko, knew that the City had not appropriated for that contract as required by Section 8-1-7.  Neither Leigh, nor Pool, Leigh & Kopko, disclosed this fact to Landreth, although they were under a duty to do so.

43.     After April 26, 2003 – while the City and Landreth were negotiating the terms of the Consulting Agreement – Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) knew that the City had not appropriated for that contract as required by Section 8-1-7.  Neither Eschbach nor any of the other City Council members disclosed this fact to Landreth, although they were under a duty to do so..

44.     After April 26, 2003 – while the City and Landreth were negotiating the terms of the Consulting Agreement – Leigh, and Pool, Leigh & Kopko, knew that in order for the contract to be a lawful obligation of the City – "binding, valid and specifically enforceable according to its terms" against the City – the City would have to amend its annual appropriations ordinance prior to

executing the contract.  Neither Leigh, nor Pool, Leigh & Kopko, disclosed this fact to Landreth, although they were under a duty to do so.

45.    After April 26, 2003 – while the City and Landreth were negotiating the terms of the Consulting Agreement – Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) knew that in order for the contract to be  binding, valid and specifically enforceable against the City, the City would have to amend its annual appropriations ordinance prior to executing the contract. Neither Eschbach nor any of the other City council members disclosed this fact to Landreth, although they were under a duty to do so.

46.    After April 26, 2003, during the time that Pool, Leigh & Kopko was drafting the Consulting Agreement, Leigh, and Pool, Leigh & Kopko, knew that the City had not appropriated for that contract as required by Section 8-1-7.  Neither Leigh, nor Pool, Leigh & Kopko, disclosed this fact to Landreth, although they were under a duty to do so.

47.    After April 26, 2003, during the time that Pool, Leigh & Kopko was drafting the Consulting Agreement, Leigh, and Pool, Leigh & Kopko, knew that in order for the contract to be a lawful obligation of the City – "binding, valid and specifically enforceable according to its terms" against the City – the City would have to amend its annual appropriations ordinance prior to executing the contract.  Neither Leigh, nor Pool, Leigh & Kopko, disclosed this fact to Landreth, although they were under a duty to do so.

48.    During the time that the City and Landreth were negotiating the terms of the Consulting Agreement, Pike represented to Landreth that the City would make the payments under the Consulting Agreement from tax increment financing ("TIF") funds.

49.    The agreement, as finally negotiated between the City and Landreth, was reduced to writing and is entitled "Consulting, Development and Marketing Agreement Between the City of Ottawa, Illinois and John Colt Landreth" (the "*Consulting Agreement*").  A true and correct copy of the Consulting Agreement is attached hereto as Exhibit "B."

50.    Pool, Leigh & Kopko drafted the Consulting Agreement.

---

*The City Approves and Enters into the Consulting Agreement with Landreth*

51.    At its regular meeting on August 5, 2003, the City Council passed and approved Resolution No. 93-2003 entitled "A Resolution Authorizing the Execution of a Consulting, Development and Marketing Agreement Between The City of Ottawa and John Colt Landreth."  A copy of Resolution No. 93-2003 is attached hereto as Exhibit "C."

52.    Resolution No. 93-2003 expressly authorized and directed the Mayor and City Clerk to execute the Consulting Agreement.

53.    On information and belief, Pool, Leigh & Kopko  drafted Resolution No. 93-2003.

54.    On August 5, 2003, when the City Council passed and approved Resolution No. 93-2003, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) knew that the City had not appropriated for that contract as required by Section 8-1-7 and, consequently –

(a)    that the Consulting Agreement was *not* a lawful obligation of the City;

(b)    that the Consulting Agreement was *not* "binding, valid and specifically enforceable according to its terms" against the City;

(c)      that the Consulting Agreement *did* "violate [a] presently existing provision of law" to which the City was subject – namely, Section 8-1-7; and

(d)      that the Consulting Agreement *was null and void* and unenforceable by Landreth.

55.    On August 5, 2003 – despite the fact that the contract was void *ab initio* – Eschbach and City Clerk Elizabeth Taylor executed the Consulting Agreement on behalf of the City.

56.    At the time Landreth executed the Consulting Agreement,, he relied upon the following representations set forth in paragraphs b. and c. of Section 12 of the agreement:

> 12.    <u>Warranties</u>.  The parties warrant and represent that:
>
> *   *   *
>
> b.    ***This Agreement is binding, valid and specifically enforceable according to its terms against each party;***
>
> c.    ***This Agreement does not violate any presently existing provision of law … to which such party may be subject;***

57.    At the time Landreth executed the Consulting Agreement, he relied upon the following representations, covenants and assurances set forth in Section 7 of the agreement:

> 7.    <u>Revocation</u>.  The City understands the long-term nature of this Agreement and the long-term nature of economic development. Therefore, **the City agrees** and covenants **not** to revoke or rescind this Agreement or to institute any proceeding or action **to challenge the validity of this agreement** or in any way to rescind, modify or alter said agreement, ***understanding that Landreth is relying upon the representations and financial commitment contained herein and has every right to do so.*** *   *   *    [emphasis added]

58.    On or about August 5, 2003 – believing the contract to be "binding, valid and specifically enforceable according to its terms" – Landreth executed the Consulting Agreement.

59.    At the time Landreth executed the Consulting Agreement, the City did not advise Landreth –

(a)    that the Consulting Agreement was *not* a lawful obligation of the City;

(b)    that the Consulting Agreement was *not* "binding, valid and specifically enforceable according to its terms" against the City;

(c)    that the Consulting Agreement *did* "violate [a] presently existing provision of law" to which the City was subject – namely, Section 8-1-7; and

(d)     that the Consulting Agreement *was null and void* and unenforceable by Landreth.

60.    The initial term of the Consulting Agreement was 24 months: from August 5, 2003 to August 5, 2005.

---

*Landreth and the City Perform Under the Consulting Agreement*

61.    In August 2003, with the City's knowledge and approval, Landreth began his consulting and development duties pursuant to the Consulting Agreement.

62.    For more than 27 months – from August 2003 through November 15, 2005 – Landreth served as the City's economic development consultant and performed the duties and obligations imposed upon him by the Consulting Agreement.

63.    For more than 27 months – from August 2003 through November 15, 2005 – while serving as the City's economic development consultant, Landreth devoted more than one-half of his professional time to economic development efforts on behalf of the City.

64.    For more than 27 months – from August 2003 through November 15, 2005 – the City accepted, utilized and benefitted from the services Landreth provided.

65.    Landreth would not have provided services to the City during the period from August 2003 through November 15, 2005 if he had known that the Consulting Agreement was:

(a)    void *ab initio;*

(b)    not a lawful obligation of the City; and

(c)    neither binding, valid nor specifically enforceable against the City according to its terms.

_____

*Pertinent Provisions of the Consulting Agreement*

<u>Section 3(a)</u>

66.    In Section 3(a) of the Consulting Agreement the City agreed to pay Landreth a monthly retainer of $5,000.00 and to reimburse his expenses. Section 3(a) of the Consulting Agreement provides:

> 3.    <u>Obligations of City</u>.  In order to provide a continuous and reliable source of funding for economic development within the City and OIP:
>
> (a) the City shall pay to Landreth the sum of $5,000.00 upon the execution of this agreement and the further sum of $5,000.00 on the same day of each succeeding month during the term of this agreement; said sum shall be for Landreth's monthly retainer; together with an [sic] monthly amount not to exceed $2,000.00 for Chicago support staff, travel, telephone; and similar items of expense.

67.    Each month – for 27 months – during the period August 2003 through October 2005, the City paid Landreth the monthly retainer of $5,000 specified by Section 3(a) of the Consulting Agreement.  On information and belief, these payments to Landreth were reviewed and approved

each month by Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter).

68.     During the period August 2003 through July 2005, the City reimbursed Landreth for his expenses pursuant to Paragraph 3(a) of the Consulting Agreement.  On information and belief, these payments to Landreth were reviewed and approved by Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter).

<u>Section 3(d)</u>

69.     In Section 3(d) of the Consulting Agreement, the City agreed to pay Landreth additional compensation "equal to 1½ % of the actual project cost of all industrial developments occurring within the City during the term or any extension of this agreement."  Section 3(d) of the Consulting Agreement provides:

> 3.     <u>Obligations of City</u>.  In order to provide a continuous and reliable source of funding for economic development within the City and OIP:
>
> \*   \*   \*
>
> (d)   [the City shall pay to Landreth]  the further and additional sum equal to 1 ½% of the actual project cost of all industrial developments occurring within the City during the term or any extension of this agreement. <u>Such sum shall be paid one-half (½) upon the commencement of construction based upon the estimate of project cost, and the balance shall be paid upon completion of construction as soon as the total project cost is determined</u>. The phrase "project cost" shall include the cost of land, <u>direct and indirect</u> building <u>costs</u>, and site preparation as shown on the building permit, but shall not include machinery, equipment or any item of personal property. Compensation for industrial developments, which occur outside existing TIF Districts, will be negotiated on a case by case basis and mutually agreed upon.         [emphasis in original]

70.     Section 3(d) was an integral and material provision of the Consulting Agreement which was mutually beneficial to the City and Landreth because, while Section 3(d) afforded Landreth an opportunity to earn substantial fees, the City did not become obligated to pay Landreth

any additional compensation under Section 3(d) unless new industrial development projects occurred in Ottawa during the term of the Consulting Agreement.

71.    The inclusion of Section 3(d) was a material inducement for Landreth to enter into the Consulting Agreement. Landreth would not have entered into the Consulting Agreement without the inclusion of Section 3(d) or a similar provision.

72.    In April 2004, construction of the Motorcycle Tour Conversion ("*MTC*") project commenced. On information and belief, the MTC project was completed in the Fall of 2005.

73.    As a result of the construction of the MTC project, Landreth became entitled to a substantial fee – in excess of $37,000.00 – pursuant to Section 3(d) of the Consulting Agreement.

74.    In February 2005, the City paid Landreth $15,879.00 pursuant to Section 3(d) of the Consulting Agreement. The amount so paid was the first installment of the Section 3(d) fee owed to Landreth in connection with the MTC Project.

75.    In the Fall of 2004, construction of the PetSmart warehouse/distribution center in the Ottawa I-80 North TIF Redevelopment Project Area (the "*PetSmart Project*") commenced. On information and belief, the PetSmart Project was completed in June 2005.

76.    As a result of the construction of the PetSmart facility, Landreth became entitled to a substantial fee – approximately $500,000.00 – pursuant to Section 3(d) of the Consulting Agreement (the "*PetSmart fee*").

77.    On June 1, 2005, Landreth and Eschbach met. Landreth inquired as to the status of the PetSmart fee. Eschbach told Landreth that the City had not contemplated paying Landreth any fees in connection with the PetSmart project.

_____

*The City and Landreth Agree that Landreth Will Work for the City After August 5, 2005*

78.    On June 20, 2005, Landreth and Eschbach met and agreed to extend the Consulting Agreement without change for an additional six months – or until February 5, 2006 – while they attempted to negotiate a new agreement.

79.    Sometime after June 20, 2005, Leigh drafted an amendment to the Consulting Agreement that extended the term of the contract for six months without any other substantive change.  This amendment was never provided to Landreth.

80.    At the request of the City and with the knowledge and approval of Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter), Landreth continued to perform the duties and obligations required of him under the Consulting Agreement after August 5, 2005.

81.    Subsequent to August 5, 2005, with the knowledge and approval of Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter), the City continued to pay Landreth the $5,000.00 monthly retainer required by Section 3(a) of the Consulting Agreement

_____

*The City Proposes a New Consulting Agreement*
*Which Requires Landreth to Relinquish PetSmart Fee*

82.    On August 23, 2005, Leigh, through his assistant, Nicole Conrad, sent an e-mail to Landreth with a draft of a proposed new consulting agreement.

83.     The proposed new consulting agreement substantially changed the terms of the Consulting Agreement.   Among other changes, the proposed new consulting agreement required that Landreth relinquish the PetSmart fee.

84.     During the period between August 23, 2005 and October 18, 2005, Landreth attempted to negotiate the terms of a new consulting agreement with the City, but the City refused to negotiate with Landreth in good faith and instead the City:

(a)     repeatedly demanded that Landreth relinquish his right to the PetSmart fee; and

(b)     repeatedly insisted that the terms of the proposed new consulting agreement – in particular, the City's demand that Landreth relinquish the PetSmart fee – were not negotiable, but rather were "take it or leave it" terms.

85.     Throughout the period of their negotiations, Landreth refused to accede to the City's demand that he relinquish the PetSmart fee.

86.     On September 6, 2005, the City adopted Resolution No. 106-2005 authorizing the City to enter into a new six-month consulting agreement with Landreth.  A copy of Resolution No. 106-2005 and the new six-month consulting agreement proposed by the City in Resolution 106-2005 (the "*proposed six-month consulting agreement*") are attached hereto as Exhibit "D."

87.     After passing Resolution 106-2005, the City sent the proposed six-month consulting agreement to Landreth and requested that he sign it.  Landreth refused to sign the proposed six-month consulting agreement because, among other things, it required him to relinquish the PetSmart fee.

———————————————————————

*The Consulting Agreement is Amended*
*So That the City Can Retain a $50,000 Grant From the State of Illinois*

88.    On or about October 17, 2005, City Clerk Shelly L. Munks faxed to Landreth a document entitled "Amendment to the Consulting, Development and Marketing Agreement Between the City of Ottawa, Illinois and John Colt Landreth" (the "*Amendment*").  Ms. Munks requested that Landreth sign and return the Amendment so that it could be acted upon by the City Council at its October 18 meeting.

89.    On information and belief, Leigh, and/or Pool, Leigh & Kopko, drafted the Amendment.

90.    On or about October 18, 2005,  Landreth signed and faxed the Amendment back to the City.

91.    The Amendment added the following subparagraph (m) to paragraph 4 of the Consulting Agreement:

> The Illinois Department of Commerce and Economic Opportunity and the Auditor General of the State of Illinois, or any of their duly authorized representatives, shall have full access to and the right to examine any pertinent books, documents, papers and records of Landreth involving transactions related to the Grant Agreement between the City and DCEO, Grant No. 04-20105, for a period of five years from the later of the expiration or termination of said Grant Agreement between the City and DCEO.

92.    This addition of subparagraph (m) to paragraph 4 of the Consulting Agreement was mandated by the State of Illinois Department of Commerce and Economic Opportunity ("*State of Illinois DCEO*") in order for the City to retain a $50,000.00 grant for the marketing of the Ottawa Industrial Park.

93.    On information and belief, when the City applied for this grant, it represented to the State of Illinois DCEO that it intended to use $26,500 of the grant proceeds to pay for Landreth's services under the Consulting Agreement.  On information and belief, the City did not disclose to the State of Illinois DCEO that the Consulting Agreement was void *ab initio*.

94.    On information and belief, the City subsequently represented to the State of Illinois DCEO that it had used $26,500 of the grant proceeds to pay Landreth for services provided under the Consulting Agreement.  On information and belief, the City did not disclose to the State of Illinois DCEO that the Consulting Agreement was void *ab initio*.

95.    On October 18, 2005, the City passed and approved Resolution 126-2005 which authorized and directed the Mayor and City Clerk to execute the Amendment. A copy of Resolution No. 126-2005 and the Amendment referred to therein is attached to this Complaint as Exhibit "E."

96.    On October 18, 2005, when the City passed and approved Resolution 126-2005, Leigh, Pool Leigh & Kopko, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter)  knew that the Consulting Agreement was void and unenforceable because the City had not made an appropriation for the contract before it was executed.

97.    The City submitted the Amendment to the State of Illinois DCEO.

98.    When the Amendment was submitted to the State of Illinois DCEO, Leigh, Pool, Leigh & Kopko, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) knew that the Consulting Agreement was void and unenforceable because the City had not made an appropriation for the Consulting Agreement before it was executed.

99.     On information and belief, when the City submitted the Amendment to the State of Illinois DCEO, the City did not advise the State of Illinois DCEO that the Consulting Agreement was void and unenforceable.

100.     On information and belief, as a result of submitting the Amendment to the State of Illinois DCEO, the City was entitled to retain a $50,000.00 State of Illinois DCEO grant.

101.     On information and belief, when the City obtained the $50,000.00 grant from the State of  Illinois DCEO, the City did not advise the State of Illinois DCEO that the Consulting Agreement was void and unenforceable.

102.     On information and belief, the City has never advised the State of Illinois DCEO that the Consulting Agreement was void and unenforceable.

103.     On information and belief, the City has retained the $50,000.00 State of Illinois DCEO grant and has not offered to refund the grant money to the State of Illinois.

―――――――――――――――

*The City Stops Payment on the Check Issued*
*in Payment of Landreth's October 2005 Retainer*

104.     On or about October 24, 2005 – after receiving notification from the State of Illinois DCEO that the Amendment was acceptable – the City stopped payment on the $5,000.00 check it had issued to Landreth for his monthly retainer for October 2005.

―――――――――――――――

*After Landreth Signs the Amendment to the Consulting Agreement,*
*the City Terminates Landreth When He refuses to Relinquish PetSmart Fee*

105.    On October 25, 2005 – the day after the City was notified by the State of Illinois

DCEO that the Amendment was sufficient to enable the City to retain Grant No. 04-20105 – Leigh,

referring to the Consulting Agreement, sent an e-mail to Landreth which stated:

> Colt,
>
> I understand that you have indicated that you will not sign the proposed six month
> extension to your consulting agreement with the City. In view of that, the City will
> not be making any further payment because there is no agreement.  The original
> agreement has expired by its own terms.
>
> Initially, I understood that the council simply wanted to extend the original contract
> for six months to provide time for its review.  I prepared an amendment that merely
> extended the term for six months without any other substantive change.  When that
> was presented to the city council, several members of the council requested
> additional changes before they would consider any extension of the agreement.
>
> Therefore, I prepared a second amendment that incorporated the requested changes.
> It is that amended agreement which you have declined to execute, and without a
> contract there exists no legal authority to make payments under the terms and
> provisions of the expired agreement.
>
> I also note that you are required under the original agreement to provide the city
> with a list of Prospects within 30 days of the termination of the agreement.  In as
> much as the agreement terminated (expired) on August 5, 2005, you are required to
> submit the list of Prospects on or before September 5, 2005.  Under the
> circumstances, I urge you to do this immediately.
>
> Keith

A copy of Leigh's October 25, 2005 e-mail to Landreth is attached to this Complaint as Exhibit "F."

106.    The "amended agreement" to which Leigh refers in his October 25, 2005 e-mail and

which, in Leigh's words, Landreth "declined to execute" required Landreth to relinquish the

PetSmart fee.

_____

*The City and Leigh Again Ratify the Consulting Agreement*

107.   On December 13, 2005, Leigh faxed a letter to Landreth in regard to the list of prospects Landreth had provided to the City in response to Leigh's October 25, 2005 e-mail.  A copy of Leigh's December 13, 2005 letter to Landreth is attached to this Complaint as Exhibit "G."  In this letter Leigh repeatedly refers to compensation to which Landreth might become entitled under Section 9 of the Consulting Agreement:

> Upon termination of this agreement, Landreth shall provide the City with a list of Prospects within thirty days of termination. Said list will serve as a registration of prospects with the City.  In the event that any of these prospects shall purchase land in a City TIF district or future TIF district (or any other location as mutually determined) within one year of the termination of this agreement, then Landreth shall be paid a fee in accordance with Section 3(d) hereof. In the event that any of the prospects purchases land as aforesaid within the period of 13 to 24 months following termination of this agreement, then Landreth shall be paid 75% of the fee provided in Section 3(d) hereof.        [emphasis in original]

---

*The City Refuses to Pay Landreth Under the Consulting Agreement*

Section 3(d) Fees

108.   On or about December 8, 2005, Landreth billed the City for a Section 3(d) fee in connection with the "Varney Land Swap."  A copy of Landreth's Invoice # 0155 dated 12/08/2005 is attached to this Complaint as part of Exhibit "H."

109.   On or about February 7, 2006, Landreth billed the City for a Section 3(d) fee in connection with the MTC project.  A copy of Landreth's Invoice # 0157 dated Feb. 7, 2006 is attached to this Complaint as part of Exhibit "I."

110.   On or about February 7, 2006, Landreth billed the City for a Section 3(d) fee in connection with the PetSmart project.  A copy of Landreth's Invoice # 0158 dated Feb. 7, 2006 is attached to this Complaint as part of Exhibit "J."

111.    On or about February 7, 2006, Landreth billed the City for a Section 3(d) fee in connection with the International Titanium Powder project.  A copy of Landreth's Invoice # 0159 dated Feb. 7, 2006 is attached to this Complaint as part of Exhibit "K."

<u>Retainers and Expenses</u>

112.    On or about December 12, 2005, Landreth billed the City for expenses under Section 3 of the Consulting Agreement.  A copy of Landreth's Invoice # 0154 dated 12/12/2005 is attached to this Complaint as part of Exhibit "L."

113.    On or about January 11, 2006, Landreth sent a letter to Eschbach in which Landreth set forth the City's failure to negotiate in good faith with regard to a new consulting agreement.  In this letter, Landreth also submitted a demand for payment of the following items:

<u>Retainer</u>

| | | |
|---|---|---|
| October Retainer | $5,000.00 | |
| November Retainer (50%) | 2,500.00 | |
| | | $7,500.00 |

<u>Expenses</u>

| | | |
|---|---|---|
| August 2005 | $1,941.68 | |
| September 2005 | 1,956.02 | |
| September 2005 (Non-recurring) | 520.00 | |
| October 2005 | 1,792.51 | |
| October 2005    (Non-recurring) | 1,000.00 | |
| November 2005 | 1,246.92 | |
| November 2005 (Non-recurring) | 682.00 | |
| | | $9,139.13 |
| Total Expenses | | $16,639.13 |

114.    The City refused to pay any of the invoices described in paragraphs 108 through 112 or any of the amounts set forth in paragraph 113.

_____

*Landreth Files Suit Against the City*

115.    On February 2, 2007, Landreth brought an action against the City to recover the amounts he had earned and was entitled to receive under the Consulting Agreement (the "*contract action*"). A copy of the complaint filed by Landreth in the contract action is attached to this Complaint as Exhibit "M."

_____

*The City Now Asserts that the Consulting Agreement is Void ab Initio and Unenforceable*

116.    More than three and a half years after the Consulting Agreement was executed, the City, for the first time, asserted that the contract was void and unenforceable.  On April 4, 2007, the City filed a Motion to Dismiss the contract action on the basis that the Consulting Agreement was null and void because the City had not previously made an appropriation for the contract, as required by Section 8-1-7.  In its Motion to Dismiss, the City asserted:

> 6.    The Budget & Appropriation of the City of Ottawa for the fiscal year commencing May 1, 2003 and ending April 30, 2004 did not make an appropriation for the Agreement or any expense related thereto.
>
> 7.    ***Without a prior appropriation for the Agreement or the expenses thereof, the Agreement is null and void.***  (emphasis added)

A copy of the Motion to Dismiss filed by Leigh on behalf of the City is attached to this Complaint as Exhibit "N."

117.    Attached to the City's Motion to Dismiss was an Affidavit of City Clerk Shelly L. Munks in which she stated:

> 6.    The Budget & Appropriation of the City of Ottawa for the fiscal year ending April 30, 2004 did not contain an appropriation for the Agreement or any expense related thereto.

*Page 24 of  50*

118.    In addition to asserting that the *City's* failure to have made an appropriation for the Consulting Agreement made the contract *void ab initio* by virtue of Section 8-1-7 and unenforceable by Landreth (even though the City and Landreth had performed under it for 27 months), Leigh also asserted that Section 4-5-16(c) of the Illinois Municipal Code (65 ILCS 5/4-5-16(c)) precluded the City Council from expending money for the Consulting Agreement.

119.    On September 13, 2007, the City filed its Reply Brief in the contract action and asserted that the exception in Section 8-1-7(b) for contracts relating to the employment of "outside professional consultants" (such as Landreth) did not exempt such contracts from the "prior appropriation requirement of Section 8-1-7(a)."

---

*Landreth's Contract Action Dismissed*

120.    On February 28, 2008, the City's Motion to Dismiss the contract action was heard by the Circuit Court of LaSalle County, Illinois.    After argument, the court entered an order dismissing the contract action with prejudice, the court finding that "Section 8-1-7 of the Illinois Municipal Code bars the action because (1) there was no prior appropriation for the contract sought to be enforced and (2) the contract sought to be enforced, or the financial obligations thereunder, would extend beyond the term of the mayor in office at the time the contract was executed."    A copy of the order entered February 28, 2008 dismissing the contract action is attached to this Complaint as Exhibit "O."

121.    Illinois courts have strictly applied Section 8-1-7 and neither equitable estoppel nor ratification may be asserted against a municipality to permit enforcement of a contract where the

municipality failed to comply with Section 8-1-7.  As a consequence, Landreth's state law remedies are inadequate or severely limited.

---

### COUNT I

### 42 U.S.C. §1983 – *Monell* Claim

### (Landreth v. City)

122.     Count I is brought pursuant to 42 U.S.C. §1983, which provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State .  .  . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress,  *  *  *

123.     Resolution No. 93-2003, passed and approved by the City Council on August 5, 2003, directed the City to enter into a contract – the Consulting Agreement – which was void *ab initio*.

124.     After Resolution No. 93-2003 was passed,  Eschbach as Mayor and City Clerk Elizabeth Taylor executed the Consulting Agreement on behalf of the City.

125.     The Consulting Agreement was neither binding, valid nor specifically enforceable against the City because an appropriation had not previously been made concerning that contract, as required by Section 8-1-7.  Because the  Consulting Agreement violated Section 8-1-7, it could not be enforced against the City if for any reason the City failed to honor its contractual obligations.

126.     The City induced Landreth to enter into the Consulting Agreement and to provide valuable services to the City thereunder by affirmatively representing to him that the agreement was *"binding, valid and specifically enforceable according to its terms against."*

127.    The City induced Landreth to enter into the Consulting Agreement and to provide valuable services to the City thereunder by affirmatively representing to him that the agreement did "*not violate any presently existing provision of law*" to which the City was subject.

128.    The City induced Landreth to enter into the Consulting Agreement and to provide valuable services to the City thereunder by:

(a)    promising Landreth that the City would not challenge the validity of the contract;

(b)    acknowledging that Landreth was relying on the representations contained in the agreement; and

(c)    assuring Landreth that he had that he had "every right to" [rely on the representations ans financial commitment contained in the agreement].

129.    For more than two years, the City induced Landreth to promote Ottawa as a site for commercial and industrial development projects and to provide consulting, development and marketing services to the City by acting in all respects as if the Consulting Agreement were valid and enforceable.  Specifically –

(a)    from August 2003 through October 2005, the City paid Landreth the $5,000.00 monthly retainer pursuant to Section 3(a)  of the Consulting Agreement;

(b)    from August 2003 through July 2005, the City reimbursed Landreth for his monthly expenses pursuant to Section 3(a) of the Consulting Agreement; and

(c)     in February 2005, the City paid Landreth $15,879.00 pursuant to Section 3(d) of the Consulting Agreement in connection with the MTC project.

130.    The City established, carried out and enforced a policy whereby it was able to obtain valuable professional services under the pretext of a valid and enforceable agreement and subsequently refuse to pay for such services by:

(a)    passing Resolution 93-2003 directing the City to enter into a contract it knew was void *ab initio* and unenforceable by Landreth;

(b)    executing the Consulting Agreement when it knew that the contract was void *ab initio* and unenforceable by Landreth;

(c)    expressly representing to Landreth that the Consulting Agreement was "binding, valid and specifically enforceable according to its terms" when the City knew that the contract was void and could not be enforced against the City by Landreth;

(d)    expressly representing to Landreth that the Consulting Agreement did "not violate any presently existing provision of law" to which the City was subject when the City knew that the agreement violated Section 8-1-7 and Section 4-5-16 of the Illinois Municipal Code; and

(e)    paying Landreth his monthly retainer fees and reimbursing Landreth's expenses, as required by the Consulting Agreement, even though it knew that such payments were unlawful.

131.    For more than two years, Landreth performed his duties under the Consulting Agreement and provided valuable consulting, development and marketing services to City.

132.    For more than two years, the City benefitted from the services Landreth provided pursuant to the Consulting Agreement.

133.    The City has refused to pay Landreth the compensation to which he became entitled under the express terms of the Consulting Agreement.

134.    Resolution No. 93-2003 directed the City to perform an unlawful act – i.e., to enter into a contract for which no appropriation had previously been made. Section 8-1-7 renders such contracts void *ab initio* and unenforceable against the City. Nevertheless, in order to induce Landreth to provide valuable services to the City, the City falsely represented to Landreth that the contract was binding, valid and enforceable according to its terms against the City. Resolution No. 93-2003, together with the City's false representations, thus created a policy which enabled the City to obtain valuable services and not pay for them.

135.    The City enforced this policy when –

(i)    contrary to the promises contained in Section 7 of the Consulting Agreement, it challenged the validity of the agreement in Landreth's state court contract action; and

(ii)    caused the state court contract action to be dismissed with prejudice on the basis that the Consulting Agreement was void *ab initio* and unenforceable by Landreth because the *City failed to comply with Section 8-1-7* – even though the City had affirmatively represented to Landreth that the contact was "binding, valid and specifically enforceable according to its terms."

136.    The City's enforcement of this policy unconstitutionally deprived Landreth of a valuable and protectable property interest, to wit: the compensation he had already earned and was entitled to be paid pursuant to the Consulting Agreement if that agreement had been valid and enforceable.

137.    The City's policy has the direct effect of absolutely precluding a party who contracts with the City to provide goods or services from seeking any redress in the state court for breach of contract if the City subsequently decides – for any reason or no reason – that it doesn't want to pay for the goods or services.

WHEREFORE, Landreth prays for the following relief against the City:

(i)    compensatory damages in an amount equal to the amounts Landreth had already earned and would be entitled to receive under the Consulting Agreement if it were a valid and enforceable obligation of the City;

(ii)    punitive damages in such amount as the trier of fact shall determine to be appropriate;

(iii)    the costs of this action, including a reasonable attorney's fee as authorized by 42 U.S.C. §1988;

(iv)    such other and further relief as may be appropriate and just.

---

**COUNT II**

**42 U.S.C. §1983**

**Deprivation of Protectable Property Interest – Substantive Due Process**

**(Landreth v. City)**

138.    Count II is brought pursuant to 42 U.S.C. §1983, which provides, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State .   .   .  subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress,  *  *  *

139.    The Fourteenth Amendment to the United States Constitution guarantees Landreth a substantive due process right to be free from arbitrary, irrational and  illegitimate government actions.

140.    As alleged with greater particularity previously in this Complaint, the City passed a resolution directing it to enter into a contract with Landreth – the Consulting Agreement –  for which a previous appropriation had not been made.

141.    Because there had been no previous appropriation for the Consulting Agreement, as required by Section 8-1-7, the contract was void *ab initio* and unenforceable.

142.    Notwithstanding that the Consulting Agreement was void *ab initio* and unenforceable against the City, the City affirmatively represented to Landreth that the agreement was "binding, valid and specifically enforceable according to its terms" against the City and that the agreement did not "violate any presently existing provision of law" to which the City was subject. Both representations were patently false at the time they were made.

143.    Notwithstanding that the Consulting Agreement was void *ab initio* and unenforceable against the City, for more than two years the City acted as if the agreement were valid in order to induce Landreth to promote the City of Ottawa to commercial and industrial development prospects and otherwise provide valuable services to the City pursuant to the Consulting Agreement.

144.    By treating the Consulting Agreement as if it were valid, the City benefitted from the services Landreth provided to the City for more than two years.

145.    However, when Landreth became entitled to the PetSmart fee – a fee of nearly $500,000.00 – the City refused to pay him.

146.    Only after Landreth sued the City to enforce the Consulting Agreement did the City assert that the contract was void *ab initio* because the *City itself* had failed to make an appropriation for the contract, as required by Section 8-1-7.

147.    The conduct by the City as alleged herein was an arbitrary, irrational and illegitimate abuse of government power.

148.    The conduct by the City as alleged herein has caused Landreth to be deprived of a valuable and protectable property interest, to wit: the compensation he had already earned and was entitled to be paid pursuant to the Consulting Agreement if that agreement had been valid and enforceable.

149.    Because the Illinois courts have strictly interpreted Section 8-1-7 so as to absolutely preclude any action for breach of a contract which does not comply with Section 8-1-7, by inducing Landreth to enter into a contract that the City knew did not comply with Section 8-1-7 and was, therefore, void *ab initio* and unenforceable, the City was able to obtain valuable services from Landreth and yet refuse to pay for those services with impunity.  Landreth's state court remedies were thus rendered inadequate.

WHEREFORE, Landreth prays for the following relief against the City:

(i)    compensatory damages in an amount equal to the amounts Landreth had already earned would have been entitled to receive under the Consulting Agreement if it were a valid and enforceable obligation of the City;

(ii)    punitive damages in such amount as the trier of fact shall determine  to be appropriate;

(iii)    the costs of this action, including a reasonable attorney's fee as authorized

by 42 U.S.C. §1988;

(iv)    such other and further relief as may be appropriate and just.

---

**COUNT III**

**Fraud**

**(Landreth v. Leigh)**

150.    Leigh knew that the City's failure to strictly comply with Section 8-1-7 made the

Consulting Agreement *void ab initio* and unenforceable by Landreth.  Leigh did not disclose this fact

to Landreth, although he had a duty to do so.

151.    Leigh knew that the City had not made an appropriation for the Consulting

Agreement when Resolution 93-2003 was passed and when the contract was subsequently executed

by the City and Landreth.  Leigh did not disclose this fact to Landreth, although he had a duty to do

so.

152.    Leigh knew when Resolution 93-2003 was passed and when the contract was

subsequently executed by the City and Landreth that the Consulting Agreement was not "binding,

valid and specifically enforceable according to its terms against [the City]" – and in fact was void

and unenforceable.  Leigh did not disclose this fact to Landreth, although he had a duty to do so.

153.    Although Leigh knew when Resolution 93-2003 was passed and when the Consulting

Agreement was subsequently executed by the City and Landreth that the City had not made an

appropriation for the Consulting Agreement as required by Section 8-1-7 – and that, consequently,

the Consulting Agreement was void and unenforceable – Leigh drafted the Consulting Agreement in such a way as to conceal that fact from Landreth and to deceive Landreth and induce him to sign the Consulting Agreement.  More specifically, Leigh drafted the following representations which he included in Section 12:

> 12.    <u>Warranties</u>.  The parties warrant and represent that:
>
> *   *   *
>
> **b.**    ***This Agreement is binding, valid and specifically enforceable according to its terms against each party;***
>
> **c.**    ***This Agreement does not violate any presently existing provision of law … to which such party may be subject;***

In addition, Leigh drafted and included the following provision in the Consulting Agreement:

> 7.    <u>Revocation</u>.  The City understands the long-term nature of this Agreement and the long-term nature of economic development. Therefore, the City agrees and covenants not to revoke or rescind this Agreement or to institute any proceeding or action to challenge the validity of this agreement or in any way to rescind, modify or alter said agreement, ***understanding that Landreth is relying upon the representations and financial commitment contained herein and has every right to do so.*** *   *   *    [emphasis added]

154.  When Resolution 93-2003 was passed and when the Consulting Agreement was subsequently executed by the City and Landreth, Leigh knew that the representations set forth in paragraphs b. and c. of  Section 12 were false.

155.    Leigh intended for Landreth to rely on the representations contained in Section 12 of the Consulting Agreement.

156.    Landreth relied on the representations contained in Section 12 of the Consulting Agreement, which representations were an inducement to him to enter into the Consulting Agreement and to perform his contractual duties thereunder.

157.    Leigh intended for Landreth to rely on the representations, covenants and assurances contained in Section 7 of the Consulting Agreement.

158.    Landreth relied on the representations, covenants and assurances contained in Section 7 of the Consulting Agreement, which representations, covenants and assurances were an inducement to him to enter into the Consulting Agreement and to perform his contractual duties thereunder.

159.    As a direct and proximate result of his reliance on the representations contained in Section 12 of the Consulting Agreement and the representations, covenants and assurances contained in Section 7 of the Consulting Agreement, Landreth was damaged in that he:

(a)    provided professional consulting, development and marketing services to the City for more than 27 months;

(b)    devoted more than one-half of his professional time during the period August 2003 through October 2005 to providing professional services to the City;

(c)    was deprived of substantial fees he had earned and would otherwise have been entitled to be paid if the Consulting Agreement had been "binding, valid and specifically enforceable according to its terms" against the City – as represented in paragraph b. of Section 12;

(d)    was deprived of substantial fees he had earned and would otherwise have been entitled to be paid if the Consulting Agreement had not violated several "presently existing provisions of law" to which the City was subject – Sections 8-1-7 and 4-5-16(c) of the Illinois Municipal Code among them – contrary to the representation in paragraph c. of Section 12.

WHEREFORE, Landreth prays for the following relief against Leigh:

(i)     compensatory damages in an amount equal to the amounts Landreth had already earned and would be entitled to receive under the Consulting Agreement if it were a valid and enforceable obligation of the City;

(ii)    punitive damages in such amount as the trier of fact shall determine to be appropriate;

(iii)   the costs of this action; and

(iv)    such other and further relief as may be appropriate and just.

———————————————

## COUNT IV

## Fraud

### (Landreth v. City of Ottawa)

160.    When Resolution 93-2003 was passed on August 5, 2003 and when the contract was subsequently executed by the City and Landreth, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh as City Attorney knew that the City had not previously made an appropriation for the Consulting Agreement.  Neither Eschbach or any of the other City Council members nor Leigh as City Attorney disclosed this fact to Landreth, although they had a duty to do so.

161.    Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh as City Attorney knew when Resolution 93-2003 was passed and when the contract was subsequently executed by the City and Landreth that the Consulting Agreement was

not "binding, valid and specifically enforceable according to its terms against [the City]" – and in fact was void and unenforceable. Neither Eschbach or any of the other City Council members nor Leigh as City Attorney disclosed this fact to Landreth, although they had a duty to do so.

162. Although Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh as City Attorney knew when Resolution 93-2003 was passed and when the Consulting Agreement was subsequently executed by the City and Landreth that the City had not made an appropriation for the Consulting Agreement as required by Section 8-1-7 – and that, consequently, the Consulting Agreement was void and unenforceable – Eschbach and the other City Council members caused or permitted the Consulting Agreement to be drafted in such a way as to conceal that fact from Landreth and to deceive Landreth and induce him to sign the Consulting Agreement. More specifically, Eschbach and the other City Council members caused or permitted the following representations to be included in the agreement:

> 12. <u>Warranties</u>. The parties warrant and represent that:
>
> *   *   *
>
> b.    ***This Agreement is binding, valid and specifically enforceable according to its terms against each party;***
>
> c.    ***This Agreement does not violate any presently existing provision of law … to which such party may be subject;***

In addition, Eschbach and the other City Council members caused or permitted the following provision to be included in the Consulting Agreement:

> 7. <u>Revocation</u>. The City understands the long-term nature of this Agreement and the long-term nature of economic development. Therefore, the City agrees and covenants not to revoke or rescind this Agreement or to institute any proceeding or action to challenge the validity of this agreement or in any way to rescind, modify or alter said agreement, ***understanding that Landreth is relying upon the representations and financial commitment contained herein and has every right to do so.*** *   *   *   [emphasis added]

163.    When Resolution 93-2003 was passed and when the Consulting Agreement was subsequently executed by the City and Landreth, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh as City Attorney knew that the representations set forth in paragraphs b. and c. of Section 12 were false.

164.    Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh as City Attorney intended for Landreth to rely on the representations contained in Section 12 of the Consulting Agreement.

165.    Landreth relied on the representations contained in Section 12 of the Consulting Agreement, which representations were an inducement to him to enter into the Consulting Agreement and to perform his contractual duties thereunder.

166.    Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh as City Attorney intended for Landreth to rely on the representations, covenants and assurances contained in Section 7 of the Consulting Agreement.

167.    Landreth relied on the representations, covenants and assurances contained in Section 7 of the Consulting Agreement, which representations, covenants and assurances were an inducement to him to enter into the Consulting Agreement and to perform his contractual duties thereunder.

168.    Although Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh as City Attorney knew that the Consulting Agreement was void and unenforceable against the City, the City nevertheless acted as if the Consulting Agreement were valid and enforceable and fraudulently induced Landreth to act as the City's economic development

consultant and to provide consulting, development and marketing services to the City under the Consulting Agreement. More specifically:

(a)     for more than two years, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter), with Leigh's knowledge, knowingly permitted Landreth to perform consulting services for the City pursuant to the Consulting Agreement;

(b)     for more than two years, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter), with Leigh's knowledge, knowingly accepted and utilized the services Landreth provided under the Consulting Agreement;

(c)     during the period August 2003 through October 2005, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter), with Leigh's knowledge, caused the City to pay Landreth the $5,000.00 monthly retainer pursuant to Section 3(a) of the Consulting Agreement – even though Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh knew that such payments:

(i)     were unlawful;

(ii)    were made in violation of both Section 8-1-7 and Section 4-5-16(c) of the Illinois Municipal Code; and

(iii)   could subject the City Council to criminal penalties;

(d)     during the period August 2003 through October 2005, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter), with

Leigh's knowledge, caused the City to pay Landreth's expenses pursuant to Section 3(a) of the Consulting Agreement – even though Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh knew that such payments:

    (i)       were unlawful;

    (ii)      were made in violation of both Section 8-1-7 and Section 4-5-16(c) of the Illinois Municipal Code; and

    (iii)    could subject the City Council to criminal penalties;

(e)    in February 2005, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter), with Leigh's knowledge, caused the City to pay Landreth $15,879.00, being the first installment of the fee to which Landreth became entitled pursuant to Section 3(d) of the Consulting Agreement as a result of the MTC project – even though Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh knew that such payment:

    (i)       was unlawful;

    (ii)      was made in violation of both Section 8-1-7 and Section 4-5-16(c) of the Illinois Municipal Code; and

    (iii)    could subject the City Council to criminal penalties;

(f)    in October 2005, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter), with Leigh's knowledge, caused the City to pass Resolution No. 126-2005 approving the Amendment and authorizing

and directing the Mayor and City Clerk to execute the Amendment in order for the City to retain a $50,000.00 grant from the State of Illinois DCEO – even though Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh knew that the Consulting Agreement was void and unenforceable and violated Section 8-1-7; and

(g)    in October 2005, needing Landreth's signature on the Amendment in order for the City to retain a $50,000.00 grant from the State of Illinois DCEO, the City, at the direction and request of Eschbach, with Leigh's knowledge, requested that Landreth sign the Amendment – even though Eschbach and Leigh knew that the Consulting Agreement was void and unenforceable and violated Section 8-1-7.

169.    As a direct and proximate result of his reliance on (i) the representations contained in Section 12 of the Consulting Agreement, (ii) the representations, covenants and assurances contained in Section 7 of the Consulting Agreement and (iii) the City's actions and conduct, as more particularly alleged in the immediately preceding paragraph, Landreth was damaged in that he:

(a)    provided professional consulting, development and marketing services to the City for more than 27 months;

(b)    devoted more than one-half of his professional time during the period August 2003 through October 2005 to providing professional services to the City;

(c)    was deprived of substantial fees he had earned and would otherwise have been entitled to be paid if the Consulting Agreement had been "binding, valid

and specifically enforceable according to its terms" against the City – as represented in paragraph b. of Section 12;

(d)    was deprived of substantial fees he had earned and would otherwise have been entitled to be paid if the Consulting Agreement had not violated several "presently existing provisions of law" to which the City was subject – Sections 8-1-7 and 4-5-16(c) of the Illinois Municipal Code among them – contrary to the representation in paragraph c. of Section 12.

WHEREFORE, Landreth prays for the following relief against the City of Ottawa:

(i)    compensatory damages in an amount equal to the amounts Landreth had already earned and would be entitled to receive under the Consulting Agreement if it were a valid and enforceable obligation of the City;

(ii)    the costs of this action; and

(iii)    such other and further relief as may be appropriate and just.

---

## COUNT V

## Negligent Misrepresentation

## (Landreth v. Leigh)

170.    At all times alleged herein, Pool, Leigh & Kopko was engaged by the City as "corporation counsel."

171.    Leigh drafted the Consulting Agreement as an employee or agent of Pool, Leigh & Kopko, the City's "corporation counsel."

172.    Leigh drafted the Consulting Agreement for the benefit of both the City and Landreth. In doing so, Leigh was providing information for the guidance of Landreth in his business transactions with the City.

173.    Leigh had a duty to exercise reasonable care to supply truthful and accurate information to Landreth.

174.    At all times alleged herein, Leigh possessed superior knowledge to Landreth insofar as matters of municipal law were concerned.

175.    At all times alleged herein, Leigh possessed superior knowledge to Landreth insofar as the business and legal affairs of the City were concerned.

176.    Leigh and the City intended for Landreth to rely on the representations contained in the Consulting Agreement, in particular the following representations contained in Section 12:

> **b.    *This Agreement is binding, valid and specifically enforceable according to its terms against each party;***
>
> **c.    *This Agreement does not violate any presently existing provision of law … to which such party may be subject;***

177.    Landreth relied on the representations contained in Section 12 of the Consulting Agreement, which representations were an inducement to him to enter into the Consulting Agreement and to perform his contractual duties thereunder.

178.    Leigh and the City intended for Landreth to rely on the representations, covenants and assurances contained in Section 7:

> 7.    <u>Revocation</u>.  The City understands the long-term nature of this Agreement and the long-term nature of economic development. Therefore, **the City agrees** and covenants **not** to revoke or rescind this Agreement or to institute any proceeding or action **to challenge the**

**validity of this agreement** or in any way to rescind, modify or alter said agreement, ***understanding that Landreth is relying upon the representations and financial commitment contained herein and has every right to do so.*** * * *    [emphasis added]

179.    Landreth relied on the representations, covenants and assurances contained in Section 7 of the Consulting Agreement, which representations, covenants and assurances were an inducement to him to enter into the Consulting Agreement and to perform his contractual duties thereunder.

180.    When he drafted the Consulting Agreement, and thereafter on August 5, 2003 when Resolution 93-2003 was passed and the Consulting Agreement was subsequently executed by the City and Landreth, Leigh breached the duty of care he owed to Landreth to supply truthful and accurate information and was guilty of negligence in that:

(a)    Leigh knew or should have known that the City had not made an appropriation for the Consulting Agreement;

(b)    Leigh knew or should have known that the City's failure to have made an appropriation for the Consulting Agreement in the City's annual appropriation ordinance for the fiscal year commencing May 1, 2003 or in a supplemental appropriation ordinance made the agreement void and unenforceable against the City;

(c)    although Leigh knew or should have known that the Consulting Agreement was void and unenforceable against the City, he included a representation in the contract which expressly stated that the agreement was "binding, valid and specifically enforceable according to its terms" against the City;

(d)　　although Leigh knew or should have known that the Consulting Agreement violated Section 8-1-7 and Section 4-5-16(c) of the Illinois Municipal Code, he included a representation in the contract which expressly stated that the agreement did "not violate any presently existing provision of law" to which the City was subject.

181.　　As a direct and proximate result of his reliance on the representations contained in Section 12 of the Consulting Agreement and the representations, covenants and assurances contained in Section 7 of the Consulting Agreement, Landreth was damaged in that he:

(a)　　provided professional consulting, development and marketing services to the City for more than 27 months;

(b)　　devoted more than one-half of his professional time during the period August 2003 through October 2005 to providing consulting and other services to the City;

(c)　　was deprived of substantial fees he had earned and would otherwise have been entitled to be paid if the Consulting Agreement had been "binding, valid and specifically enforceable according to its terms" against the City – as represented in paragraph b. of Section 12;

(d)　　was deprived of substantial fees he had earned and would otherwise have been entitled to be paid if the Consulting Agreement had not violated several "presently existing provisions of law" to which the City was subject – Sections 8-1-7 and 4-5-16(c) of the Illinois Municipal Code among them – contrary to the representation in paragraph c. of Section 12.

WHEREFORE, Landreth prays for the following relief against Leigh:

(i)     compensatory damages in an amount equal to the amounts Landreth had already earned and would be entitled to receive under the Consulting Agreement if it were a valid and enforceable obligation of the City;

(ii)    the costs of this action; and

(iv)   such other and further relief as may be appropriate and just.

---

## COUNT VI

### Negligent Misrepresentation

### (Landreth v. Pool, Leigh & Kopko, P.C.)

182.    At all times alleged herein, Pool, Leigh & Kopko was engaged by the City as "corporation counsel."

183.    Pool, Leigh & Kopko drafted the Consulting Agreement as the City's "corporation counsel."

184.    Pool, Leigh & Kopko drafted the Consulting Agreement for the benefit of both the City and Landreth. In doing so, Pool, Leigh & Kopko was providing information for the guidance of Landreth in his business transactions with the City.

185.    Pool, Leigh & Kopko had a duty to exercise reasonable care to supply truthful and accurate information to Landreth.

186.    At all times alleged herein, Pool, Leigh & Kopko possessed superior knowledge to Landreth insofar as matters of municipal law were concerned.

187.    At all times alleged herein, Pool, Leigh & Kopko possessed superior knowledge to Landreth insofar as the business and legal affairs of the City were concerned.

188.    Pool, Leigh & Kopko and the City intended for Landreth to rely on the representations contained in the Consulting Agreement, in particular the following representations contained in Section 12:

    b.    *This Agreement is binding, valid and specifically enforceable according to its terms against each party;*

    c.    *This Agreement does not violate any presently existing provision of law … to which such party may be subject;*

189.    Landreth relied on the representations contained in Section 12 of the Consulting Agreement, which representations were an inducement to him to enter into the Consulting Agreement and to perform his contractual duties thereunder.

190.    Pool, Leigh & Kopko and the City intended for Landreth to rely on the representations, covenants and assurances contained in Section 7:

    7.    <u>Revocation</u>.  The City understands the long-term nature of this Agreement and the long-term nature of economic development. Therefore, **the City agrees** and covenants **not** to revoke or rescind this Agreement or to institute any proceeding or action **to challenge the validity of this agreement** or in any way to rescind, modify or alter said agreement, ***understanding that Landreth is relying upon the representations and financial commitment contained herein and has every right to do so.*** * * * [emphasis added]

191.    Landreth relied on the representations, covenants and assurances contained in Section 7 of the Consulting Agreement, which representations, covenants and assurances were an inducement to him to enter into the Consulting Agreement and to perform his contractual duties thereunder.

192.    When Pool, Leigh & Kopko drafted the Consulting Agreement, and thereafter on August 5, 2003 when Resolution 93-2003 was passed and the Consulting Agreement was subsequently executed by the City and Landreth, Pool, Leigh & Kopko breached the duty of care it owed to Landreth to supply truthful and accurate information and was guilty of negligence in that:

(a)    Pool, Leigh & Kopko knew or should have known that the City had not made an appropriation for the Consulting Agreement, as required by Section 8-1-7;

(b)    Pool, Leigh & Kopko knew or should have known that the City's failure to have made an appropriation for the Consulting Agreement in the City's annual appropriation ordinance for the fiscal year commencing May 1, 2003 or in a supplemental appropriation ordinance made the agreement void and unenforceable against the City;

(c)    although Pool, Leigh & Kopko knew or should have known that the Consulting Agreement was void and unenforceable against the City, it included a representation in the contract which expressly stated that the agreement was "binding, valid and specifically enforceable according to its terms" against the City;

(d)    although Pool, Leigh & Kopko knew or should have known that the Consulting Agreement violated Section 8-1-7 and Section 4-5-16(c) of the Illinois Municipal Code, it included a representation in the contract which expressly stated that the agreement did "not violate any presently existing provision of law" to which the City was subject.

193.    As a direct and proximate result of his reliance on the representations contained in Section 12 of the Consulting Agreement and the representations, covenants and assurances contained in Section 7 of the Consulting Agreement, Landreth was damaged in that he:

(a)    provided professional consulting, development and marketing services to the City for more than 27 months;

(b)    devoted more than one-half of his professional time during the period August 2003 through October 2005 to providing consulting and other services to the City;

(c)    was deprived of substantial fees he had earned and would otherwise have been entitled to be paid if the Consulting Agreement had been "binding, valid and specifically enforceable according to its terms" against the City – as represented in paragraph b. of Section 12;

(d)    was deprived of substantial fees he had earned and would otherwise have been entitled to be paid if the Consulting Agreement had not violated several "presently existing provisions of law" to which the City was subject – Sections 8-1-7 and 4-5-16(c) of the Illinois Municipal Code among them – contrary to the representation in paragraph c. of Section 12.

WHEREFORE, Landreth prays for the following relief against Pool, Leigh & Kopko:

(i)    compensatory damages in an amount equal to the amounts Landreth had already earned and would be entitled to receive under the Consulting Agreement if it were a valid and enforceable obligation of the City;

(ii)    the costs of this action; and

(iii)    such other and further relief as may be appropriate and just.

Date: March 20, 2006

**John Colt Landreth**, Plaintiff

By:    s/ Richard J. Berry                              

Richard J. Berry ARDC #198269
Member of Trial Bar
MYERS, BERRY, O'CONOR & KUZMA, LTD.
130 East Madison Street
Ottawa, IL 61350
E-mail address: rberry@mdbok.com
Tel.  815-434-6206


**Jury Demand**

Plaintiff demands that all issues triable by a jury be decided by a jury of twelve persons.

**John Colt Landreth,** Plaintiff

By:    s/ Richard J. Berry                              

One of his Attorneys

Richard J. Berry,  ARDC #198269
MYERS, BERRY, O'CONOR & KUZMA, LTD.
130 East Madison Street
Ottawa, IL 61350
E-mail: rberry@mdbok.com
Ph. 815-434-6206

Sec. 8-1-7. (a) Except as provided otherwise in this Section, **no contract shall be made** by the corporate authorities, or by any committee or member thereof, **and no expense shall be incurred** by any of the officers or departments of any municipality, *whether the object of the expenditure has been ordered by the corporate authorities or not*, **unless an appropriation has been previously made concerning that contract or expense. Any contract made**, or any expense otherwise incurred, **in violation of the provisions of this section shall be null and void as to the municipality, and no money belonging thereto shall be paid on account thereof.** However, pending the passage of the annual appropriation ordinance for any fiscal year, the corporate authorities may authorize heads of departments or other separate agencies of the municipality to make necessary expenditures for the support thereof upon the basis of the appropriations of the preceding fiscal year. However, if it is determined by two-thirds vote of the corporate authorities then holding office at a regularly scheduled meeting of the corporate authorities that it is expedient and in the best public interest to begin proceedings for the construction of a needed public work, then the provisions of this section shall not apply to the extent that the corporate authorities may employ or contract for professional services necessary for the planning and financing of such public work.

(b) Notwithstanding any provision of this Code to the contrary, **the corporate authorities of any municipality may make contracts for a term exceeding one year and not exceeding the term of the mayor or president holding office at the time the contract is executed, relating to:** (1) the employment of a municipal manager, administrator, engineer, health officer, land planner, finance director, attorney, police chief or other officer who requires technical training or knowledge; **(2) the employment of outside professional consultants** such as engineers, doctors, land planners, auditors, attorneys **or other professional consultants who require technical training or knowledge;** (3) the provision of data processing equipment and services; or (4) the provision of services which directly relate to the prevention, identification or eradication of disease. In such case the corporate authorities shall include in the annual appropriation ordinance for each fiscal year, an appropriation of a sum of money sufficient to pay the amount which, by the terms of the contract, is to become due and payable during the current fiscal year.

(c) This section shall not apply to municipalities operating under special charters.

(d) In order to promote orderly collective bargaining relationships, to prevent labor strife and to protect the interests of the public and the health and safety of the citizens of Illinois, this Section shall not apply to multi-year collective bargaining agreements between public employers and exclusive representatives governed by the provisions of the Illinois Public Labor Relations Act.

Notwithstanding any provision of this Code to the contrary, the corporate authorities of any municipality may enter into multi-year collective bargaining agreements with exclusive representatives under the provisions of the Illinois Public Labor Relations Act.

(e) Notwithstanding any provision of this Code to the contrary, the corporate authorities of any municipality may enter into any multi-year contract or otherwise associate for any term under the provisions of Section 10 of Article VII of the Illinois Constitution or the Intergovernmental Cooperation Act.

(Source: P.A. 90-517, eff. 8-22-97.)

# CONSULTING, DEVELOPMENT AND MARKETING AGREEMENT BETWEEN THE CITY OF OTTAWA, ILLINOIS AND JOHN COLT LANDRETH

Whereas, the City of Ottawa (the "City") is an Illinois municipal corporation and body politic operating under the provisions of the Illinois Municipal Code, (65 ILCS 5/1-1-1 *et seq.*) (the "Code"), and

Whereas, the Code authorizes the City to acquire, develop, and convey real property and to sell and convey such property within a redevelopment area, and

Whereas, the City is attempting to promote the commercial, industrial and economic development and welfare of the City, and

Whereas, the City encourages the increase of industry and commerce within the City and the State of Illinois, and

Whereas, the City now owns certain real property within the Ottawa Industrial Park Conservation TIF District ("OIP"), and

Whereas, the City has caused said real property to be platted and developed as an industrial park, and

Whereas, John Colt Landreth ("Landreth") is an individual with expertise in the development and marketing of industrial real property, and

Whereas, the specific and primary purposes for which OIP was created were to stimulate the promotion of industrial development within the City and to interest industry to locate in and about the City by the establishment of a comprehensive real estate marketing and development program (the "Program"), and

Whereas, the establishment of the program will further the public health, safety and welfare by the creation of jobs within the City, and

Whereas, Landreth has developed an expertise and experience with respect to the program and with regard to general economic development within the territory of the City, and

Whereas, the continued commercial and industrial development of the City is one of the primary corporate purposes of the City, and

Whereas, the Council of the City believes that it is in the best interest of the City to utilize Landreth as the primary economic development organization for the City, and

Whereas, efforts for the continued economic development of the City will require funds for all of the necessary development activity, including the appropriate marketing of the City as a viable location for potential commercial and industrial prospects, and

Whereas, Landreth is willing to act as the primary economic development organization of the City and devote one-half (1/2) of his time thereto.

WITNESSETH:

FOR AND IN CONSIDERATION of the mutual promises and undertakings herein set forth and other good and valuable considerations, the sufficiency of which is hereby acknowledged, the **CITY** and **LANDRETH** agree as follows:

1. <u>Incorporation of Recitals</u>. All of the foregoing recitals are incorporated herein by reference and are acknowledged as true and correct.

2. <u>Term of Agreement</u>. The initial term of this agreement shall be for twenty-four (24) months commencing, 2003, to and including, 2005. The initial term may be extended by mutual, written agreement of the parties.

3. <u>Obligations of City</u>. In order to provide a continuous and reliable source of funding for economic development within the City and OIP:

(a) the City shall pay to Landreth the sum of $5,000.00 upon the execution of this agreement and the further sum of $5,000.00 on the same day of each succeeding month during the term of this agreement; said sum shall be for Landreth's monthly retainer; together with an monthly amount not to exceed $2,000.00 for Chicago support staff, travel, telephone; and similar items of expense.

(b) the further and additional sum of not to exceed $28,900.00 annually for web hosting and web modifications, broker events, CoreNet/SIOR dues, advertising, brochures and miscellaneous (wats line); and

(c) the further and additional sum (one time expense only) of $2,000.00 for web site design.

(d) the further and additional sum equal to 1 ½% of the actual project cost of all industrial developments occurring within the City during the term or any extension of this agreement. <u>Such sum shall be paid one-half (1/2) upon the commencement of construction based upon the estimate of project cost, and the balance shall be paid upon completion of construction as soon as the total project cost is determined</u>. The phrase "project cost" shall include the cost of land, <u>direct and indirect</u> building <u>costs</u>, and site preparation as shown on the building permit, but shall not include machinery, equipment or any item of personal property. Compensation for industrial developments, which occur outside existing TIF Districts, will be negotiated on a case by case basis and mutually agreed upon.

(e)    The projects known as Murph-Haines, Galaxy, Bedrock and Burton shall not be eligible for compensation under paragraph (d) above.

Landreth shall provide a monthly statement to the City for the items of expense set forth in paragraphs (a) and (b) above; such statements shall contain reasonable detail for each item of expense, including receipts or copies of invoices, if available.

4.    Services of Landreth. During the term of this Agreement Landreth shall provide to the City consulting, development and marketing services which shall be designed to increase and promote the commercial, industrial and economic base of the City, including, but not limited to the following:

(a)    Advertise and otherwise promote the City and OIP;

(b)    Develop and implement a marketing strategy for the City and OIP;

(c)    Develop and implement a master plan for OIP in conjunction with the City;

(d)    Develop and implement a strategic plan for OIP which shall include a a statement of mission and goals, as well as financial considerations and projections;

(e)    Develop community relations and public awareness on behalf of the City;

(f)    Identify and rank potential users and companies for location within OIP;

(g)    Coordinate and cooperate with other units of government and industry, as well as other economic development agencies;

(h)    Field and respond to all inquiries, and provide all necessary information to all prospects;

(i)    Coordinate activities and work with industrial real estate brokers in the Chicago metropolitan area;

(j)    Maintain and operate an office within the City of Chicago for the promotion and development of OIP;

(k)    Provide regular reports to the City, but not less frequently than quarterly, of all economic development activity;

(k)    Perform all other services as outlined and contained in the written proposal of Plaza Property Advisors dated March 17, 2003; and

(l)    Perform such other services as the City may reasonably require to accomplish the objective of increasing the job base within the City by attracting industry and distribution centers to the City.

5.    Independent Contract. Landreth understands and agrees that his obligation under this Agreement is to serve the City for the promotion and development of commercial and industrial development. It is understood and agreed between the parties that all persons working for Landreth under this Agreement, if any, shall be employees of Landreth and shall be in no way considered employees of the City. Should any liability arise under the Illinois Worker's Compensation Act during any time that employees are working for Landreth, said employees are covered by the Illinois Worker's Compensation Act and are the employees of Landreth. Neither Landreth nor his employees shall hold himself or themselves out to be employees, agents, or servants of the City.

6.    <u>Best Efforts</u>. Landreth agrees to devote his best efforts to the City's interest and to endeavor in every way to make successful the promotion of the City as a significant commercial and industrial location.

7.    <u>Revocation</u>. The City understands the long-term nature of this Agreement and the long-term nature of economic development. Therefore, the City agrees and covenants not to revoke or rescind this agreement or to institute any proceeding or action to challenge the validity of this agreement or in any way to rescind, modify or alter said agreement, understanding that Landreth is relying upon the representations and financial commitment contained herein and has every right to do so. Notwithstanding the foregoing or any other provision of this agreement to the contrary, either party to this agreement my cancel this agreement for any reason by providing the other party with not less than thirty (30) days prior, written notice of cancellation.

8.    <u>Waiver</u>. Waiver by either party of a breach of any term, condition or covenant herein shall not be deemed a waiver of any other term or condition or covenant.

9.    <u>Breach</u>. Upon a breach of any term or provision of this Agreement, the non-breaching party shall immediately provide a written notice to the other party describing the nature of the breach and a request for its immediate cure. In the event that said breach has not been cured within thirty (30) days of the issuance of written notice as aforesaid, then the non-breaching party may take such action as it deems necessary for the specific performance of this Agreement or its termination.

<u>Upon termination of this agreement, Landreth shall provide the City with a list of Prospects within thirty days of termination. Said list will serve as a registration of prospects with the City. In the event that any of these prospects shall purchase land in a City TIF district or future TIF district (or any other location as mutually determined) within one year of the termination of this agreement, then Landreth shall be paid a fee in accordance with Section 3(d) hereof. In the event that any of the prospects purchases land as aforesaid within the period of 13 to 24 months following termination of this agreement, then Landreth shall be paid 75% of the fee provided in Section 3(d) hereof.</u>

10.    <u>Assignability</u>. It is agreed that neither party shall have the right to assign this Agreement, in whole or in part, without the written consent of the other party.

11.    <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective assessors or assigns.

12.    <u>Warranties</u>. The parties warrant and represent that :

a.    Each of the undersigned representatives of such party has been duly authorized by such party to execute this Agreement on behalf of such party;

b.    This Agreement is binding, valid and specifically enforceable according to its terms against each party;

c.      This Agreement does not violate any presently existing provision of law or any applicable order, writ, injunction or decree of any court or governmental department, commission, board, bureau, agency or instrumentality to which such party may be subject;

d.      This Agreement does not constitute a default under any indenture, mortgage, deed of trust, agreement or contract of any kind to which such party may be bound;

e.      There are no pending legal proceedings by any party against the other party.

13.     Headings. The headings of the sections of this Agreement are for convenience and reference only and in no way define, extend, limit or describe the scope or intent of this Agreement or any provision hereof.

14.     Execution and Counterparts. This Agreement may be executed in multiple identical counterparts and all of said counterparts shall, taken together, constitute the same agreement.

15.     Disclosure. The parties have jointly utilized the law firm of Pool, Leigh & Fabricius with respect to this Agreement, and each party acknowledges this fact and hereby expressly authorizes such joint representation. Each party also waives any claim against said law firm or its individual attorneys because of any conflict of interest or any apparent conflict of interest resulting from said joint representation.

Executed in duplicate this _5th_ day of _August_, 2003, by authority of a resolution of the Council of the City and by Landreth.

City of Ottawa, Illinois

By: _____
    Its Mayor

_____
John Colt Landreth

Attest:

_____
Its Clerk
F:\Docs\SRPD\Development and Marketing Agreement.doc

State of Illinois       )
                        )       SS
County of LaSalle       )

I, the undersigned, a notary public, in and for the County and State as aforesaid, do hereby certify that Robert M. Eschbach, personally known to me to be the Mayor of the City of Ottawa, Illinois, and Elizabeth A. Taylor, personally known to me to be the Clerk of said City, and personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and severally acknowledged that as Mayor and Clerk of said City, they signed and delivered said instrument in their official capacities as caused the corporate seal of said City be affixed thereto, pursuant to authority given by the Council said City, as the free and voluntary act and deed of said City, for the uses and purposes therein set forth.

Given under my hand and notarial seal
this _5th_ day of _August_ , 2003.

_Vicki V. Donahue_
Notary Public

"OFFICIAL SEAL"
VICKI V. DONAHUE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 5/16/07

6

State of Illinois    )
                  )    SS
County of          )

    I, the undersigned, a notary public, in and for the County and State as aforesaid, do hereby certify that John Colt Landerth, personally known to me to be the same person whose names is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered said instrument as his free and voluntary act and deed for the uses and purposes therein set forth.

    Given under my hand and notarial seal
this _____ day of _____, 2003.

_____
      Notary Public

"OFFICIAL SEAL"
NANCY C. STISSER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 5/16/07

L:\Docs\ottawa\Contracts-Agreements\Landreth revised 7-31-03.doc

7

EXHIBIT C

## RESOLUTION NO. _93_ -2003

### A RESOLUTION AUTHORIZING THE EXECUTION OF A CONSULTING, DEVELOPMENT AND MARKETING AGREEMENT BETWEEN THE CITY OF OTTAWA AND JOHN COLT LANDRETH
#### (Ottawa Industrial Park Conservation TIF District)

**BE IT RESOLVED BY THE COUNCIL OF THE CITY OF OTTAWA, ILLINOIS, AS FOLLOWS:**

**Section One:** That the Mayor and City Clerk of the City of Ottawa, Illinois, be, and they are hereby authorized and directed to execute a Consulting, Development and Marketing Agreement between the City of Ottawa and John Colt Landreth, a copy of which is attached hereto and incorporated herein by reference.

**Section Two:** That all Resolutions or parts thereof which are in conflict herewith are hereby repealed.

**Section Three:** That this Resolution shall be in full force and effect from and after its passage and approval as required by law.

**Passed** and **Approved** this _5th_ day of _August_, 2003.

_____
Robert M. Eschbach, Mayor

**ATTEST:**

_____
Elizabeth A. Taylor, City Clerk

L:\Docs\ottawa\Resolutions\Agreements\Agreement - Colt Landreth - OIP.doc

## CONSULTING, DEVELOPMENT AND MARKETING AGREEMENT
## BETWEEN THE CITY OF OTTAWA, ILLINOIS
## AND JOHN COLT LANDRETH

**Whereas**, the City of Ottawa (the "City") is an Illinois municipal corporation and body politic operating under the provisions of the Illinois Municipal Code, (65 ILCS 5/1-1-1 *et seq.*) (the "Code"), and

**Whereas**, the Code authorizes the City to acquire, develop, and convey real property and to sell and convey such property within a redevelopment area, and

**Whereas**, the City is attempting to promote the commercial, industrial and economic development and welfare of the City, and

**Whereas**, the City encourages the increase of industry and commerce within the City and the State of Illinois, and

**Whereas**, the City now owns certain real property within the Ottawa Industrial Park Conservation TIF District ("OIP"), and

**Whereas**, the City has caused said real property to be platted and developed as an industrial park, and

**Whereas**, John Colt Landreth ("Landreth") is an individual with expertise in the development and marketing of industrial real property, and

**Whereas**, the specific and primary purposes for which OIP was created were to stimulate the promotion of industrial development within the City and to interest industry to locate in and about the City by the establishment of a comprehensive real estate marketing and development program (the "Program"), and

**Whereas**, the establishment of the program will further the public health, safety and welfare by the creation of jobs within the City, and

**Whereas**, Landreth has developed an expertise and experience with respect to the program and with regard to general economic development within the territory of the City, and

**Whereas**, the continued commercial and industrial development of the City is one of the primary corporate purposes of the City, and

**Whereas**, the Council of the City believes that it is in the best interest of the City to utilize Landreth as the primary economic development organization for the City, and

**Whereas,** efforts for the continued economic development of the City will require funds for all of the necessary development activity, including the appropriate marketing of the City as a viable location for potential commercial and industrial prospects, and

**Whereas,** Landreth is willing to act as the primary economic development organization of the City and devote one-half (1/2) of his time thereto.

**WITNESSETH:**

FOR AND IN CONSIDERATION of the mutual promises and undertakings herein set forth and other good and valuable considerations, the sufficiency of which is hereby acknowledged, the **CITY** and **LANDRETH** agree as follows:

1.    <u>Incorporation of Recitals</u>. All of the foregoing recitals are incorporated herein by reference and are acknowledged as true and correct.

2.    <u>Term of Agreement</u>. The initial term of this agreement shall be for twenty-four (24) months commencing, 2003, to and including, 2005. The initial term may be extended by mutual, written agreement of the parties.

3.    <u>Obligations of City</u>. In order to provide a continuous and reliable source of funding for economic development within the City and OIP:

(a) the City shall pay to Landreth the sum of $5,000.00 upon the execution of this agreement and the further sum of $5,000.00 on the same day of each succeeding month during the term of this agreement; said sum shall be for Landreth's monthly retainer; together with an monthly amount not to exceed $2,000.00 for Chicago support staff, travel, telephone; and similar items of expense.

(b) the further and additional sum of not to exceed $28,900.00 annually for web hosting and web modifications, broker events, CoreNet/SIOR dues, advertising, brochures and miscellaneous (wats line); and

(c)    the further and additional sum (one time expense only) of $2,000.00 for web site design.

(d)    the further and additional sum equal to 1 ½% of the actual project cost of all industrial developments occurring within the City during the term or any extension of this agreement. <u>Such sum shall be paid one-half (1/2) upon the commencement of construction based upon the estimate of project cost, and the balance shall be paid upon completion of construction as soon as the total project cost is determined</u>. The phrase "project cost" shall include the cost of land, <u>direct and indirect</u> building <u>costs</u>, and site preparation as shown on the building permit, but shall not include machinery, equipment or any item of personal property. Compensation for industrial developments, which occur outside existing TIF Districts, will be negotiated on a case by case basis and mutually agreed upon.

2

(e)    The projects known as Murph-Haines, Galaxy, Bedrock and Burton shall not be eligible for compensation under paragraph (d) above.

Landreth shall provide a monthly statement to the City for the items of expense set forth in paragraphs (a) and (b) above; such statements shall contain reasonable detail for each item of expense, including receipts or copies of invoices, if available.

4.    Services of Landreth.  During the term of this Agreement Landreth shall provide to the City consulting, development and marketing services which shall be designed to increase and promote the commercial, industrial and economic base of the City, including, but not limited to the following:

(a)    Advertise and otherwise promote the City and OIP;

(b)    Develop and implement a marketing strategy for the City and OIP;

(c)    Develop and implement a master plan for OIP in conjunction with the City;

(d)    Develop and implement a strategic plan for OIP which shall include a a statement of mission and goals, as well as financial considerations and projections;

(e)    Develop community relations and public awareness on behalf of the City;

(f)    Identify and rank potential users and companies for location within OIP;

(g)    Coordinate and cooperate with other units of government and industry, as well as other economic development agencies;

(h)    Field and respond to all inquiries, and provide all necessary information to all prospects;

(i)    Coordinate activities and work with industrial real estate brokers in the Chicago metropolitan area;

(j)    Maintain and operate an office within the City of Chicago for the promotion and development of OIP;

(k)    Provide regular reports to the City, but not less frequently than quarterly, of all economic development activity;

(k)    Perform all other services as outlined and contained in the written proposal of Plaza Property Advisors dated March 17, 2003; and

(l)    Perform such other services as the City may reasonably require to accomplish the objective of increasing the job base within the City by attracting industry and distribution centers to the City.

5.    Independent Contract.  Landreth understands and agrees that his obligation under this Agreement is to serve the City for the promotion and development of commercial and industrial development.  It is understood and agreed between the parties that all persons working for Landreth under this Agreement, if any, shall be employees of Landreth and shall be in no way considered employees of the City.  Should any liability arise under the Illinois Worker's Compensation Act during any time that employees are working for Landreth, said employees are covered by the Illinois Worker's Compensation Act and are the employees of Landreth.  Neither Landreth nor his employees shall hold himself or themselves out to be employees, agents, or servants of the City.

3

6.    <u>Best Efforts</u>. Landreth agrees to devote his best efforts to the City's interest and to endeavor in every way to make successful the promotion of the City as a significant commercial and industrial location.

7.    <u>Revocation</u>. The City understands the long-term nature of this Agreement and the long-term nature of economic development. Therefore, the City agrees and covenants not to revoke or rescind this agreement or to institute any proceeding or action to challenge the validity of this agreement or in any way to rescind, modify or alter said agreement, understanding that Landreth is relying upon the representations and financial commitment contained herein and has every right to do so. Notwithstanding the foregoing or any other provision of this agreement to the contrary, either party to this agreement my cancel this agreement for any reason by providing the other party with not less than thirty (30) days prior, written notice of cancellation.

8.    <u>Waiver</u>. Waiver by either party of a breach of any term, condition or covenant herein shall not be deemed a waiver of any other term or condition or covenant.

9.    <u>Breach</u>. Upon a breach of any term or provision of this Agreement, the non-breaching party shall immediately provide a written notice to the other party describing the nature of the breach and a request for its immediate cure. In the event that said breach has not been cured within thirty (30) days of the issuance of written notice as aforesaid, then the non-breaching party may take such action as it deems necessary for the specific performance of this Agreement or its termination.

<u>Upon termination of this agreement, Landreth shall provide the City with a list of Prospects within thirty days of termination. Said list will serve as a registration of prospects with the City. In the event that any of these prospects shall purchase land in a City TIF district or future TIF district (or any other location as mutually determined) within one year of the termination of this agreement, then Landreth shall be paid a fee in accordance with Section 3(d) hereof. In the event that any of the prospects purchases land as aforesaid within the period of 13 to 24 months following termination of this agreement, then Landreth shall be paid 75% of the fee provided in Section 3(d) hereof.</u>

10.    <u>Assignability</u>. It is agreed that neither party shall have the right to assign this Agreement, in whole or in part, without the written consent of the other party.

11.    <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective assessors or assigns.

12.    <u>Warranties</u>. The parties warrant and represent that :

a.    Each of the undersigned representatives of such party has been duly authorized by such party to execute this Agreement on behalf of such party;

b.    This Agreement is binding, valid and specifically enforceable according to its terms against each party;

4

c.    This Agreement does not violate any presently existing provision of law or any applicable order, writ, injunction or decree of any court or governmental department, commission, board, bureau, agency or instrumentality to which such party may be subject;

d.    This Agreement does not constitute a default under any indenture, mortgage, deed of trust, agreement or contract of any kind to which such party may be bound;

e.    There are no pending legal proceedings by any party against the other party.

13.    <u>Headings</u>. The headings of the sections of this Agreement are for convenience and reference only and in no way define, extend, limit or describe the scope or intent of this Agreement or any provision hereof.

14.    <u>Execution and Counterparts</u>. This Agreement may be executed in multiple identical counterparts and all of said counterparts shall, taken together, constitute the same agreement.

15.    <u>Disclosure</u>. The parties have jointly utilized the law firm of Pool, Leigh & Fabricius with respect to this Agreement, and each party acknowledges this fact and hereby expressly authorizes such joint representation. Each party also waives any claim against said law firm or its individual attorneys because of any conflict of interest or any apparent conflict of interest resulting from said joint representation.

Executed in duplicate this _5th_ day of _August_ , 2003, by authority of a resolution of the Council of the City and by Landreth.

City of Ottawa, Illinois

By: _____          _____
         Its Mayor                                    John Colt Landreth

Attest:

_____
Its Clerk
F:\Docs\SRPD\Development and Marketing Agreement.doc

5

FOIA000847

State of Illinois      )
                   )     SS
County of LaSalle    )

      I, the undersigned, a notary public, in and for the County and State as aforesaid, do hereby certify that Robert M. Eschbach, personally known to me to be the Mayor of the City of Ottawa, Illinois, and Elizabeth A. Taylor, personally known to me to be the Clerk of said City, and personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and severally acknowledged that as Mayor and Clerk of said City, they signed and delivered said instrument in their official capacities as caused the corporate seal of said City be affixed thereto, pursuant to authority given by the Council said City, as the free and voluntary act and deed of said City, for the uses and purposes therein set forth.

      Given under my hand and notarial seal
      this _5th_ day of _August_ , 2003.

_Vicki V Donahue_
        Notary Public

"OFFICIAL SEAL"
VICKI V. DONAHUE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 5/16/07

6

State of Illinois        )
                         )        SS
County of                )

 I, the undersigned, a notary public, in and for the County and State as aforesaid, do hereby certify that John Colt Landerth, personally known to me to be the same person whose names is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered said instrument as his free and voluntary act and deed for the uses and purposes therein set forth.

 Given under my hand and notarial seal this _____ day of _____, 2003.

_____
Notary Public

"OFFICIAL SEAL"
NANCY C. STISSER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 5/16/07

L:\Docs\ottawa\Contracts-Agreements\Landreth revised 7-31-03.doc

7

FOIA000849

EXHIBIT D

RESOLUTION NO. 106 -2005

A RESOLUTION AUTHORIZING THE EXECUTION OF A
CONSULTING, DEVELOPMENT AND MARKETING AGREEMENT BETWEEN
THE CITY OF OTTAWA AND JOHN COLT LANDRETH
(Ottawa Industrial Park Conservation TIF District)

BE IT RESOLVED BY THE COUNCIL OF THE CITY OF OTTAWA, ILLINOIS,

AS FOLLOWS:

Section One: That the Mayor and City Clerk of the City of Ottawa, Illinois, be, and they are

hereby authorized and directed to execute a Consulting, Development and Marketing Agreement

between the City of Ottawa and John Colt Landreth, a copy of which is attached hereto and

incorporated herein by reference.

Section Two: That all Resolutions or parts thereof which are in conflict herewith are hereby

repealed.

Section Three: That this Resolution shall be in full force and effect from and after its passage

and approval as required by law.

Passed and Approved this 6th day of September, 2005.

_____
Robert M. Eschbach, Mayor

ATTEST:

Shelly L. Munks, City Clerk

L:\Docs\ottawa\Resolutions\Agreements\Agreement - Colt Landreth - OIP - 2005.doc

## CONSULTING, DEVELOPMENT AND MARKETING AGREEMENT BETWEEN THE CITY OF OTTAWA, ILLINOIS AND JOHN COLT LANDRETH

**Whereas**, the City of Ottawa (the "City") is an Illinois municipal corporation and body politic operating under the provisions of the Illinois Municipal Code, (65 ILCS 5/1-1-1 *et seq.*) (the "Code"), and

**Whereas**, the Code authorizes the City to acquire, develop, and convey real property and to sell and convey such property within a redevelopment area, and

**Whereas**, the City is attempting to promote the commercial, industrial and economic development and welfare of the City, and

**Whereas**, the City encourages the increase of industry and commerce within the City and the State of Illinois, and

**Whereas**, the City now owns certain real property within the Ottawa Industrial Park Conservation TIF District ("OIP"), and

**Whereas**, the City has caused said real property to be platted and developed as an industrial park, and

**Whereas**, John Colt Landreth ("Landreth") is an individual with expertise in the development and marketing of industrial real property, and

**Whereas**, the specific and primary purposes for which OIP was created were to stimulate the promotion of industrial development within the City and to interest industry to locate in and about the City by the establishment of a comprehensive real estate marketing and development program (the "Program"), and

**Whereas**, the establishment of the program will further the public health, safety and welfare by the creation of jobs within the City, and

**Whereas**, Landreth has developed an expertise and experience with respect to the program and with regard to general economic development within the territory of the City, and

**Whereas**, the continued commercial and industrial development of the City is one of the primary corporate purposes of the City, and

**Whereas**, the Council of the City believes that it is in the best interest of the City to utilize Landreth as the primary economic development organization for the City, and

**Whereas,** efforts for the continued economic development of the City will require funds for all of the necessary development activity, including the appropriate marketing of the City as a viable location for potential commercial and industrial prospects, and

**Whereas,** Landreth and the City entered into a Consulting, Development And Marketing Agreement in 2003 and said agreement has expired, and

**Whereas,** Landreth is willing to continue to act as the primary economic development organization of the City and devote one-half (1/2) of his time thereto any and all time which is reasonably and necessarily required therefore.

**WITNESSETH:**

FOR AND IN CONSIDERATION of the mutual promises and undertakings herein set forth and other good and valuable considerations, the sufficiency of which is hereby acknowledged, the **CITY** and **LANDRETH** agree as follows:

1.    Incorporation of Recitals. All of the foregoing recitals are incorporated herein by reference and are acknowledged as true and correct.

2.    Term of Agreement. The initial term of this agreement shall be for six (6) twenty-four (24) months commencing on the date hereof. The initial term may be extended by mutual, written agreement of the parties.

3.    Obligations of City. In order to provide a continuous and reliable source of funding for economic development within the City and OIP:

(a)    The City shall pay to Landreth the sum of $5,000.00 upon the execution of this agreement and the further sum of $5,000.00 on the same day of each succeeding month during the term of this agreement; said sum shall be for Landreth's monthly retainer; together with an additional monthly amount not to exceed $2,000.00 for Chicago support staff, travel, telephone and similar items of reasonable and necessary expense.

(b) The further and additional sum of not to exceed $28,900.00 annually for web hosting and web modifications, broker events, CoreNet/SIOR dues, advertising, brochures and miscellaneous (wats line); and

(c)    The further and additional sum equal to 1 ½% of the actual project cost of all industrial developments occurring within the City during the term or any extension of this agreement. Such sum shall be paid one-half (1/2) upon the commencement of construction based upon the estimate of project cost as submitted by a developer and approved by the City, and the balance shall be paid upon completion of construction as soon as the total project cost is determined, and approved by the City. The phrase "project cost" shall include the cost of land, direct and indirect building costs, and site preparation as shown on the building permit, but shall not include machinery, equipment or any item of personal property. Compensation for industrial developments, which occur outside existing TIF Districts, will be negotiated on a case-by-case

2

basis and mutually agreed upon. Notwithstanding any of the foregoing to the contrary, the obligation of the City under this paragraph (c) shall be limited solely to industrial developments that result from the marketing efforts of Landreth and not from other sources.

(d)     The projects known as Murph-Haines, Galaxy, Bedrock, Burton and PetSmart shall not be eligible for compensation under paragraph (c) above.

Landreth shall provide a monthly statement to the City for the items of expense set forth in paragraphs (a) and (b) above; such statements shall contain reasonable detail for each item of expense, including receipts or copies of invoices, and such statements shall separate the items of expense as set forth in paragraphs (a) and (b) above.

4.     Services of Landreth. During the term of this Agreement Landreth shall provide to the City consulting, development and marketing services which shall be designed to increase and promote the commercial, industrial and economic base of the City, including, but not limited to the following:

(a)     Advertise and otherwise promote the City and OIP;
(b)     Develop and implement a marketing strategy for the City and OIP;
(c)     Develop and implement a master plan for OIP in conjunction with the City;
(d)     Develop and implement a strategic plan for OIP which shall include a
        a statement of mission and goals, as well as financial considerations and
        projections;
(e)     Develop community relations and public awareness on behalf of the City;
(f)     Identify and rank potential users and companies for location within OIP;
(g)     Coordinate and cooperate with other units of government and industry, as well
        as other economic development agencies;
(h)     Field and respond to all inquiries, and provide all necessary information to all
        prospects;
(i)     Coordinate activities and work with industrial real estate brokers in the Chicago
        metropolitan area;
(j)     Maintain and operate an office within the City of Chicago for the promotion and
        development of OIP;
(k)     Provide regular written reports to the City, but not less frequently than quarterly,
        of all economic development activity including the names of all industrial
        prospects.
(k)     Perform all other services as outlined and contained in the written proposal of
        Plaza Property Advisors dated March 17, 2003; and
(l)     Perform such other services as the City may reasonably require to accomplish the
        objective of increasing the job base within the City by attracting industry and
        distribution centers to the City.

5.     Independent Contract. Landreth understands and agrees that his obligation under this Agreement is to serve the City for the promotion and development of commercial and industrial development. It is understood and agreed between the parties that all persons working for Landreth under this Agreement, if any, shall be employees of Landreth and shall be in no

3

way considered employees of the City. Should any liability arise under the Illinois Worker's Compensation Act during any time that employees are working for Landreth, said employees are covered by the Illinois Worker's Compensation Act and are the employees of Landreth. Neither Landreth nor his employees shall hold himself or themselves out to be employees, agents, or servants of the City.

6.    Best Efforts. Landreth agrees to devote his best efforts to the City's interest and to endeavor in every way to make successful the promotion of the City as a significant commercial and industrial location.

7.    Revocation. The City understands the long-term nature of this Agreement and the long-term nature of economic development. Therefore, the City agrees and covenants not to revoke or rescind this agreement or to institute any proceeding or action to challenge the validity of this agreement or in any way to rescind, modify or alter said agreement, understanding that Landreth is relying upon the representations and financial commitment contained herein and has every right to do so. Notwithstanding the foregoing or any other provision of this agreement to the contrary, either party to this agreement my cancel this agreement for any reason by providing the other party with not less than thirty (30) days prior, written notice of cancellation.

8.    Waiver. Waiver by either party of a breach of any term, condition or covenant herein shall not be deemed a waiver of any other term or condition or covenant.

9.    Breach. Upon a breach of any term or provision of this Agreement, the non-breaching party shall immediately provide a written notice to the other party describing the nature of the breach and a request for its immediate cure. In the event that said breach has not been cured within thirty (30) days of the issuance of written notice as aforesaid, then the non-breaching party may take such action as it deems necessary for the specific performance of this Agreement or its termination.

Upon termination of this agreement, Landreth shall provide the City with a list of all industrial prospects within thirty days of termination. Said list will serve as a registration of prospects with the City. In the event that any of these prospects shall purchase land in a City TIF district or future TIF district (or any other location as mutually determined) within one year 180 days of the termination of this agreement, then Landreth shall be paid a fee in accordance with Section 3(d) hereof. In the event that any of the prospects purchases land as aforesaid within the period of 13 to 24 months following termination of this agreement, then Landreth shall be paid 75% of the fee provided in Section 3(d) hereof.

10.    Assignability. It is agreed that neither party shall have the right to assign this Agreement, in whole or in part, without the written consent of the other party.

11.    Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective assessors or assigns.

12.    Warranties. The parties warrant and represent that :

4

a.    Each of the undersigned representatives of such party has been duly authorized by such party to execute this Agreement on behalf of such party;

b.    This Agreement is binding, valid and specifically enforceable according to its terms against each party;

c.    This Agreement does not violate any presently existing provision of law or any applicable order, writ, injunction or decree of any court or governmental department, commission, board, bureau, agency or instrumentality to which such party may be subject;

d.    This Agreement does not constitute a default under any indenture, mortgage, deed of trust, agreement or contract of any kind to which such party may be bound;

e.    There are no pending legal proceedings by any party against the other party.

13.    <u>Headings</u>. The headings of the sections of this Agreement are for convenience and reference only and in no way define, extend, limit or describe the scope or intent of this Agreement or any provision hereof.

14.    <u>Execution and Counterparts</u>. This Agreement may be executed in multiple identical counterparts and all of said counterparts shall, taken together, constitute the same agreement.

15.    <u>Disclosure</u>. The parties have jointly utilized the law firm of Pool, Leigh & Fabricius with respect to this Agreement, and each party acknowledges this fact and hereby expressly authorizes such joint representation. Each party also waives any claim against said law firm or its individual attorneys because of any conflict of interest or any apparent conflict of interest resulting from said joint representation.

Executed in duplicate this _____ day of _____, 2005, by authority of a resolution of the Council of the City and by Landreth.

**City of Ottawa, Illinois**

By: _____          _____

    **Robert M. Eschbach, Mayor**                              **John Colt Landreth**

Attest:

_____
**Shelly L. Munks, City Clerk**
F:\Docs\ottawa\Contracts-Agreements\Landreth Consulting 8-05.doc

5

State of Illinois          )
                           )        SS
County of LaSalle          )


     I, the undersigned, a notary public, in and for the County and State as aforesaid, do hereby certify that Robert M. Eschbach, personally known to me to be the Mayor of the City of Ottawa, Illinois, and Shelly L. Munks, personally known to me to be the Clerk of said City, and personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and severally acknowledged that as Mayor and Clerk of said City, they signed and delivered said instrument in their official capacities as caused the corporate seal of said City be affixed thereto, pursuant to authority given by the Council said City, as the free and voluntary act and deed of said City, for the uses and purposes therein set forth.

     Given under my hand and notarial seal this _____ day of _____, 2005.


_____
                              Notary Public

State of Illinois          )
                           )          SS
County of LaSalle          )


I, the undersigned, a notary public, in and for the County and State as aforesaid, do hereby certify that John Colt Landreth, personally known to me to be the same person whose names is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered said instrument as his free and voluntary act and deed for the uses and purposes therein set forth.

Given under my hand and notarial seal this _____ day of _____, 2005.


_____
Notary Public

F:\Docs\ottawa\Contracts-Agreements\Landreth Consulting 8-05.doc

EXHIBIT E

)                              )

# RESOLUTION NO. 126 -2005

## A RESOLUTION AUTHORIZING THE EXECUTION OF AN AMENDMENT TO THE CONSULTING, DEVELOPMENT AND MARKETING AGREEMENT BETWEEN THE CITY OF OTTAWA AND JOHN COLT LANDRETH

### BE IT RESOLVED BY THE COUNCIL OF THE CITY OF OTTAWA, ILLINOIS,

AS FOLLOWS:

**Section One:** That the Mayor and City Clerk of the City of Ottawa, Illinois, be, and they are

hereby authorized and directed to execute an Amendment to the Consulting, Development and

Marketing Agreement between the City of Ottawa and John Colt Landreth, a copy of which is attached

hereto and incorporated herein by reference.

**Section Two:** That all resolutions or parts thereof which are in conflict herewith are hereby

repealed.

**Section Three:** That this Resolution shall be in full force and effect from and after its passage

and approval as required by law.

**Passed** and **Approved** this 18th day of October, 2005.

Robert M. Eschbach, Mayor

MAYOR PRO TEM

ATTEST:

Shelly L. Munks, City Clerk

L:\Docs\ottawa\Resolutions\Agreements\Agreement - Colt Landreth amendment 10-05.doc

)                                )

# AMENDMENT TO THE CONSULTING, DEVELOPMENT AND MARKETING AGREEMENT BETWEEN THE CITY OF OTTAWA, ILLINOIS AND JOHN COLT LANDRETH

This Amendment to the Consulting, Development and Marketing Agreement between the City of Ottawa, Illinois and John Colt Landreth (the "Amendment") is made and entered into as of the 14th day of October, 2005.

## RECITALS:

WHEREAS, the City of Ottawa, Illinois (the "City") and John Colt Landreth ("Landreth") entered into a Consulting, Development and Marketing Agreement (the "Agreement") on August 5, 2003, and

WHEREAS, the City received a grant from the Illinois Department of Commerce and Economic Opportunity ("DCEO") in the amount of $50,000.00 for marketing of the Ottawa Industrial Park (Grant No. 14-20105) and entered into a Grant Agreement, and

WHEREAS, the Grant Agreement between the City and DCEO requires specific language in all subcontracts relating to all services to be performed under the Grant Agreement, and

WHEREAS, Landreth has performed services on behalf of the City under the Grant Agreement between the City and DCEO, and

WHEREAS, the City and Landreth wish to amend the Agreement to incorporate the language required by Section 5.4 A. of the Grant Agreement between the City and DCEO.

NOW, THEREFORE, CITY AND LANDRETH AGREE AS FOLLOWS:

The Agreement is hereby amended by the addition of subparagraph (m) to paragraph 4 as follows: The Illinois Department of Commerce and Economic

FOIA000851

)                                                )

Opportunity and the Auditor General of the State of Illinois, or any of their duly

authorized representatives, shall have full access to and the right to examine any pertinent

books, documents, papers and records of Landreth involving transactions related to the

Grant Agreement between the City and DCEO, Grant No. 04-20105, for a period of five

years from the later of the expiration or termination of said Grant Agreement between the

City and DCEO.

City of Ottawa, Illinois

By: _____            _____
    Robert M. Eschbach, Mayor                John Colt Landreth
    *MAYOR PRO TEM*
F:\Docs\Ottawa\Contracts-Agreements\Landreth amendment 10-05.doc

FOIA000852

**coltlandreth**

From:     Keith R. Leigh [keithleigh@mchsi.com]
Sent:     Tuesday, October 25, 2005 11:03 AM
To:       John Colt Landreth
Cc:       Robert M. Eschbach; Shelly Munks
Subject:  Consulting Agreement/City of Ottawa

Colt,

I understand that you have indicated that you will not sign the proposed six month extension to your consulting agreement with th
City. In view of that, the City will not be making any further payment because there is no agreement.
The original agreement has expired by its own terms.

Initially, I understood that the council simply wanted to extend the original contract for six months to provide time for its review. I
prepared an amendment that merely extended the term for six months without any other substantive change. When that was
presented to the city council, several members of the council requested additional changes before they would consider any
extension of the agreement.

Therefore, I prepared a second amendment that incorporated the requested changes. It is that amended agreement which you
have declined to execute, and without a contract there exists no legal authority to continue to make payments under the terms and
provisions of the expired agreement.

I also note that you are required under the provisions of the original agreement to provide the city with a list of Prospects within 30
days of the termination of the agreement. In as much as the agreement terminated (expired) on August 5, 2005, you were
required to submit the list of Prospects on or before September 5, 2005. Under the circumstances, I urge you to do so
immediately.

Keith

LAW OFFICES

# POOL, LEIGH & FABRICIUS

AN ASSOCIATION INCLUDING PROFESSIONAL CORPORATIONS
CENTRAL LIFE BUILDING
628 COLUMBUS STREET
SUITE 208
OTTAWA, IL 61350

KEITH R. LEIGH
RAYMOND P. FABRICIUS

ANITA L. KOPKO
JENNIFER H. KOENIG .
JAMES R. LINDIG

ERNEST H. POOL, SR. (1894-1985)
ERNEST H. POOL, JR. (RETIRED)

TELEPHONE 815 - 434 - 0097
FACSIMILE 815 - 434 - 0270
E-MAIL: POOLLEIGHLAW@MCHSI.COM

December 13, 2005                    **Via Facsimile and U.S. Mail**

Mr. John Colt Landreth
Plaza Property Advisors
One IBM Plaza, Suite 2901
330 N. Wabash Avenue
Chicago, IL 60611

> **Re:    City of Ottawa, Illinois**
> **Consulting, Development and Marketing Agreement**

Dear Colt:

The Ottawa City Council has repealed Resolution No. 106-2005, which was approved on September 6, 2005 authorizing the Mayor to execute a new agreement with you. The Council took this action primarily because you have declined to execute the agreement, which had been authorized by Resolution No. 106-2005, and there has been an inability to arrive at mutually acceptable terms.

In view of the fact that your original agreement with the City of Ottawa expressly provided for a term of two years, that agreement expired by its own terms on August 5, 2005. Therefore, as of August 5, 2005 you no longer have a contractual relationship with the City of Ottawa except for the specific provisions of the original agreement, which provide for compensation to you under certain conditions and within certain time parameters. Similarly, since you no longer have any contractual relationship with the City of Ottawa, you have no authority whatsoever to act on the City's behalf or to make any representations for or on behalf of the City. Please note the language of paragraph 9 of the agreement prohibiting you from holding yourself out as an employee, agent or servant of the City. Moreover, since August 5, 2005 you have no authority or right to incur any obligations, costs or expenses which would have been reimbursable pursuant to paragraphs 3 a and b of the agreement.

On October 25, 2005 I sent you an email requesting a list of prospects pursuant to paragraph 9 of the agreement. My request was made because the agreement expired on August 5, 2005, and you elected not to extend the agreement as proposed by the City of Ottawa.

Mr. John Colt Landreth
December 13, 2005
Page 2

Your correspondence of November 18, 2005 to Mayor Eschbach contains a list identified by you as prospects under paragraph 9 of the agreement. I understand from the City Engineer that you have declined to provide any further or additional information with respect to the list. The City has no way of determining the authenticity of the list at this time. Additionally, if the list consists of genuine and viable economic development prospects, your failure to provide any detail or contact information unreasonably inhibits the City's ability to locate those prospects within the City. In that regard, paragraphs 4 (f) and (k) of the agreement required you to provide an identification and rank of potential users and customers and to provide regular reports not less frequently than quarterly of all economic development activity. Therefore, I do not believe the City's request for the date on which you initially had contact with the company and/or provided services pursuant to the agreement or which prospects are industrial as contrasted with commercial, or the name and address of the contact person for each prospect on the list is unreasonable considering your obligations under paragraph 4 of the agreement.

Obviously, without such information the City is inhibited, if not entirely precluded, from continuing its economic development activity with respect to the "prospects" which you have identified by name alone. With respect to many of the "prospects", the City has no information or knowledge whatsoever, and they have not been previously disclosed by you in any report to the City. If any entity on the list is a genuine prospect for which you might be entitled to compensation under paragraph 9 of the agreement, it would appear in your best interests to provide whatever information you have assembled on the City's behalf. In view of the express provisions of paragraph 4 of the agreement, I believe you have an affirmative obligation to provide that information now. I believe that it is best to resolve any questions or issues with respect to the prospect list at this time, and to permit the City the opportunity to further work with such prospects. Your lack of cooperation in this regard would demonstrate a lack of good faith on your part.

In addition, without the requested information the City has no basis whatsoever to determine your entitlement to future compensation under the agreement. If you claim compensation under paragraph 9 with respect to any entity on the "prospect" list, the City will be requiring such information prior to making any disbursement to you. Furthermore, your filing of the list shall not be construed or deemed an acknowlegement of any obligation of the City to provide compensation to you under paragraph 9 of the agreement.

To the extent that you may be requesting compensation in the future under paragraph 9 of the agreement, I believe you have a distinct economic interest in cooperating with the City at this time. Your lack of cooperation can only diminish the likelihood of any genuine prospect from locating in Ottawa and the realization by you of future compensation.

Mr. John Colt Landreth
December 13, 2005
Page 3

Moreover, I understand that the City has requested information about the web site which
you established on the City's behalf and which was paid for by the City. I also
understand that you have declined to provide that information to enable the City to
continue the site's operation and maintenance. Your declination to provide this
information and that previously mentioned clearly frustrates the City's efforts at
economic development and makes a smooth transition virtually impossible.

Kindly reconsider your refusal to provide the requested information with regard to the
prospect list, web site and any other information the City may reasonably require. If you
have any questions concerning this letter, kindly contact me at your convenience.

Sincerely,

POOL, LEIGH & FABRICIUS

By: Keith R. Leigh

cc:    City Council
       City Clerk
       City Engineer

F:\Docs\ottawa\TIF\Letters\ltr Landreth 12-7-05.doc

# Plaza Property Advisors, Inc.

INVOICE

One IBM Plaza, Suite 2901
330 North Wabash Avenue
Chicago, Illinois 60611

INVOICE # 0155
Date:12/08/2005

Telephone (312) 670-1500
Facsimile  (312) 670-1523

Bill To: **City of Ottawa**
**301 West Madison Street**
**Ottawa, IL 61350**

For:  **Varney Land Deal**
**Ottawa, Illinois**

Attention:  **Mayor Robert M. Eschbach**

| DESCRIPTION | | AMOUNT |
|---|---|---|
| **Land Sale** | | |
| 9.5 Acres @ $20,000 per acre - | $190,000.00 | |
| Fee:  Rate | 0.015 | |
| Fee Earned | | 2,850.00 |
| Note:<br>If this land is developed within the next twenty-four (24) months an additional fee based on the development cost will be due and payable pursuant to Paragraph 3 of Consulting, Development and Marketing Agreement between The City of Ottawa, Illinois and John Colt Landreth fully executed and dated 5 August, 2003 | | |

Please make all checks payable to:          **Total**    | **$2,850.00** |

**Plaza Property Advisors**
**Suite 2901**
**One IBM Plaza**
**330 North Wabash Avenue**
**Chicago, IL 60611**
Telephone (312) 670-1500

# Plaza Property Advisors, Inc.

INVOICE

One IBM Plaza, Suite 2901
330 North Wabash Avenue
Chicago, Illinois 60611

INVOICE # 0157
Date: Feb. 7, 2006

Telephone (312) 670-1500
Facsimilie  (312) 670-1523

Bill To:  **Honorable Robert M. Eschbach**
**Mayor**
**City of Ottawa**
**301 West Madison Street**
**Ottawa, IL 61350**
**Telephone (815) 433-0161/Fax (815) 433-2270**

For:  **MTC Development**
**Ottawa Industrial Park - Unit I**
**Ottawa, Illinois**

| DESCRIPTION | AMOUNT |
|---|---|
| Total All Costs | $2,496,808 |
| Plaza Property Advisors Fee - 1.5% | 0.0150 |
| Total Fee | $37,452.12 |
| Less:  First Installment (Paid 2-4-05) | 15,879.00 |
| Second Installment due upon receipt | $21,573.12 |
| **Total** | **$21,573.12** |

Please make all checks payable to:
**Plaza Property Advisors**
**Suite 2901**
**One IBM Plaza**
**330 North Wabash Avenue**
**Chicago, IL 60611**
Telephone (312) 670-1500

# Plaza Property Advisors, Inc.

## INVOICE

One IBM Plaza, Suite 2901
330 North Wabash Avenue
Chicago, Illinois 60611

INVOICE # 0158
Date: Feb. 7, 2006

Telephone (312) 670-1500
Facsimilie  (312) 670-1523

Bill To: **Honorable Robert M. Eschbach**
**Mayor**
**City of Ottawa**
**301 West Madison Street**
**Ottawa, IL 61350**
**Telephone (815) 433-0161/Fax (815) 433-2270**

For:   **PetsMart Development**
**Ottawa, Illinois**

| | DESCRIPTION | AMOUNT |
|---|---|---|
| | Total Project Costs (est.) | $32,000,000 |
| | Plaza Property Advisors Fee - 1.5% | 0.0150 |
| | Total Fee (First & Second Installments) (est.) Due upon receipt | $480,000 |
| | **Total** | **$480,000** |

Please make all checks payable to:
**Plaza Property Advisors**
**Suite 2901**
**One IBM Plaza**
**330 North Wabash Avenue**
**Chicago, IL 60611**
Telephone (312) 670-1500

# Plaza Property Advisors, Inc.

INVOICE

One IBM Plaza, Suite 2901
330 North Wabash Avenue
Chicago, Illinois 60611

INVOICE # 0159
Date: Feb. 7, 2006

Telephone (312) 670-1500
Facsimilie (312) 670-1523

Bill To: **Honorable Robert M. Eschbach**
**Mayor**
**City of Ottawa**
**301 West Madison Street**
**Ottawa, IL 61350**
**Telephone (815) 433-0161/Fax (815) 433-2270**

For: **International Titanium Powder**
**Ottawa Industrial Park - Unit I**
**Ottawa, Illinois**

| DESCRIPTION | AMOUNT |
|---|---|
| Total Project Costs (est.) | $4,360,000 |
| Plaza Property Advisors Fee - 1.5% | 0.0150 |
| Total Fee (est.) | $65,400.00 |
| | |
| First Installment (not due yet) | $32,700 |
| **Total** | **$32,700** |

Please make all checks payable to:
**Plaza Property Advisors**
**Suite 2901**
**One IBM Plaza**
**330 North Wabash Avenue**
**Chicago, IL 60611**
Telephone (312) 670-1500

# Plaza Property Advisors, Inc.

INVOICE

One IBM Plaza, Suite 2901
330 North Wabash Avenue
Chicago, Illinois 60611

INVOICE # 0154
Date:12/12/2005

Telephone (312) 670-1500
Facsimile  (312) 670-1523

Bill To:  Ms. Shelly Munks
          **City Clerk**
          **City of Ottawa**
          **301 West Madison Street**
          **Ottawa, IL 61350**
          **Telephone (815) 433-0161/Fax (815) 433-2270**

For:   **Ottawa Industrial Development Authority**
       **November, 2005 Non-recurring Expenses**

| Nov. | DESCRIPTION | AMOUNT |
|---|---|---|
| | **Miscellaneous Budget Expenses** | |
| | **Broker Events** | |
| 4 | SIOR Fall Conference | 650.00 |
| | Taxis 4 @ $8.00 each | 32.00 |

Please make all checks payable to:          Total          682.00

**Plaza Property Advisors**
**Suite 2901**
**One IBM Plaza**
**330 North Wabash Avenue**
**Chicago, IL 60611**
**Telephone (312) 670-1500**

FILED

IN THE CIRCUIT COURT FOR THE THIRTEENTH JUDICIAL CIRCUIT
LASALLE COUNTY, ILLINOIS

FEB 0 2 2007

LA SALLE COUNTY CIRCUIT CLERK
THIRTEENTH JUDICIAL CIRCUIT OF ILLINOIS

John Colt Landreth,                    )
                                        )
            Plaintiff,                  )
                                        )
    vs.                                 )    No.  07-L-  17
                                        )
City of Ottawa, Illinois               )    08CV1654              EDA
a municipal corporation,               )    JUDGE NORGLE
                                        )    MAGISTRATE JUDGE SCHENKIER
            Defendant.                  )

## COMPLAINT AT LAW AND JURY DEMAND

Plaintiff, **John Colt Landreth** ("*Landreth*"), by his attorneys, Myers, Berry, O'Conor &

Kuzma, Ltd., complaining of the Defendant, **City of Ottawa, Illinois** (the "*City*"), states as follows:

### COUNT I

### Breach of Contract – Consulting Agreement

1.      The City is an Illinois municipal corporation and body politic operating under the

provisions of the Illinois Municipal Code, 65 ILCS 5/1-1-1 *et seq.*

2.      On and prior to August 5, 2003, the City was engaged in an effort to promote

commercial, industrial and economic development within the political boundaries of Ottawa, Illinois

("*Ottawa*").

3.      At all material times hereto, Landreth was an individual with expertise in the

development and marketing of commercial and industrial real property and, as of August 5, 2003,

Landreth possessed expertise and experience with regard to the general economic development of

Ottawa.

4.      On August 5, 2003, the City sought to promote and market Ottawa as a site for

commercial and industrial development by utilizing Landreth's skills and contacts.

5.      On August 5, 2003, the City and Landreth entered into a written agreement entitled

"Consulting, Development and Marketing Agreement" (the "*Consulting Agreement*"). A true and

correct copy of the Consulting Agreement is attached hereto as Exhibit "A."

6.      The Consulting Agreement provided, *inter alia,* that Landreth was to promote

commercial, industrial and economic development within Ottawa.

7.      In Section 3(a) of the Consulting Agreement the City agreed to pay Landreth a

monthly retainer of $5,000.00 and to reimburse his expenses.

8.      In Section 3(d) of the Consulting Agreement the City agreed to pay incentive

compensation to Landreth based on the "project cost" of new industrial developments occurring

within Ottawa during the term or any extension of the Consulting Agreement (the "*incentive

compensation*"). Section 3(d) of the Consulting Agreement provides::

> 3.      Obligations of City. In order to provide a continuous and reliable source of
> funding for economic development within the City and OIP:
>
> * * *
>
> (d) [The City shall pay to Landreth] the further and additional sum equal to
> 1 ½% of the actual project cost of all industrial developments occurring within
> the City during the term of (sic) any extension of this agreement. Such sum
> shall be paid one-half (½) upon the commencement of construction based upon
> the estimate of project cost, and the balance shall be paid upon completion of
> construction as soon as the total project cost is determined. The phrase "project
> cost" shall include the cost of land, direct and indirect building costs, and site
> preparation as shown on the building permit, but shall not include machinery,
> equipment or any item of personal property. Compensation for industrial
> developments, which occur outside existing TIF Districts, will be negotiated on
> a case by case basis and mutually agreed upon. (emphasis in original)

9.      Landreth performed the duties and obligations imposed upon him by the Consulting Agreement and, in particular, promoted Ottawa as a viable site for commercial and industrial development.

10.     By reason of certain industrial developments which occurred within Ottawa during the initial term of the Consulting Agreement, Landreth became entitled to incentive compensation under Section 3(d) of the Consulting Agreement, including (on information and belief) at least $450,000.00 attributable to the PetsMart warehouse/distribution center (the "PetsMart Development") constructed in the Ottawa I-80 North TIF Redevelopment Project Area.

11.     The City has failed to pay Landreth the incentive compensation to which he became entitled under Section 3(d) of the Consulting Agreement.

WHEREFORE, Landreth prays for judgment against the City for the following amounts:

A.      $450,000.00, being the least amount of incentive compensation to which Landreth became entitled under Section 3(d) of the Consulting Agreement prior to August 5, 2005;

B.      other incentive compensation to which Landreth became entitled under Section 3(d) of the Consulting Agreement prior to August 5, 2005;

C.      pre-judgment interest on all amounts due Landreth under the Consulting Agreement from the date Landreth became entitled to receive such amounts;

D.      the costs of this action; and

E.      such other and further relief as may be just and proper in the premises.

## COUNT II

### Breach of Contract – Agreement to Extend

1.-9.   Plaintiff restates the allegations contained in paragraphs 1 through 9 of Count I as and

for paragraphs 1 through 9 of Count II.

10.     On June 20, 2005, Landreth and Robert Eschbach, Mayor of the City, met and agreed to extend the Consulting Agreement without change for an additional six months – or until February 5, 2006 – while they attempted to negotiate a new agreement (the "*agreement to extend*").

11.     Subsequent to August 5, 2005, in furtherance of the agreement to extend, Landreth continued to perform the duties and obligations required of him under the Consulting Agreement, and, *inter alia,* continued to promote Ottawa as a viable site for commercial and industrial development.

12.     In furtherance of the agreement to extend, the City paid Landreth the monthly retainer required by Section 3(a) of the Consulting Agreement as follows:

| Date | Amount Paid |
|---|---|
| August 5, 2005 | $5,000.00 |
| September 5, 2005 | $5,000.00 |
| October 5, 2005 | $5,000.00 |

13.     On August 23, 2005, the City presented Landreth with a draft of a proposed new consulting agreement (the "*proposed new consulting agreement*"). A copy of the proposed new consulting agreement is attached hereto as Exhibit "B."

14.     The proposed new consulting agreement substantially changed the terms of the Consulting Agreement. Among other changes, the proposed new consulting agreement required that Landreth relinquish incentive compensation attributable to the PetsMart Development which Landreth had earned prior to August 5, 2005 (the "*accrued PetsMart compensation*").

15.     During the period between August 23, 2005 and October 18, 2005, Landreth attempted to negotiate the terms of a new consulting agreement with the City, but the City refused to negotiate with Landreth in good faith and instead –

(a) repeatedly demanded that Landreth relinquish his right to the accrued PetsMart compensation; and

(b) repeatedly insisted that the terms of the proposed new consulting agreement – including the City's demand that Landreth relinquish his right to the accrued PetsMart compensation – were not negotiable but rather were "take it or leave it" terms.

16.     Throughout the period of their negotiations, Landreth refused to accede to the City's demand that he relinquish the accrued PetsMart compensation.

17.     On October 18, 2005, the City dishonored the $5,000.00 check which the City had issued to Landreth on October 5, 2005 in payment of his monthly retainer fee.

18.     On October 25, 2005, the City terminated the Consulting Agreement.

19.     The City has failed to reimburse Landreth for $9,139.13 of expenses he incurred during the period August 2005 through November 2005 in connection with the Consulting Agreement.

20.     To the extent industrial developments occurred within Ottawa subsequent to August 5, 2005, Landreth became entitled to incentive compensation under Section 3(d) of the Consulting Agreement.

21.     The City has failed to pay Landreth any incentive compensation to which he may have become entitled under Section 3(d) of the Consulting Agreement by reason of industrial

developments which occurred within Ottawa subsequent to August 5, 2005.

WHEREFORE, Landreth prays for judgment against the City for the following amounts:

A.      $20,000.00, being Landreth's monthly retainers for the period October 5, 2005 through February 5, 2006;

B.      $9, 139.13, being the expenses Landreth incurred during the period August 2005 through November 2005 in connection with the Consulting Agreement;

C.      incentive compensation due Landreth for the period August 5, 2005 through February 5, 2006;

D.      pre-judgment interest on all amounts due Landreth under the Consulting Agreement from the date Landreth became entitled to receive such amounts;

E.      the costs of this action; and

F.      such other and further relief as may be just and proper in the premises.

## COUNT III

### Declaratory Judgment – Post-Termination Incentive Compensation

1.- 9.   Plaintiff restates the allegations contained in paragraphs 1 through 9 of Count I as and for paragraphs 1 through 9 of Count III.

10.-12. Plaintiff restates the allegations contained in paragraphs 10 through 12 of Count II as and for paragraphs 10 through 12 of Count III.

13.      On October 25, 2005, the City terminated the Consulting Agreement.

14.      In Section 9 of the Consulting Agreement the City agreed to pay incentive compensation to Landreth after the termination of the Consulting Agreement ("*post-termination*

*incentive compensation*"). Section 9 of the Consulting Agreement provides, in pertinent part:

> 9. Breach.                    * * *
>
> Upon termination of this agreement, Landreth shall provide the City with a list of Prospects within thirty days of termination. Said list will serve as a registration of prospects with the City. In the event that any of these prospects shall purchase land in a City TIF district or future TIF district (or any other location as mutually determined) within one year of the termination of this agreement, then Landreth shall be paid a fee in accordance with Section 3(d) hereof. In the event that any of the prospects purchases land as aforesaid within the period of 13 to 24 months following termination of this agreement, then Landreth shall be paid 75% of the fee provided in Section 3(d) hereof. (emphasis in original)

15.    On or about November 18, 2005, Landreth delivered his list of prospects (the "*prospect list*") to the City. A true and correct copy of the prospect list is attached hereto as Exhibit "C."

16.    Under Section 9 of the Consulting Agreement, Landreth is entitled to post-termination incentive compensation (as provided in Section 3(d) of the Consulting Agreement) –

(i)    based on the "project cost" of industrial developments

(ii)   constructed on land in a City TIF district (or future TIF district)

(iii)  where the land was purchased within 24 months of the termination of the Consulting Agreement by a person or entity on the prospect list.

17.    An actual controversy exists between Landreth and the City as to whether or not Landreth is entitled to post-termination incentive compensation pursuant to Section 9 of the Consulting Agreement.

WHEREFORE, Landreth requests the following relief:

A.    That this Court determine and declare that Landreth and the City validly entered into an agreement to extend the Consulting Agreement for six months – or until February 5, 2006.

B.    That this Court determine and declare that the City wrongfully terminated the Consulting Agreement on October 25, 2005.

C.    That this Court determine and declare that the Consulting Agreement, if not wrongfully terminated by the City, would have expired February 5, 2006.

D.    That this Court determine and declare that Landreth is entitled to post-termination incentive compensation (as provided in Section 3(d) of the Consulting Agreement) –

   (i)    based on the "project cost" of industrial developments

   (ii)    constructed on land in a City TIF district (or future TIF district)

   (iii)    where the land was purchased within 24 months of the termination of the Consulting Agreement by a person or entity on the prospect list.

E.    That Landreth have judgment for the costs of this action and for such other and further relief as may be just and proper in the premises.

John Colt Landreth, Plaintiff

By _____
One of His Attorneys

## VERIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

*John Colt Landreth*

**John Colt Landreth**

## JURY DEMAND

Plaintiff demands that all issues properly submissible to a jury be tried by a jury of twelve persons.

**John Colt Landreth, Plaintiff**

By: _____
One of His Attorneys

Stephen C. Myers
Richard J. Berry
Myers, Berry, O'Conor & Kuzma, Ltd.
130 East Madison Street
Ottawa, Illinois 61350
Telephone: 815-434-6206

## CONSULTING, DEVELOPMENT AND MARKETING AGREEMENT
## BETWEEN THE CITY OF OTTAWA, ILLINOIS
## AND JOHN COLT LANDRETH

**Whereas**, the City of Ottawa (the "City") is an Illinois municipal corporation and body politic operating under the provisions of the Illinois Municipal Code, (65 ILCS 5/1-1-1 *et seq.*) (the "Code"), and

**Whereas**, the Code authorizes the City to acquire, develop, and convey real property and to sell and convey such property within a redevelopment area, and

**Whereas**, the City is attempting to promote the commercial, industrial and economic development and welfare of the City, and

**Whereas**, the City encourages the increase of industry and commerce within the City and the State of Illinois, and

**Whereas**, the City now owns certain real property within the Ottawa Industrial Park Conservation TIF District ("OIP"), and

**Whereas**, the City has caused said real property to be platted and developed as an industrial park, and

**Whereas**, John Colt Landreth ("Landreth") is an individual with expertise in the development and marketing of industrial real property, and

**Whereas**, the specific and primary purposes for which OIP was created were to stimulate the promotion of industrial development within the City and to interest industry to locate in and about the City by the establishment of a comprehensive real estate marketing and development program (the "Program"), and

**Whereas**, the establishment of the program will further the public health, safety and welfare by the creation of jobs within the City, and

**Whereas**, Landreth has developed an expertise and experience with respect to the program and with regard to general economic development within the territory of the City, and

**Whereas**, the continued commercial and industrial development of the City is one of the primary corporate purposes of the City, and

**Whereas**, the Council of the City believes that it is in the best interest of the City to utilize Landreth as the primary economic development organization for the City, and



**Whereas,** efforts for the continued economic development of the City will require funds for all of the necessary development activity, including the appropriate marketing of the City as a viable location for potential commercial and industrial prospects, and

**Whereas,** Landreth is willing to act as the primary economic development organization of the City and devote one-half (1/2) of his time thereto.

**WITNESSETH:**

FOR AND IN CONSIDERATION of the mutual promises and undertakings herein set forth and other good and valuable considerations, the sufficiency of which is hereby acknowledged, the **CITY** and **LANDRETH** agree as follows:

1.      Incorporation of Recitals.  All of the foregoing recitals are incorporated herein by reference and are acknowledged as true and correct.

2.      Term of Agreement.  The initial term of this agreement shall be for twenty-four (24) months commencing, 2003, to and including, 2005.  The initial term may be extended by mutual, written agreement of the parties.

3.      Obligations of City.  In order to provide a continuous and reliable source of funding for economic development within the City and OIP:

(a) the City shall pay to Landreth the sum of $5,000.00 upon the execution of this agreement and the further sum of $5,000.00 on the same day of each succeeding month during the term of this agreement; said sum shall be for Landreth's monthly retainer; together with an monthly amount not to exceed $2,000.00 for Chicago support staff, travel, telephone; and similar items of expense.

(b) the further and additional sum of not to exceed $28,900.00 annually for web hosting and web modifications, broker events, CoreNet/SIOR dues, advertising, brochures and miscellaneous (wats line); and

(c)      the further and additional sum (one time expense only) of $2,000.00 for web site design.

(d)      the further and additional sum equal to 1 ½% of the actual project cost of all industrial developments occurring within the City during the term or any extension of this agreement.  Such sum shall be paid one-half (1/2) upon the commencement of construction based upon the estimate of project cost, and the balance shall be paid upon completion of construction as soon as the total project cost is determined.  The phrase "project cost" shall include the cost of land, direct and indirect building costs, and site preparation as shown on the building permit, but shall not include machinery, equipment or any item of personal property. Compensation for industrial developments, which occur outside existing TIF Districts, will be negotiated on a case by case basis and mutually agreed upon.

2

(e)     The projects known as Murph-Haines, Galaxy, Bedrock and Burton shall not be eligible for compensation under paragraph (d) above.

Landreth shall provide a monthly statement to the City for the items of expense set forth in paragraphs (a) and (b) above; such statements shall contain reasonable detail for each item of expense, including receipts or copies of invoices, if available.

4.     Services of Landreth. During the term of this Agreement Landreth shall provide to the City consulting, development and marketing services which shall be designed to increase and promote the commercial, industrial and economic base of the City, including, but not limited to the following:

(a)     Advertise and otherwise promote the City and OIP;

(b)     Develop and implement a marketing strategy for the City and OIP;

(c)     Develop and implement a master plan for OIP in conjunction with the City;

(d)     Develop and implement a strategic plan for OIP which shall include a a statement of mission and goals, as well as financial considerations and projections;

(e)     Develop community relations and public awareness on behalf of the City;

(f)     Identify and rank potential users and companies for location within OIP;

(g)     Coordinate and cooperate with other units of government and industry, as well as other economic development agencies;

(h)     Field and respond to all inquiries, and provide all necessary information to all prospects;

(i)     Coordinate activities and work with industrial real estate brokers in the Chicago metropolitan area;

(j)     Maintain and operate an office within the City of Chicago for the promotion and development of OIP;

(k)     Provide regular reports to the City, but not less frequently than quarterly, of all economic development activity;

(k)     Perform all other services as outlined and contained in the written proposal of Plaza Property Advisors dated March 17, 2003; and

(l)     Perform such other services as the City may reasonably require to accomplish the objective of increasing the job base within the City by attracting industry and distribution centers to the City.

5.     Independent Contract. Landreth understands and agrees that his obligation under this Agreement is to serve the City for the promotion and development of commercial and industrial development. It is understood and agreed between the parties that all persons working for Landreth under this Agreement, if any, shall be employees of Landreth and shall be in no way considered employees of the City. Should any liability arise under the Illinois Worker's Compensation Act during any time that employees are working for Landreth, said employees are covered by the Illinois Worker's Compensation Act and are the employees of Landreth. Neither Landreth nor his employees shall hold himself or themselves out to be employees, agents, or servants of the City.

6.    Best Efforts. Landreth agrees to devote his best efforts to the City's interest and to endeavor in every way to make successful the promotion of the City as a significant commercial and industrial location.

7.    Revocation. The City understands the long-term nature of this Agreement and the long-term nature of economic development. Therefore, the City agrees and covenants not to revoke or rescind this agreement or to institute any proceeding or action to challenge the validity of this agreement or in any way to rescind, modify or alter said agreement, understanding that Landreth is relying upon the representations and financial commitment contained herein and has every right to do so. Notwithstanding the foregoing or any other provision of this agreement to the contrary, either party to this agreement my cancel this agreement for any reason by providing the other party with not less than thirty (30) days prior, written notice of cancellation.

8.    Waiver. Waiver by either party of a breach of any term, condition or covenant herein shall not be deemed a waiver of any other term or condition or covenant.

9.    Breach. Upon a breach of any term or provision of this Agreement, the non-breaching party shall immediately provide a written notice to the other party describing the nature of the breach and a request for its immediate cure. In the event that said breach has not been cured within thirty (30) days of the issuance of written notice as aforesaid, then the non-breaching party may take such action as it deems necessary for the specific performance of this Agreement or its termination.

Upon termination of this agreement, Landreth shall provide the City with a list of Prospects within thirty days of termination. Said list will serve as a registration of prospects with the City. In the event that any of these prospects shall purchase land in a City TIF district or future TIF district (or any other location as mutually determined) within one year of the termination of this agreement, then Landreth shall be paid a fee in accordance with Section 3(d) hereof. In the event that any of the prospects purchases land as aforesaid within the period of 13 to 24 months following termination of this agreement, then Landreth shall be paid 75% of the fee provided in Section 3(d) hereof.

10.    Assignability. It is agreed that neither party shall have the right to assign this Agreement, in whole or in part, without the written consent of the other party.

11.    Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective assessors or assigns.

12.    Warranties. The parties warrant and represent that :

a.    Each of the undersigned representatives of such party has been duly authorized by such party to execute this Agreement on behalf of such party;

b.    This Agreement is binding, valid and specifically enforceable according to its terms against each party;

4

c.   This Agreement does not violate any presently existing provision of law or any applicable order, writ, injunction or decree of any court or governmental department, commission, board, bureau, agency or instrumentality to which such party may be subject;

d.   This Agreement does not constitute a default under any indenture, mortgage, deed of trust, agreement or contract of any kind to which such party may be bound;

e.   There are no pending legal proceedings by any party against the other party.

13.   Headings.  The headings of the sections of this Agreement are for convenience and reference only and in no way define, extend, limit or describe the scope or intent of this Agreement or any provision hereof.

14.   Execution and Counterparts.  This Agreement may be executed in multiple identical counterparts and all of said counterparts shall, taken together, constitute the same agreement.

15.   Disclosure.  The parties have jointly utilized the law firm of Pool, Leigh & Fabricius with respect to this Agreement, and each party acknowledges this fact and hereby expressly authorizes such joint representation.  Each party also waives any claim against said law firm or its individual attorneys because of any conflict of interest or any apparent conflict of interest resulting from said joint representation.

Executed in duplicate this _5th_ day of _August_____, 2003, by authority of a resolution of the Council of the City and by Landreth.

City of Ottawa, Illinois

By: _____          _____
      Its Mayor                                             John Colt Landreth

Attest:

_____
Its Clerk
F:\Docs\SRPD\Development and Marketing Agreement.doc

State of Illinois        )
                         )        SS
County of LaSalle        )


I, the undersigned, a notary public, in and for the County and State as aforesaid, do hereby certify that Robert M. Eschbach, personally known to me to be the Mayor of the City of Ottawa, Illinois, and Elizabeth A. Taylor, personally known to me to be the Clerk of said City, and personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and severally acknowledged that as Mayor and Clerk of said City, they signed and delivered said instrument in their official capacities as caused the corporate seal of said City be affixed thereto, pursuant to authority given by the Council said City, as the free and voluntary act and deed of said City, for the uses and purposes therein set forth.


Given under my hand and notarial seal
this ___5th___ day of ___August___ , 2003.


_____
Notary Public


"OFFICIAL SEAL"
VICKI V. DONAHUE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 5/16/07


6

State of Illinois        )
                         )        SS
County of                )


I, the undersigned, a notary public, in and for the County and State as aforesaid, do hereby certify that John Colt Landerth, personally known to me to be the same person whose names is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered said instrument as his free and voluntary act and deed for the uses and purposes therein set forth.

Given under my hand and notarial seal
this _____ day of _____, 2003.

_____
Notary Public

```
"OFFICIAL SEAL"
NANCY C. STISSER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 5/16/07
```

L:\Docs\ottawa\Contracts-Agreements\Landreth revised 7-31-03.doc

7

## CONSULTING, DEVELOPMENT AND MARKETING AGREEMENT
## BETWEEN THE CITY OF OTTAWA, ILLINOIS
## AND JOHN COLT LANDRETH

Whereas, the City of Ottawa (the "City") is an Illinois municipal corporation and body politic operating under the provisions of the Illinois Municipal Code, (65 ILCS 5/1-1-1 *et seq.*) (the "Code"), and

Whereas, the Code authorizes the City to acquire, develop, and convey real property and to sell and convey such property within a redevelopment area, and

Whereas, the City is attempting to promote the commercial, industrial and economic development and welfare of the City, and

Whereas, the City encourages the increase of industry and commerce within the City and the State of Illinois, and

Whereas, the City now owns certain real property within the Ottawa Industrial Park Conservation TIF District ("OIP"), and

Whereas, the City has caused said real property to be platted and developed as an industrial park, and

Whereas, John Colt Landreth ("Landreth") is an individual with expertise in the development and marketing of industrial real property, and

Whereas, the specific and primary purposes for which OIP was created were to stimulate the promotion of industrial development within the City and to interest industry to locate in and about the City by the establishment of a comprehensive real estate marketing and development program (the "Program"), and

Whereas, the establishment of the program will further the public health, safety and welfare by the creation of jobs within the City, and

Whereas, Landreth has developed an expertise and experience with respect to the program and with regard to general economic development within the territory of the City, and

Whereas, the continued commercial and industrial development of the City is one of the primary corporate purposes of the City, and

~~Whereas, the Council of the City believes that it is in the best interest of the City to utilize Landreth as the primary economic development organization for the City, and~~



Whereas, efforts for the continued economic development of the City will require funds for all of the necessary development activity, including the appropriate marketing of the City as a viable location for potential commercial and industrial prospects, and

Whereas, Landreth and the City entered into a Consulting, Development And Marketing Agreement in 2003 and said agreement has expired, and

Whereas, Landreth is willing to continue to act as the primary economic development organization of the City and devote one-half (1/2) of his time thereto any and all time which is reasonably and necessarily required therefore.

WITNESSETH:

FOR AND IN CONSIDERATION of the mutual promises and undertakings herein set forth and other good and valuable considerations, the sufficiency of which is hereby acknowledged, the CITY and LANDRETH agree as follows:

1.    Incorporation of Recitals. All of the foregoing recitals are incorporated herein by reference and are acknowledged as true and correct.

2.    Term of Agreement. The initial term of this agreement shall be for six (6) twenty-four (24) months commencing on the date hereof. The initial term may be extended by mutual, written agreement of the parties.

3.    Obligations of City. In order to provide a continuous and reliable source of funding for economic development within the City and OIP:

(a)    The City shall pay to Landreth the sum of $5,000.00 upon the execution of this agreement and the further sum of $5,000.00 on the same day of each succeeding month during the term of this agreement; said sum shall be for Landreth's monthly retainer; together with an additional monthly amount not to exceed $2,000.00 for Chicago support staff, travel, telephone and similar items of reasonable and necessary expense.

(b) The further and additional sum of not to exceed $28,900.00 annually for web hosting and web modifications, broker events, CoreNet/SIOR dues, advertising, brochures and miscellaneous (wats line); and

(c)    The further and additional sum equal to 1 ½ % of the actual project cost of all industrial developments occurring within the City during the term or any extension of this agreement. Such sum shall be paid one-half (1/2) upon the commencement of construction based upon the estimate of project cost as submitted by a developer and approved by the City, and the balance shall be paid upon completion of construction as soon as the total project cost is determined, and approved by the City. The phrase "project cost" shall include the cost of land, direct and indirect building costs, and site preparation as shown on the building

permit, but shall not include machinery, equipment or any item of personal property. Compensation for industrial developments, which occur outside existing TIF Districts, will be negotiated on a case-by-case basis and mutually agreed upon. **Notwithstanding any of the foregoing to the contrary, the obligation of the City under this paragraph (c) shall be limited solely to industrial developments that result from the marketing efforts of Landreth and not from other sources.**

(d)    The projects known as Murph-Haines, Galaxy, Bedrock, Burton and PetSmart shall not be eligible for compensation under paragraph (c) above.

Landreth shall provide a monthly statement to the City for the items of expense set forth in paragraphs (a) and (b) above; such statements shall contain reasonable detail for each item of expense, including receipts or copies of invoices, and such statements shall separate the items of expense as set forth in paragraphs (a) and (b) above.

4.    Services of Landreth. During the term of this Agreement Landreth shall provide to the City consulting, development and marketing services which shall be designed to increase and promote the commercial, industrial and economic base of the City, including, but not limited to the following:

(a)    Advertise and otherwise promote the City and OIP;

(b)    Develop and implement a marketing strategy for the City and OIP;

(c)    Develop and implement a master plan for OIP in conjunction with the City;

(d)    Develop and implement a strategic plan for OIP which shall include a a statement of mission and goals, as well as financial considerations and projections;

(e)    Develop community relations and public awareness on behalf of the City;

(f)    Identify and rank potential users and companies for location within OIP;

(g)    Coordinate and cooperate with other units of government and industry, as well as other economic development agencies;

(h)    Field and respond to all inquiries, and provide all necessary information to all prospects;

(i)    Coordinate activities and work with industrial real estate brokers in the Chicago metropolitan area;

(j)    Maintain and operate an office within the City of Chicago for the promotion and development of OIP;

(k)    Provide regular written reports to the City, but not less frequently than quarterly, of all economic development activity **including the names of all industrial prospects.**

(k)    Perform all other services as outlined and contained in the written proposal of Plaza Property Advisors dated March 17, 2003; and

(l)    Perform such other services as the City may reasonably require to accomplish the objective of increasing the job base within the City by attracting industry and distribution centers to the City.

3

5.    Independent Contract. Landreth understands and agrees that his obligation under this Agreement is to serve the City for the promotion and development of commercial and industrial development. It is understood and agreed between the parties that all persons working for Landreth under this Agreement, if any, shall be employees of Landreth and shall be in no way considered employees of the City. Should any liability arise under the Illinois Worker's Compensation Act during any time that employees are working for Landreth, said employees are covered by the Illinois Worker's Compensation Act and are the employees of Landreth. Neither Landreth nor his employees shall hold himself or themselves out to be employees, agents, or servants of the City.

6.    Best Efforts. Landreth agrees to devote his best efforts to the City's interest and to endeavor in every way to make successful the promotion of the City as a significant commercial and industrial location.

7.    Revocation. The City understands the long-term nature of this Agreement and the long-term nature of economic development. Therefore, the City agrees and covenants not to revoke or rescind this agreement or to institute any proceeding or action to challenge the validity of this agreement or in any way to rescind, modify or alter said agreement, understanding that Landreth is relying upon the representations and financial commitment contained herein and has every right to do so. Notwithstanding the foregoing or any other provision of this agreement to the contrary, either party to this agreement my cancel this agreement for any reason by providing the other party with not less than thirty (30) days prior, written notice of cancellation.

8.    Waiver. Waiver by either party of a breach of any term, condition or covenant herein shall not be deemed a waiver of any other term or condition or covenant.

9.    Breach. Upon a breach of any term or provision of this Agreement, the non-breaching party shall immediately provide a written notice to the other party describing the nature of the breach and a request for its immediate cure. In the event that said breach has not been cured within thirty (30) days of the issuance of written notice as aforesaid, then the non-breaching party may take such action as it deems necessary for the specific performance of this Agreement or its termination.

Upon termination of this agreement, Landreth shall provide the City with a list of all industrial prospects within thirty days of termination. Said list will serve as a registration of prospects with the City. In the event that any of these prospects shall purchase land in a City TIF district or future TIF district (or any other location as mutually determined) within one year 180 days of the termination of this agreement, then Landreth shall be paid a fee in accordance with Section 3(d) hereof. In the event that any of the prospects purchases land as aforesaid within the period of 13 to 24 months following termination of this agreement, then Landreth shall be paid 75% of the fee provided in Section 3(d) hereof.

4

10.    Assignability. It is agreed that neither party shall have the right to assign this Agreement, in whole or in part, without the written consent of the other party.

11.    Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective assessors or assigns.

12.    Warranties. The parties warrant and represent that :

a.    Each of the undersigned representatives of such party has been duly authorized by such party to execute this Agreement on behalf of such party;

b.    This Agreement is binding, valid and specifically enforceable according to its terms against each party;

c.    This Agreement does not violate any presently existing provision of law or any applicable order, writ, injunction or decree of any court or governmental department, commission, board, bureau, agency or instrumentality to which such party may be subject;

d.    This Agreement does not constitute a default under any indenture, mortgage, deed of trust, agreement or contract of any kind to which such party may be bound;

e.    There are no pending legal proceedings by any party against the other party.

13.    Headings. The headings of the sections of this Agreement are for convenience and reference only and in no way define, extend, limit or describe the scope or intent of this Agreement or any provision hereof.

14.    Execution and Counterparts. This Agreement may be executed in multiple identical counterparts and all of said counterparts shall, taken together, constitute the same agreement.

15.    Disclosure. The parties have jointly utilized the law firm of Pool, Leigh & Fabricius with respect to this Agreement, and each party acknowledges this fact and hereby expressly authorizes such joint representation. Each party also waives any claim against said law firm or its individual attorneys because of any conflict of interest or any apparent conflict of interest resulting from said joint representation.

Executed in duplicate this _____ day of _____, 2005, by authority of a resolution of the Council of the City and by Landreth.

City of Ottawa, Illinois


By:_____

      Its Mayor                           _____

                                             John Colt Landreth


Attest:


_____

Its Clerk


F:\Docs\ottawa\Contracts-Agreements\Landreth Consulting 8-05.doc

State of Illinois   )
                )    SS
County of LaSalle   )

      I, the undersigned, a notary public, in and for the County and State as aforesaid, do hereby certify that Robert M. Eschbach, personally known to me to be the Mayor of the City of Ottawa, Illinois, and Shelly L. Munks, personally known to me to be the Clerk of said City, and personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and severally acknowledged that as Mayor and Clerk of said City, they signed and delivered said instrument in their official capacities as caused the corporate seal of said City be affixed thereto, pursuant to authority given by the Council said City, as the free and voluntary act and deed of said City, for the uses and purposes therein set forth.

      Given under my hand and notarial seal
this _____ day of _____, 2005.


_____

      Notary Public

State of Illinois     )
                    )    SS
County of           )

        I, the undersigned, a notary public, in and for the County and State as aforesaid, do hereby certify that John Colt Landerth, personally known to me to be the same person whose names is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered said instrument as his free and voluntary act and deed for the uses and purposes therein set forth.

        Given under my hand and notarial seal
        this _____ day of _____, 2005.


        _____
            Notary Public

F:\Docs\ottawa\Contracts-Agreements\Landreth Consulting 8-05.doc

November 18, 2005

The Honorable Robert M. Eschbach          **VIA FACSIMILE**
Mayor                                      **and FDX**
City of Ottawa
301 West Madison Street
Ottawa, Illinois 61350

RE:  Prospect List

Dear Bob:

Pursuant to the terms of the "Consulting, Development and Marketing Agreement
between The City of Ottawa and John Colt Landreth executed on August 5, 2003, I am
submitting the following list of prospects pursuant to the second section of Paragraph 9.

Due to the fact that, while we have been in the process of negotiating a contract
extention, I have been working for the City as usual with The City's knowledge, we have
had an implied contract through at least November 8, 2005.My submittal of the following
list of prospects is well within the requirement of thirty (30) days from termination.

PROSPECTS

International Titanium Powder
Mortorcycle Tour Conversion (final payment due upon bldg. completion)
Varney Land Sale (an additional fee will be due when this property is developed)
Project Crunch (Snack Food Co.)
Project Searchlight
GE Plastics
Advantage Logistics


EXHIBIT
C

Honorable Robert M. Eschbach
Mayor of Ottawa
Page 2
November 18, 2005

| | |
|---|---|
| BLAIR Group DC | APL |
| Super Valu | Hub Group |
| TLC (Total Logistic Control) | Kuehne + Nagel |
| ABBA Plastics | Maersk |
| Aaron Equipment | New Breed |
| Vehicle Manufacturer (IDCEO) | Panalpina |
| Lowe's Distribution Center | Exel Logistics |
| Warehouse (broker D. Botthof) | Dayton Freight |
| Retail Co. DC (Staubach) | UPS |
| Heritage Harbor Ottawa (Heimsoth) | USF |
| Distribution Center CBRE (Frain) | CAT Logistics |
| Stock Seigle | NYK |
| George Weston Bakeries | |

I look forward to the opportunity to extend our contract. There is much work to do.


Sincerely yours,


John Colt Landreth

EXHIBIT N

### IN THE CIRCUIT COURT FOR THE THIRTEENTH JUDICIAL CIRCUIT
### LASALLE COUNTY, ILLINOIS

FILED

APR — 4 2007

LA SALLE COUNTY CIRCUIT
(THIRTEENTH) JUDICIAL CIRCUIT

John Colt Landreth,               )

        Plaintiff,      )

vs.                   )  No. 07-L-17

City of Ottawa, Illinois,     )
a municipal corporation,    )
                      )
        Defendant.   )

### MOTION TO DISMISS

Now comes the Defendant, City of Ottawa, an Illinois municipal corporation, by its attorneys, Pool, Leigh & Kopko, P.C., pursuant to section 2-619 (9) of the Code of Civil Procedure (735 ILCS 5/2-619 (9)) and moves this Honorable Court to dismiss the Complaint of Plaintiff, and in support hereof states as follows:

Count I

1.  Count I of Plaintiff's Complaint seeks damages against the Defendant based upon the breach of a written contract (the "Agreement"). (See, Exhibit A of Plaintiff's Complaint).

2.  The contract is dated August 5, 2003.

3.  On August 5, 2003 section 8-1-7 (a) of the Illinois Municipal Code (65 ILCS 5/8-1-7 (a)) provided:

> § 8-1-7. (a) Except as provided otherwise in this Section, no contract shall be made by the corporate authorities, or by any committee or member thereof, and no expense shall be incurred by any of the officers or departments of any municipality, whether the object of the expenditure has been ordered by the corporate authorities or not, unless an appropriation has been previously made concerning that contract or expense. Any contract made, or any expense otherwise incurred, in violation of the provisions of this section shall be null and void as to the municipality, and no money belonging thereto shall be paid on account thereof. However, pending the passage of the annual appropriation ordinance for any fiscal year, the corporate authorities may authorize heads

of departments or other separate agencies of the municipality to make necessary expenditures for the support thereof upon the basis of the appropriations of the preceding fiscal year. However, if it is determined by two-thirds vote of the corporate authorities then holding office at a regularly scheduled meeting of the corporate authorities that it is expedient and in the best public interest to begin proceedings for the construction of a needed public work, then the provisions of this section shall not apply to the extent that the corporate authorities may employ or contract for professional services necessary for the planning and financing of such public work. (emphasis supplied).

4. Attached hereto and incorporated herein by reference as Exhibit A is a certified copy of the Budget & Appropriation of the City of Ottawa for the fiscal year ending April 30, 2004.

5. The fiscal year of the City of Ottawa commences on May 1 of each year and ends on April 30 of the following year.

6. The Budget & Appropriation of the City of Ottawa for the fiscal year commencing May 1, 2003 and ending April 30, 2004 did not make an appropriation for the Agreement or any expense related thereto.

7. Without a prior appropriation for the Agreement or the expenses thereof, the Agreement is null and void.

8. Attached hereto and incorporated by reference as Exhibit B is the Affidavit of Shelly L. Munks, City Clerk of the City of Ottawa.

**Wherefore**, Defendant prays that Count I of Plaintiff's Complaint be dismissed with prejudice.

### Count II

1. Count II of Plaintiff's Complaint seeks damages against the Defendant based upon an alleged oral agreement to extend the term of the Agreement.

2. The Agreement provides in paragraph 2 thereof: "The initial term of this agreement shall be for twenty-four (24) months commencing, 2003, to and including, 2005. The initial term may be extended by **mutual, written agreement** of the parties." (emphasis supplied).

2

3. The Agreement commenced on August 5, 2003.

4. The Plaintiff alleges that on June 20, 2005 he and the Mayor Robert Eschbach agreed to extend the Agreement without change for an additional six months or until February 5, 2006. (See, Par. 10 of Count II of Plaintiff's Complaint).

5. Defendant had no duty or obligation to renew or extend the Agreement, and the Agreement expressly provided in paragraph 7 thereof: "Notwithstanding the foregoing or any other provision of this agreement to the contrary, either party to this agreement may cancel this agreement for any reason by providing the other party with not less than thirty (30 days prior, written notice of cancellation."

6. The Agreement expressly provided that any extension was required to be mutual and written.

7. Any agreement to extend the original Agreement required approval by the Council of the City of Ottawa.

8. Section 30.02 (B) of the Code of Ordinances of the City of Ottawa expressly provides:

   The Council shall make or authorize the making of all contracts, and no contract shall bind or be obligatory upon the city unless either made by ordinance or resolution adopted by the Council or reduced to writing and approved by the Council or expressly authorized by ordinance or resolution adopted by the Council.

9. Implied contracts are not recognized in cases involving municipalities.

10. Unless the power to bind a municipality in contract is expressly delegated to someone other than the corporate authority, only the corporate authority may authorize contracts.

11. The Agreement was never extended by subsequent agreement of the parties.

12. While the Council of the City of Ottawa did authorize a subsequent agreement with Plaintiff, the Plaintiff never executed the subsequent agreement and the Council repealed the authorization for the subsequent agreement.

13. Attached hereto and incorporated by reference as Exhibit B is the Affidavit of Shelly L. Munks, City Clerk of the City of Ottawa.

**Wherefore,** the Defendant prays that Count II of Plaintiff's Complaint be dismissed with prejudice.

<u>Count III</u>

1. Count III of Plaintiff's Complaint seeks declaratory relief for compensation under the Agreement and any valid extension thereof, and in effect, a declaration that the Agreement was extended for compensatory purposes.

2. In as much as the Agreement is null and void for the reasons set forth in Counts I and II of this motion, the Court should dismiss Count III of Plaintiff's Complaint.

Wherefore, Defendant prays that Count III of Plaintiff's Complaint be dismissed with prejudice.

**City of Ottawa, an Illinois municipal corporation**

By: _____

One of its Attorneys

Keith R. Leigh
Anita L. Kopko
Pool, Leigh & Kopko, P.C
628 Columbus Street, Suite 208
Ottawa, IL 61350
Telephone: 815-434-0097
Email: poolleighlaw@mchsi.com

L:\Docs\ottawa\Landreth v. Ottawa\Pleadings\Motion to Dismiss 3-28-07.doc



# City of Ottawa

### Robert M. Eschbach
### Mayor

Year Ending

## April 30, 2004

# BUDGET & APPROPRIATION

### Commissioners

Edward V. Whitney
Finance & General Administration

William E. Walsh
Streets & Public
Improvements

Dale F. Baxter
Public Health & Safety

Wayne Eichelkraut, Jr.
Public Property

**EXHIBIT A**

City of Otawa                    Revenue Estimates           Fiscal year ending April 30, 2003

Estimated Revenue

GENERAL CORPORATE FUND

| | | |
|---|---|---|
| 001-001-31100 | PROPERTY TAX | 1,220,000 |
| 001-001-31200 | REPLACEMENT TAX | 123,000 |
| 001-001-31301 | UTILITY TAX | 980,000 |
| 001-001-31500 | RETAILERS OCCUPATIONAL SALES TAX | 3,500,000 |
| 001-001-31600 | STATE INCOME TAX | 1,150,000 |
| 001-001-31700 | GAMBLING TAX | 6,000 |
| 001-002-32104 | MISCELLANEOUS LICENSES | 750 |
| 001-002-32105 | PEDDLERS LICENSE | 4,000 |
| 001-002-32106 | LIQUOR LICENSE | 30,000 |
| 001-002-32110 | SCAVENGER LICENSE | 350 |
| 001-002-32111 | SIGN FILING FEE | 550 |
| 001-002-32112 | TV FRANCHISE FEE | 160,000 |
| 001-002-32113 | PLUMBER LICENSE | 1,500 |
| 001-002-32116 | ARCADE LICENSE | 500 |
| 001-002-32118 | ELECTRICAL LICENSE | 18,000 |
| 001-002-32120 | RAFFLE LICENSE | 500 |
| 001-002-32121 | USE OF SIDEWALK LICENSE | 150 |
| 001-002-32124 | TREE CARE LICENSE | 400 |
| 001-002-32125 | CONTRACTOR LICENSE | 1,000 |
| 001-002-32201 | ELECTRICAL TEST FEE | 1,000 |
| 001-002-32202 | DOG RELEASE FEES | 3,000 |
| 001-002-32203 | PLUMBING PERMIT | 8,000 |
| 001-002-32204 | REZONING FILING FEE | 1,600 |
| 001-002-32205 | BUILDING PERMIT | 35,000 |
| 001-002-32206 | SWIMMING POOL PERMIT | 400 |
| 001-002-32207 | WRECKING PERMIT | 750 |
| 001-002-32210 | ELECTRICAL PERMIT | 10,000 |
| 001-002-32211 | PROPERTY VACATION PERMIT | 1,500 |
| 001-002-32212 | HOME OCCUPATION/BUSINESS PERMIT | 150 |
| 001-002-32214 | 1.5 MILE ZONING/LAND USE PERMIT | 1,000 |
| 001-002-32215 | GROWTH IMPACT FEES | 40,000 |
| 001-003-32208 | PARKING METER FEES | 750 |
| 001-003-32209 | REGISTRAR FEES | 8,000 |
| 001-003-32301 | MAGISTRATE FINES | 185,000 |
| 001-003-32303 | PARKING FINES | 40,000 · |
| 001-003-32304 | LIQUOR FINES | 2,000 |
| 001-003-33210 | HIGHWAY MAINTENANCE | 28,000 |
| 001-003-33220 | TRAFFIC LIGHT REIMBURSEMENT | 45,000 |
| 001-003-33230 | POLICE & FIRE TRAINING | 10,000 |
| 001-003-33231 | LAW ENFORCEMENT GRANT | 30,230 |
| 001-003-33240 | GRANTS | 442,500 |
| 001-006-34110 | POLICE MISCELLANEOUS | 5,000 |
| 001-006-34130 | GROUP INSURANCE PAYMENTS | 380,000 |
| 001-006-34131 | GROUP INSURANCE PAYMENTS-W&S FUND | 200,000 |
| 001-006-34150 | TELEPHONE FRANCHISE | 58,000 |
| 001-006-34225 | SPECIAL DUTY OFFICERS | 160,000 |
| 001-006-34310 | TREE REMOVAL | 5,000 |
| 001-006-35101 | RECOUP LIENS | 500 |
| 001-006-36111 | INTEREST ON INVESTMENTS | 25,000 |
| 001-006-36113 | TREE PROGRAM DONATIONS  - | 7,500 |

City of Otawa     Revenue Estimates     Fiscal year ending April 30, 2003

| | | Estimated Revenue |
|---|---|---|
| 001-006-36201 | RENTS | 500 |
| 001-006-36401 | SALE OF PROPERTY | - |
| 001-006-36402 | SALE OF EQUIPMENT | 500 |
| 001-006-36501 | REDDICK MANSION UTILITIES | 7,000 |
| 001-006-36502 | MUSEUM REIMBURSEMENT | 2,900 |
| 001-006-36650 | AMBULANCE FEES | 326,801 |
| 001-006-36701 | OTHER | 101,801 |
| 001-006-36706 | SKATEBOARD POP CONCESSION | - |
| 001-006-36711 | DONATIONS-PARKS | 2,500 |
| 001-006-36712 | DONATIONS-RIVERWALK | 50,000 |
| 001-006-36713 | DONATIONS-LINCOLN/DOUGLAS STATUE | 65,000 |
| 001-006-36716 | DONATIONS/YEAR OF LINCOLN | - |
| 001-006-36717 | DONATIONS-STR LIGHTING PROJECT | - |
| 001-006-36718 | DONATIONS-TOLL HOUSE PROJECT | 50,000 |
| 001-006-39300 | BOND SALE PROCEEDS | 200,000 |
| | **GENERAL CORPORATE FUND** | **9,738,582** |
| | | |
| | **CROSSING GUARD FUND** | |
| 101-001-31100 | PROPERTY TAX | 36,000 |
| 101-006-36111 | INTEREST ON INVESTMENTS | 50 |
| | **CROSSING GUARD FUND** | **36,050** |
| | | |
| | **AUDITING FUND** | |
| 102-001-31100 | PROPERTY TAX | 30,000 |
| 102-006-36111 | INTEREST ON INVESTMENTS | 200 |
| 102-006-36701 | OTHER | 8,500 |
| | **AUDITING FUND** | **38,700** |
| | | |
| | **ILL MUNICIPAL RETIREMENT FUND** | |
| 103-001-31100 | PROPERTY TAX | 341,000 |
| 103-001-31200 | REPLACEMENT TAX | 35,000 |
| 103-006-36111 | INTEREST ON INVESTMENTS | 10,000 |
| 103-006-36701 | OTHER | 4,000 |
| | **ILL MUNICIPAL RETIREMENT FUND** | **390,000** |
| | | |
| | **PUBLIC LIABILITY INSURANCE FUND** | |
| 104-001-31100 | PROPERTY TAX | 192,000 |
| 104-006-36111 | INTEREST ON INVESTMENTS | 10,000 |
| 104-006-36701 | OTHER | - |
| | **PUBLIC LIABILITY INSURANCE FUND** | **202,000** |
| | | |
| | **CIVIL DEFENSE FUND** | |
| 105-001-31100 | PROPERTY TAX | 8,200 |
| 105-006-36111 | INTEREST ON INVESTMENTS | 350 |
| 105-006-36701 | OTHER | - |
| | **CIVIL DEFENSE FUND** | **8,550** |

City of Otawa                    Revenue Estimates              Fiscal year ending April 30, 2003

|  |  | Estimated Revenue |
|---|---|---|
|  | **MOTOR FUEL TAX FUND** |  |
| 107-001-31800 | MOTOR FUEL TAX ALLOCATIONS | 511,000 |
| 107-006-36111 | INTEREST ON INVESTMENTS | 5,500 |
| 107-006-36701 | OTHER | - |
|  | **MOTOR FUEL TAX FUND** | **516,500** |
|  |  |  |
|  | **FOREIGN FIRE INSURANCE FUND** |  |
| 108-006-36701 | OTHER | **19,000** |
|  |  |  |
|  | **PLAYGROUND & RECREATION FUND** |  |
| 109-001-31100 | PROPERTY TAX | 150,000 |
| 109-006-36111 | INTEREST ON INVESTMENTS | 3,000 |
| 109-006-36220 | PLAY & REC CONCESSIONS | 19,600 |
| 109-006-36221 | PLAY & REC PARTICIPANT FEES | 12,800 |
| 109-006-36225 | ADULT SOFTBALL PROGRAM | 22,000 |
| 109-006-36226 | BASKETBALL PROGRAM | 4,000 |
| 109-006-36227 | TENNIS PROGRAM | - |
| 109-006-36228 | EVENING RECREATION PROGRAM | 1,200 |
| 109-006-36229 | MINOR LEAGUE PROGRAM | - |
| 109-006-36230 | CRAFT PROGRAM | - |
| 109-006-36231 | SPECIAL SUMMER PROGRAMS | - |
| 109-006-36232 | YOUTH ORGANIZATION PROGRAMS | - |
| 109-006-36701 | OTHER | - |
|  | **PLAYGROUND & RECREATION FUND** | **212,600** |
|  |  |  |
|  | **REDDICK LIBRARY FUND** |  |
| 110-001-31100 | PROPERTY TAX | 343,240 |
| 110-001-31200 | REPLACEMENT TAX | 24,989 |
| 110-003-33240 | GRANTS | 22,800 |
| 110-006-36111 | INTEREST ON INVESTMENTS | 8,000 |
| 110-006-36676 | LEGACIES & BEQUESTS | 3,500 |
| 110-006-36701 | OTHER | 30,000 |
| 110-006-39200 | PERMANENT TRANSFERS | 69,011 |
|  | **REDDICK LIBRARY FUND** | **501,540** |
|  |  |  |
|  | **INDUSTRIAL DEVEL COMM FUND** |  |
| 111-006-36111 | INTEREST ON INVESTMENTS | 200 |
| 111-006-36114 | LOAN INTEREST ON LOAN | 800 |
|  | **INDUSTRIAL DEVEL COMM FUND** | **1,000** |
|  |  |  |
|  | **POLICE DEPT DRUG EDUCATION FUND** |  |
| 112-006-36111 | INTEREST ON INVESTMENTS | 2,000 |
| 112-006-36701 | OTHER | 35,000 |
|  | **POLICE DEPT DRUG EDUCATION FUND** | **37,000** |
|  |  |  |
|  | **911 EMERGENCY PHONE SYSTEM FUND** |  |
| 113-006-36111 | INTEREST ON INVESTMENTS | 2,500 |
| 113-006-36701 | OTHER | 137,500 |
|  | **911 EMERGENCY PHONE SYSTEM FUND** | **140,000** |

City of Otawa                          Revenue Estimates                    Fiscal year ending April 30, 2003

|  |  | Estimated Revenue |
|---|---|---|
| | **FIRE DEPT FIRST AID FUND** | |
| 115-006-36111 | INTEREST ON INVESTMENTS | 1,500 |
| 115-006-36701 | OTHER | 3,500 |
| | **FIRE DEPT FIRST AID FUND** | **5,000** |
| | | |
| | **POLICE D.A.R.E. FUND** | |
| 116-006-36111 | INTEREST ON INVESTMENTS | 15 |
| 116-006-36701 | OTHER | 6,000 |
| | **POLICE D.A.R.E. FUND** | **6,015** |
| | | |
| | **REVOLVING LOAN FUND** | |
| 117-006-36111 | INTEREST ON INVESTMENTS | 3,000 |
| 117-006-36114 | LOAN INTEREST ON LOAN | 10,000 |
| | **REVOLVING LOAN FUND** | **13,000** |
| | | |
| | **POLICE FEDERAL DRUG FUND** | |
| 118-006-36111 | INTEREST ON INVESTMENTS | 225 |
| 118-006-36701 | OTHER | - |
| | **POLICE FEDERAL DRUG FUND** | **225** |
| | | |
| | **MAIN STREET LOAN FUND** | |
| 119-006-36111 | INTEREST ON INVESTMENTS | 500 |
| 119-006-36114 | LOAN INTEREST ON LOAN | 800 |
| | **MAIN STREET LOAN FUND** | **1,300** |
| | | |
| | **WASHINGTON PARK STATUE FUND** | |
| 129-003-33240 | GRANTS | - |
| 129-006-36111 | INTEREST ON INVESTMENTS | 500 |
| 129-006-36701 | OTHER | 67,500 |
| | **WASHINGTON PARK STATUE FUND** | **68,000** |
| | | |
| | **WEST LAFAYETTE STREET PROJECT FUND** | |
| 130-006-36111 | INTEREST ON INVESTMENTS | 10 |
| | **WEST LAFAYETTE STREET PROJECT FUND** | **10** |
| | | |
| | **ILL AVENUE SEWER SEPARATION FUND** | |
| 131-006-36111 | INTEREST ON INVESTMENTS | 100 |
| | **ILL AVENUE SEWER SEPARATION FUND** | **100** |
| | | |
| | **POLICE DRUG LAB FUND** | |
| 132-006-36111 | INTEREST ON INVESTMENTS | 250 |
| 132-006-36701 | OTHER | 1,000 |
| | **POLICE DRUG LAB FUND** | **1,250** |
| | | |
| | **POLICE PENSION FUND** | |
| 133-001-31100 | PROPERTY TAX | 200,000 |
| 133-006-31200 | REPLACEMENT TAX | 8,500 |
| | **POLICE PENSION FUND** | **208,500** |

City of Otawa                          Revenue Estimates          Fiscal year ending April 30, 2003

Estimated Revenue

|  |  |  |
|---|---|--:|
| | **FIRE PENSION FUND** | |
| 134-001-31100 | PROPERTY TAX | 336,304 |
| 134-006-31200 | REPLACEMENT TAX | 26,000 |
| | **FIRE PENSION FUND** | 362,304 |
| | | |
| | **DUI EQUIPMENT FUND** | |
| 135-006-36111 | INTEREST ON INVESTMENTS | 225 |
| 135-006-36701 | OTHER | 13,775 |
| | **DUI EQUIPMENT FUND** | 14,000 |
| | | |
| | **PUBLIC BENEFIT FUND** | |
| 202-001-31100 | PROPERTY TAX | 98,000 |
| 202-006-36111 | INTEREST ON INVESTMENTS | 3,000 |
| | **PUBLIC BENEFIT FUND** | 101,000 |
| | | |
| | **CORP PURPOSE BOND & INT FUND** | |
| 206-001-31100 | PROPERTY TAX | 334,000 |
| 206-006-36111 | INTEREST ON INVESTMENTS | 3,000 |
| | **CORP PURPOSE BOND & INT FUND** | 337,000 |
| | | |
| | **TIF DRAINAGE BOND & INT FUND** | |
| 207-003-39200 | PERMANENT TRANSFER | 96,300 |
| 207-006-36111 | INTEREST ON INVESTMENTS | 2,200 |
| | **TIF DRAINAGE BOND & INT FUND** | 98,500 |
| | | |
| | **SERIES 2001 BOND & INT FUND** | |
| 209-001-31100 | PROPERTY TAX | 208,730 |
| 209-006-36111 | INTEREST ON INVESTMENTS | 1,000 |
| | **SERIES 2001 BOND & INT FUND** | 209,730 |
| | | |
| | **STEVENSON ROAD IMPROVEMENT FUND** | |
| 319-006-36111 | INTEREST ON INVESTMENTS | 175 |
| | **STEVENSON ROAD IMPROVEMENT FUND** | 175 · |
| | | |
| | **ANITA DRIVE PAVING FUND** | |
| 320-006-36111 | INTEREST ON INVESTMENTS | 225 |
| 320-006-36302 | INTEREST RECD/SPEC ASSESSMENTS | 250 |
| | **ANITA DRIVE PAVING FUND** | 475 |
| | | |
| | **KANSAS STREET PAVING FUND** | |
| 321-006-36111 | INTEREST ON INVESTMENTS | 100 |
| 321-006-36302 | INTEREST RECD/SPEC ASSESSMENTS | 400 |
| | **KANSAS STREET PAVING FUND** | 500 |
| | | |
| | **PINE STREET PAVING FUND** | |
| 322-006-36111 | INTEREST ON INVESTMENTS | 150 |
| 322-006-36302 | INTEREST RECD/SPEC ASSESSMENTS | - |
| | **PINE STREET PAVING FUND** - | 150 |

City of Otawa                          Revenue Estimates                    Fiscal year ending April 30, 2003

Estimated Revenue

| | | |
|---|---|---:|
| | **TIF DRAINAGE CAP PROJECT FUND** | |
| 323-006-36111 | INTEREST ON INVESTMENTS | 400 |
| | TIF DRAINAGE CAP PROJECT FUND | 400 |
| | | |
| | **MAUDELLE ADDITION PAVING FUND** | |
| 324-006-36111 | INTEREST ON INVESTMENTS | - |
| 324-006-36301 | SPECIAL ASSESSMENTS | - |
| 324-006-36302 | INTEREST RECD/SPEC ASSESSMENTS | 375 |
| | MAUDELLE ADDITION PAVING FUND | 375 |
| | | |
| | **ILL ELM PAVING FUND** | |
| 325-006-36111 | INTEREST ON INVESTMENTS | 45 |
| 325-006-36302 | INTEREST RECD/SPEC ASSESSMENTS | 30 |
| | ILL ELM PAVING FUND | 75 |
| | | |
| | **PORTER STREET PAVING FUND** | |
| 326-006-36111 | INTEREST ON INVESTMENTS | 50 |
| 326-006-36302 | INTEREST RECD/SPEC ASSESSMENTS | 75 |
| | PORTER STREET PAVING FUND | 125 |
| | | |
| | **ELM KANSAS PAVING FUND** | |
| 327-006-36111 | INTEREST ON INVESTMENTS | 25 |
| 327-006-36302 | INTEREST RECD/SPEC ASSESSMENTS | 60 |
| | ELM KANSAS PAVING FUND | 85 |
| | | |
| | **FIFTH AVE SANITARY SEWER FUND** | |
| 328-006-36111 | INTEREST ON INVESTMENTS | 5 |
| 328-006-36302 | INTEREST RECD/SPEC ASSESSMENTS | 195 |
| | FIFTH AVE SANITARY SEWER FUND | 200 |
| | | |
| | **CATHERINE ST SPEC ASSMNT FUND** | |
| 329-006-36111 | INTEREST ON INVESTMENTS | 40 |
| 329-006-36302 | INTEREST RECD/SPEC ASSESSMENTS | 710 |
| | CATHERINE ST SPEC ASSMNT FUND | 750 |
| | | |
| | **HURON STREET ROADWAY FUND** | |
| 330-006-36111 | INTEREST ON INVESTMENTS | 10 |
| 330-006-36302 | INTEREST RECD/SPEC ASSESSMENTS | 665 |
| | HURON STREET ROADWAY FUND | 675 |
| | | |
| | **FOX RIVER PARK PROJECT FUND** | |
| 331-006-36111 | INTEREST ON INVESTMENTS | 1,325 |
| 331-006-36701 | OTHER | - |
| 331-006-36712 | DONATIONS-RIVERWALK | - |
| 331-006-36714 | DONATIONS-FOX RIVER PARK | - |
| | FOX RIVER PARK PROJECT FUND | 1,325 |
| | | |
| | **BELLEVUE AVE ROADWAY FUND** | |
| 332-006-36111 | INTEREST ON INVESTMENTS | 500 |
| 332-006-36302 | INTEREST RECD/SPEC ASSESSMENTS | 4,350 |

City of Otawa                     Revenue Estimates              Fiscal year ending April 30, 2003

| | | Estimated Revenue |
|---|---|---|
| 332-006-39200 | PERMANENT TRANSFER | - |
| | BELLEVUE AVE ROADWAY FUND | 4,850 |
| | | |
| | SERIES 2001-02 BOND PROJECT FUND | |
| 333-006-36111 | INTEREST ON INVESTMENTS | 1,000 |
| 333-006-36701 | OTHER | - |
| | SERIES 2001-02 BOND PROJECT FUND | 1,000 |
| | | |
| | OTTAWA VISITORS CENTER FUND | |
| 334-003-33240 | GRANTS | - |
| 334-006-36111 | INTEREST ON INVESTMENTS | - |
| 334-006-36675 | HOTEL MOTEL TAX | 205,540 |
| 334-006-36701 | OTHER | 888 |
| | OTTAWA VISITORS CENTER FUND | 206,428 |
| | | |
| | TIF DISTRICT 1/I-80 NORTH | |
| 501-001-31100 | PROPERTY TAX | 675,000 |
| 501-001-31500 | RETAILERS OCCUPATIONAL SALES TAX | 45,000 |
| 501-006-36111 | INTEREST ON INVESTMENTS | 8,000 |
| | TIF DISTRICT 1/I-80 NORTH | 728,000 |
| | | |
| | TIF DISTRICT 2/ROUTE 6 EAST | |
| 502-001-31100 | PROPERTY TAX | 265,000 |
| 502-001-31200 | RETAILERS OCCUPATIONAL SALES TAX | 135,000 |
| 502-006-36111 | INTEREST ON INVESTMENTS | 3,500 |
| | TIF DISTRICT 2/ROUTE 6 EAST | 403,500 |
| | | |
| | TIF DISTRICT 3/DOWNTOWN | |
| 503-001-31100 | PROPERTY TAX | 25,000 |
| 503-001-31200 | RETAILERS OCCUPATIONAL SALES TAX | 6,000 |
| 503-006-36111 | INTEREST ON INVESTMENTS | - |
| | TIF DISTRICT 3/DOWNTOWN | 31,000 |
| | | |
| | TIF DISTRICT 4/OTTAWA INDUSTRIAL PARK | |
| 504-001-31100 | PROPERTY TAX | - |
| 504-001-31200 | RETAILERS OCCUPATIONAL SALES TAX | - |
| 504-003-33240 | GRANTS | 660,000 |
| 504-006-36111 | INTEREST ON INVESTMENTS | - |
| | TIF DISTRICT 4/OTTAWA INDUSTRIAL PARK | 660,000 |
| | | |
| | WATER & SEWER FUND | |
| 601-003-33240 | GRANTS | 78,000 |
| 601-004-34401 | WATER REVENUE | 1,450,000 |
| 601-004-34402 | SEWER REVENUE | 655,000 |
| 601-004-34403 | PENALTY REVENUE | 35,000 |
| 601-004-34404 | TAPPING FEES | 3,500 |
| 601-004-34405 | SEWER EXTENSION FEES | 1,500 |
| 601-004-34406 | WATER MAIN EXTENSIONS | 500 |
| 601-004-34407 | BULK WATER REVENUE | 1,000 |
| 601-004-34408 | SEWER ASSESSMENT REVENUE | 350 |

|              |                                      | Estimated Revenue |
|--------------|--------------------------------------|-------------------|
| 601-004-34409 | NEW WATER METER REVENUE             | 15,000            |
| 601-004-34412 | BASIC WATER REVENUE                 | 375,000           |
| 601-004-34413 | BASIC SEWER REVENUE                 | 360,000           |
| 601-006-36402 | SALE OF EQUIPMENT                   | 2,000             |
| 601-006-36701 | OTHER                               | 5,000             |
| 601-006-39100 | NON OPERATING INTEREST              | 45,000            |
| 601-006-39300 | BOND SALE PROCEEDS                  | 1,500,000         |
|              | **WATER & SEWER FUND**               | **4,526,850**     |
|              |                                      |                   |
|              | SWIMMING POOL                        |                   |
| 603-006-36210 | POOL CONCESSIONS                    | 28,000            |
| 603-006-36211 | POOL GATE RECEIPTS                  | 57,000            |
| 603-006-36701 | OTHER                               | -                 |
| 603-006-39100 | NON OPERATING INTEREST              | -                 |
| 603-006-39200 | PERMANENT TRANSFER                  | 35,000            |
|              | **SWIMMING POOL**                    | **120,000**       |
|              |                                      |                   |
|              | CANAL RENTAL & PURCHASE FUND         |                   |
| 604-006-36201 | RENTS                               | 3,050             |
| 604-006-39100 | NON OPERATING INTEREST              | 400               |
|              | **CANAL RENTAL & PURCHASE FUND**     | **3,450**         |
|              |                                      |                   |
|              | FRIENDLY CITY RIVERFEST FUND         |                   |
| 605-006-36701 | OTHER                               | 325,000           |
| 605-006-39100 | NON OPERATING INTEREST              | 250               |
|              | **FRIENDLY CITY RIVERFEST FUND**     | **325,250**       |
|              |                                      |                   |
|              | HOTEL MOTEL TAX FUND                 |                   |
| 606-006-36701 | OTHER                               | 183,400           |
| 606-006-36704 | SPECIAL EVENTS REVENUE              | 21,200            |
| 606-006-36708 | THUNDER MONEY                       | 12,000            |
| 606-006-39100 | NON OPERATING INTEREST              | 500               |
|              | **HOTEL MOTEL TAX FUND**             | **217,100**       |
|              |                                      |                   |
|              | Grand total                          | 20,500,194        |

|  | Estimated Revenue |
|---|---|
| GENERAL CORPORATE FUND | 9,738,582 |
| CROSSING GUARD FUND | 36,050 |
| AUDITING FUND | 38,700 |
| ILL MUNICIPAL RETIREMENT FUND | 390,000 |
| PUBLIC LIABILITY INSURANCE FUND | 202,000 |
| CIVIL DEFENSE FUND | 8,550 |
| MOTOR FUEL TAX FUND | 516,500 |
| FOREIGN FIRE INSURANCE FUND | 19,000 |
| PLAYGROUND & RECREATION FUND | 212,600 |
| REDDICK LIBRARY FUND | 501,540 |
| INDUSTRIAL DEVEL COMM FUND | 1,000 |
| POLICE DEPT DRUG EDUCATION FUND | 37,000 |
| 911 EMERGENCY PHONE SYSTEM FUND | 140,000 |
| FIRE DEPT FIRST AID FUND | 5,000 |
| POLICE D.A.R.E. FUND | 6,015 |
| REVOLVING LOAN FUND | 13,000 |
| POLICE FEDERAL DRUG FUND | 225 |
| MAIN STREET LOAN FUND | 1,300 |
| WASHINGTON PARK STATUE FUND | 68,000 |
| WEST LAFAYETTE STREET PROJECT FUND | 10 |
| ILL AVENUE SEWER SEPARATION FUND | 100 |
| POLICE DRUG LAB FUND | 1,250 |
| POLICE PENSION FUND | 208,500 |
| FIRE PENSION FUND | 362,304 |
| DUI EQUIPMENT FUND | 14,000 |
| PUBLIC BENEFIT FUND | 101,000 |
| CORP PURPOSE BOND & INT FUND | 337,000 |
| TIF DRAINAGE BOND & INT FUND | 98,500 |
| SERIES 2001 BOND & INT FUND | 209,730 |
| STEVENSON ROAD IMPROVEMENT FUND | 175 |
| ANITA DRIVE PAVING FUND | 475 |
| KANSAS STREET PAVING FUND | 500 |
| PINE STREET PAVING FUND | 150 |
| TIF DRAINAGE CAP PROJECT FUND | 400 |
| MAUDELLE ADDITION PAVING FUND | 375 |
| ILL ELM PAVING FUND | 75 . |
| PORTER STREET PAVING FUND | 125 |
| ELM KANSAS PAVING FUND | 85 |
| FIFTH AVE SANITARY SEWER FUND | 200 |
| CATHERINE ST SPEC ASSMNT FUND | 750 |
| HURON STREET ROADWAY FUND | 675 |
| FOX RIVER PARK PROJECT FUND | 1,325 |
| BELLEVUE AVE ROADWAY FUND | 4,850 |
| SERIES 2001-02 BOND PROJECT FUND | 1,000 |
| OTTAWA VISITORS CENTER FUND | 206,428 |
| TIF DISTRICT 1/I-80 NORTH | 728,000 |
| TIF DISTRICT 2/ROUTE 6 EAST | 403,500 |
| TIF DISTRICT 3/DOWNTOWN | 31,000 |
| TIF DISTRICT 4/OTTAWA INDUSTRIAL PARK | 660,000 |
| WATER & SEWER FUND | 4,526,850 |
| SWIMMING POOL | 120,000 |

City of Otawa                     Revenue Estimates            Fiscal year ending April 30, 2003

|  | Estimated Revenue |
|---|---|
| CANAL RENTAL & PURCHASE FUND | 3,450 |
| FRIENDLY CITY RIVERFEST FUND | 325,250 |
| HOTEL MOTEL TAX FUND | 217,100 |
|  | 20,500,194 |

City of Ottawa                                  EXHIBIT A                                              5/7/03

## GENERAL CORPORATE FUND

Budget

### MAYOR

| Account | Description | Budget |
|---|---|---|
| 001-110-110 | ELECTED OFFICIAL | 46,000 |
| 001-110-140 | CLERICAL | 72,000 |
| 001-110-150 | PROFESSIONAL | 35,000 |
| 001-110-170 | PART TIME | 29,000 |
| 001-110-240 | DUES, EDUCATION, SEMINARS | 5,000 |
| 001-110-310 | OFFICE SUPPLIES | 1,000 |
| 001-110-320 | OPERATING SUPPLIES | 10,000 |
| 001-110-342 | TELEPHONE & PAGER EXPENSE | 600 |
| 001-110-344 | GASOLINE & DIESEL FUEL | 1,000 |
| 001-110-352 | MISCELLANEOUS | 10,000 |
| 001-110-740 | EQUIPMENT | 3,000 |
| | **MAYOR** | **212,600** |

### LIQUOR COMMISSIONER

| Account | Description | Budget |
|---|---|---|
| 001-111-110 | ELECTED OFFICIAL | 4,000 |
| 001-111-140 | CLERICAL | 400 |
| | **LIQUOR COMMISSIONER** | **4,400** |

### FIRE & POLICE COMMISSION

| Account | Description | Budget |
|---|---|---|
| 001-112-240 | DUES, EDUCATION, SEMINARS | 600 |
| 001-112-310 | OFFICE SUPPLIES | 200 |
| 001-112-320 | OPERATING SUPPLIES | 200 |
| 001-112-345 | PUBLISHING | 3,000 |
| 001-112-352 | MISCELLANEOUS | 1,000 |
| 001-112-410 | PROFESSIONAL SERVICES | 8,000 |
| | **FIRE & POLICE COMMISSION** | **13,000** |

### CIVIL SERVICE COMMISSION

| Account | Description | Budget |
|---|---|---|
| 001-116-320 | OPERATING SUPPLIES | 200 |
| 001-116-345 | PUBLISHING | 2,000 |
| 001-116-352 | MISCELLANEOUS | 100 |
| 001-116-410 | PROFESSIONAL SERVICES | 4,000 |
| | **CIVIL SERVICE COMMISSION** | **6,300** |

### GENERAL ADMINISTRATION

| Account | Description | Budget |
|---|---|---|
| 001-120-120 | ADMINISTRATIVE | 80,000 |
| 001-120-140 | CLERICAL | 38,665 |
| 001-120-170 | PART TIME | 5,000 |
| 001-120-180 | OVERTIME | 1,500 |
| 001-120-230 | CLOTHING REIMBURSEMENT | 3,000 |
| 001-120-240 | DUES, EDUCATION, SEMINARS | 15,000 |
| 001-120-25001 | GI - ADMINSITRATION EXPENSE | 38,000 |
| 001-120-25002 | GI - REVIEW SERVICE | 4,000 |
| 001-120-25003 | GI - TRANSPLANT PREMIUM | 20,000 |
| 001-120-25004 | GI - LIFE INSURANCE PREMIUM | 23,000 |
| 001-120-25005 | GI - EMPLOYEE ASSITANCE PLAN | 4,000 |
| 001-120-25006 | GI - STOP LOSS INSURANCE | 331,500 |
| 001-120-25007 | GI - TAX SAVER SELECT PREMIUM | 1,000 |
| 001-120-25030 | GI - CLAIM EXPENSE | 1,120,000 |
| 001-120-25031 | GI - STOP RECOVERIES | (150,000) |
| 001-120-25032 | GI - RX CARD BENEFIT | 165,000 |
| 001-120-280 | UNEMPLOYMENT | 20,000 |
| 001-120-310 | OFFICE SUPPLIES | 15,000 |
| 001-120-320 | OPERATING SUPPLIES | 10,000 |
| 001-120-330 | REPAIRS & MAINTENANCE | 2,500 |
| 001-120-342 | TELEPHONE & PAGER EXPENSE | 12,500 |
| 001-120-343 | POSTAGE | 13,000 |
| 001-120-345 | PUBLISHING | 7,500 |
| 001-120-34501 | PUBLISHING/PROMOTIONS | 5,000 |
| 001-120-352 | MISCELLANEOUS | 20,000 |

City of Ottawa                                    EXHIBIT A                                    5/7/03

|  |  | Budget |
|---|---|---|
| 001-120-410 | PROFESSIONAL SERVICES | 60,000 |
| 001-120-447 | ALLOCATIONS & SUBSIDIES | 5,000 |
| 001-120-44705 | ALLOCATIONS/RIVER RESCUE | 5,000 |
| 001-120-44707 | ALLOCATIONS/LABOR OF LOVE | 2,000 |
| 001-120-44708 | ALLOCATIONS/SENIOR SERVICES | 3,000 |
| 001-120-44710 | SUBSIDY / TAXI CAB | 18,000 |
| 001-120-44720 | ALLOCATIONS/RIORDAN SWIMMING POOL | 35,000 |
| 001-120-450 | LEGAL FEES | 210,000 |
| 001-120-451 | EQUIPMENT LEASES | 2,500 |
| 001-120-453 | OPERATING LEASE | 5,500 |
| 001-120-710 | LAND AND OPTIONS | 156,000 |
| 001-120-740 | EQUIPMENT | 25,000 |
| 001-120-910 | BOISE CASCADE SUBSIDY AGREEMENT | 69,000 |
|  | GENERAL ADMINISTRATION | 2,401,165 |
|  |  |  |
|  | COMM ACCOUNTS & FINANCE |  |
| 001-126-110 | ELECTED OFFICIAL | 7,800 |
| 001-126-240 | DUES, EDUCATION, SEMINARS | 2,000 |
| 001-126-310 | OFFICE SUPPLIES | 500 |
| 001-126-342 | TELEPHONE & PAGER EXPENSE | 1,500 |
| 001-126-344 | GASOLINE & DIESEL FUEL | 700 |
|  | COMM ACCOUNTS & FINANCE | 12,500 |
|  |  |  |
|  | COMMUNITY DEVELOPMENT |  |
| 001-131-140 | CLERICAL | 37,000 |
| 001-131-150 | PROFESSIONAL | 129,000 |
| 001-131-160 | OTHER EMPLOYEES | 54,000 |
| 001-131-170 | PART TIME | 5,000 |
| 001-131-210 | MEAL ALLOWANCE | 500 |
| 001-131-240 | DUES, EDUCATION, SEMINARS | 4,000 |
| 001-131-310 | OFFICE SUPPLIES | 2,000 |
| 001-131-330 | REPAIRS & MAINTENANCE | 500 |
| 001-131-342 | TELEPHONE & PAGER EXPENSE | 1,200 |
| 001-131-344 | GASOLINE & DIESEL FUEL | 4,000 |
| 001-131-345 | PUBLISHING | 2,000 |
| 001-131-352 | MISCELLANEOUS | 1,000 |
| 001-131-410 | PROFESSIONAL SERVICES | 80,000 |
| 001-131-421 | CONTRACTUAL/TREE REMOVAL PROGR | 50,000 |
| 001-131-450 | LEGAL FEES | 1,000 |
| 001-131-451 | EQUIPMENT LEASES | 1,000 |
| 001-131-740 | EQUIPMENT | 12,000 |
| 001-131-750 | CONSTRUCTION IN PROGRESS | 1,000 |
| 001-131-75004 | CIP/STORM SEWER IMPROVEMENTS | 100,000 |
| 001-131-75005 | CIP/IV RAIL STUDY | 140,000 |
| 001-131-75006 | CIP/STOMSEWER MASTER PLANS | 5,000 |
| 001-131-75008 | CIP/STORM SEWER MAINTENANCE | 20,000 |
|  | COMMUNITY DEVELOPMENT | 650,200 |
|  |  |  |
|  | POLICE |  |
| 001-310-120 | ADMINISTRATIVE | 66,560 |
| 001-310-140 | CLERICAL | 320,000 |
| 001-310-160 | OTHER EMPLOYEES | 1,400,000 |
| 001-310-180 | OVERTIME | 120,000 |
| 001-310-190 | SPECIAL DUTY | 140,660 |
| 001-310-230 | CLOTHING ALLOWANCE | 25,000 |
| 001-310-240 | DUES, EDUCATION, SEMINARS | 35,000 |
| 001-310-310 | OFFICE SUPPLIES | 5,500 |
| 001-310-320 | OPERATING SUPPLIES | 18,000 |
| 001-310-330 | REPAIRS & MAINTENANCE | 5,000 |
| 001-310-331 | REPAIRS & MAINTENANCE-EQUIPMENT | 16,000 |
| 001-310-342 | TELEPHONE & PAGER EXPENSE | 30,000 |
| 001-310-343 | POSTAGE | 300 |

City of Ottawa                                        EXHIBIT A                                        5/7/03

|  |  | Budget |
|---|---|---|
| 001-310-344 | GASOLINE & DIESEL FUEL | 40,000 |
| 001-310-345 | PUBLISHING | 200 |
| 001-310-352 | MISCELLANEOUS | 300 |
| 001-310-410 | PROFESSIONAL SERVICES | 12,000 |
| 001-310-420 | CONTRACTUAL/ANIMAL CONTROL | 5,000 |
| 001-310-422 | GRANT EXP/ILL VIOLENCE PREVENT | 11,000 |
| 001-310-42201 | GRANT EXP/TOBACCO GRANT | 200 |
| 001-310-740 | EQUIPMENT | 25,000 |
|  | **POLICE** | **2,275,720** |

**FIRE**

|  |  |  |
|---|---|---|
| 001-320-120 | ADMINISTRATIVE | 67,000 |
| 001-320-160 | OTHER EMPLOYEES | 1,213,469 |
| 001-320-180 | OVERTIME | 135,000 |
| 001-320-210 | MEAL ALLOWANCE | 16,800 |
| 001-320-230 | CLOTHING ALLOWANCE | 8,700 |
| 001-320-240 | DUES, EDUCATION, SEMINARS | 40,000 |
| 001-320-310 | OFFICE SUPPLIES | 2,000 |
| 001-320-320 | OPERATING SUPPLIES | 15,000 |
| 001-320-330 | REPAIRS & MAINTENANCE | 1,500 |
| 001-320-331 | REPAIRS & MAINTENANCE-EQUIPMENT | 5,000 |
| 001-320-335 | REPAIRS & MAINTENANCE-VEHICLES | 10,000 |
| 001-320-342 | TELEPHONE & PAGER EXPENSE | 13,000 |
| 001-320-343 | POSTAGE | 150 |
| 001-320-344 | GASOLINE & DIESEL FUEL | 8,000 |
| 001-320-345 | PUBLISHING | 1,000 |
| 001-320-352 | MISCELLANEOUS | 500 |
| 001-320-35211 | AMBULANCE EXPENSES | 40,000 |
| 001-320-410 | PROFESSIONAL SERVICES | 10,000 |
| 001-320-41001 | PROFESSIONAL SERVICES/WELLNESS GRANT | 43,088 |
| 001-320-740 | EQUIPMENT | 200,000 |
|  | **FIRE** | **1,830,207** |

**COMM PUBLIC HEALTH & SAFETY**

|  |  |  |
|---|---|---|
| 001-326-110 | ELECTED OFFICIAL | 7,800 |
| 001-326-240 | DUES, EDUCATION, SEMINARS | 2,000 |
| 001-326-310 | OFFICE SUPPLIES | 500 |
| 001-326-342 | TELEPHONE & PAGER EXPENSE | 1,500 |
| 001-326-344 | GASOLINE & DIESEL FUEL | 700 |
|  | **COMM PUBLIC HEALTH & SAFETY** | **12,500** |

**STREET**

|  |  |  |
|---|---|---|
| 001-510-120 | ADMINISTRATIVE | 55,120 |
| 001-510-160 | OTHER EMPLOYEES | 245,000 |
| 001-510-170 | PART TIME | 40,000 |
| 001-510-180 | OVERTIME | 40,000 |
| 001-510-230 | CLOTHING REIMBURSEMENT | 2,700 |
| 001-510-240 | DUES, EDUCATION, SEMINARS | 500 |
| 001-510-310 | OFFICE SUPPLIES | 500 |
| 001-510-320 | OPERATING SUPPLIES | 73,000 |
| 001-510-330 | REPAIRS & MAINTENANCE | 10,000 |
| 001-510-33010 | TRAFFIC LIGHT MAINT/LABOR | 60,000 |
| 001-510-33011 | STREET LIGHT MAINT/LABOR | 10,000 |
| 001-510-342 | TELEPHONE & PAGER EXPENSE | 3,000 |
| 001-510-344 | GASOLINE & DIESEL FUEL | 20,000 |
| 001-510-345 | PUBLISHING | 1,500 |
| 001-510-352 | MISCELLANEOUS | 700 |
| 001-510-410 | PROFESSIONAL SERVICES | 75,000 |
| 001-510-451 | EQUIPMENT LEASES | 27,000 |
| 001-510-453 | OPERATING LEASE | 500 |
| 001-510-740 | EQUIPMENT | 5,000 |
| 001-510-750 | CONSTRUCTION IN PROGRESS | 198,000 |

City of Ottawa

EXHIBIT A

5/7/03

|  |  | Budget |
|---|---|---|
|  | STREET | 867,520 |

VEHICLE MAINTENANCE

| | | |
|---|---|---|
| 001-520-160 | OTHER EMPLOYEES | 81,120 |
| 001-520-170 | PART TIME WORKERS | 4,000 |
| 001-520-180 | OVERTIME | 5,500 |
| 001-520-230 | CLOTHING REIMBURSEMENT | 1,000 |
| 001-520-240 | DUES, EDUCATION, SEMINARS | 200 |
| 001-520-310 | OFFICE SUPPLIES | 500 |
| 001-520-320 | OPERATING SUPPLIES | 12,000 |
| 001-520-330 | REPAIRS & MAINTENANCE | 500 |
| 001-520-331 | REPAIRS & MAINTENANCE-EQUIPMENT | 3,000 |
| 001-520-332 | REPAIRS & MAINT/VEHICLES/STREETS | 25,000 |
| 001-520-333 | REPAIRS & MAINT/VEHICLES/PARKS | 5,000 |
| 001-520-334 | REPAIRS & MAINT/VEHICLES/POLIC | 5,000 |
| 001-520-336 | REPAIRS & MAINT/VEHICLES/OTHER | 2,500 |
| 001-520-344 | GASOLINE & DIESEL FUEL | 750 |
| 001-520-352 | MISCELLANEOUS | 100 |
| 001-520-410 | PROFESSIONAL SERVICES | 2,000 |
| 001-520-740 | EQUIPMENT | 3,000 |
| | VEHICLE MAINTENANCE | 151,170 |

COMM PUBLIC IMPROVEMENT

| | | |
|---|---|---|
| 001-526-110 | ELECTED OFFICIAL | 7,800 |
| 001-526-240 | DUES, EDUCATION, SEMINARS | 2,000 |
| 001-526-310 | OFFICE SUPPLIES | 500 |
| 001-526-342 | TELEPHONE & PAGER EXPENSE | 1,500 |
| 001-526-344 | GASOLINE & DIESEL FUEL | 700 |
| | COMM PUBLIC IMPROVEMENT | 12,500 |

MINI BUS

| | | |
|---|---|---|
| 001-530-160 | OTHER EMPLOYEES | 35,000 |
| 001-530-170 | PART TIME | 6,650 |
| 001-530-342 | TELEPHONE & PAGER EXPENSE | 700 |
| 001-530-344 | GASOLINE & DIESEL FUEL | 7,000 |
| 001-530-352 | MISCELLANEOUS | 500 |
| 001-530-410 | PROFESSIONAL/CONTRACTUAL SERVICES | 500 |
| | MINI BUS | 50,350 |

COMM PUBLIC PROPERTY

| | | |
|---|---|---|
| 001-626-110 | ELECTED OFFICIAL | 7,800 |
| 001-626-240 | DUES, EDUCATION, SEMINARS | 2,000 |
| 001-626-310 | OFFICE SUPPLIES | 500 |
| 001-626-342 | TELEPHONE & PAGER EXPENSE | 1,500 |
| 001-626-344 | GASOLINE & DIESEL FUEL | 700 |
| | COMM PUBLIC PROPERTY | 12,500 |

PARKS & PUBLIC BUILDINGS

| | | |
|---|---|---|
| 001-630-120 | ADMINISTRATIVE | 54,600 |
| 001-630-160 | OTHER EMPLOYEES (Garbage) | 100,000 |
| 001-630-170 | PART TIME | 30,000 |
| 001-630-180 | OVERTIME | 10,000 |
| 001-630-230 | CLOTHING ALLOWANCE | 1,350 |
| 001-630-240 | DUES, EDUCATION, SEMINARS | 2,000 |
| 001-630-310 | OFFICE SUPPLIES | 350 |
| 001-630-320 | OPERATING SUPPLIES | 60,000 |
| 001-630-32081 | PARKS ADVISORY-FLOWERS&LAMPPOST | 10,000 |
| 001-630-32082 | TREE BOARD/TREES | 12,500 |
| 001-630-330 | REPAIRS & MAINTENANCE (Public comfort statio | 60,000 |
| 001-630-331 | REPAIRS & MAINTENANCE-EQUIPMEN | 10,000 |
| 001-630-342 | TELEPHONE & PAGER EXPENSE | 2,500 |
| 001-630-344 | GASOLINE & DIESEL FUEL | 8,000 |

City of Ottawa                                        EXHIBIT A                                        5/7/03

|  |  | Budget |
|---|---|---|
| 001-630-345 | PUBLISHING | 150 |
| 001-630-349 | UTILITIES (Street lighting) | 230,000 |
| 001-630-352 | MISCELLANEOUS | 5,000 |
| 001-630-410 | PROFESSIONAL SERVICES | 65,000 |
| 001-630-41200 | CONTRACTUAL REPAIRS/BLDG/STREETS | 5,000 |
| 001-630-41202 | CONTRACTUAL REPAIRS/BLDG/POLIC | 15,000 |
| 001-630-41203 | CONTRACTUAL REPAIRS/BLDG/FIRE | 15,000 |
| 001-630-41204 | CONTRACTUAL REPAIRS/BLDG/CITYH | 10,000 |
| 001-630-41205 | CONTRACTUAL REPAIRS/BLDG/OTHER | 20,000 |
| 001-630-451 | EQUIPMENT LEASES | 2,000 |
| 001-630-453 | OPERATING LEASE | 2,000 |
| 001-630-710 | LAND & OPTIONS | 40,000 |
| 001-630-740 | EQUIPMENT | 30,000 |
| 001-630-750 | CONSTRUCTION IN PROGRESS | 120,000 |
| 001-630-75002 | CIP - RIVERWALK | 292,500 |
| 001-630-75010 | CIP-BOAT DOCKS | 5,000 |
| 001-630-75011 | CIP-TOLL HOUSE | 8,000 |
|  | PARKS & PUBLIC BUILDINGS | 1,225,950 |
|  |  |  |
|  | GENERAL CORPORATE FUND | 9,738,582 |
|  |  |  |
|  | CROSSING GUARD FUND |  |
| 101-340-563 | PERMANENT TRANSFERS | 36,050 |
|  | CROSSING GUARD FUND | 36,050 |
|  |  |  |
|  | AUDITING FUND |  |
| 102-132-352 | MISCELLANEOUS | 0 |
| 102-132-410 | PROFESSIONAL SERVICES | 42,500 |
|  | AUDITING FUND | 42,500 |
|  |  |  |
|  | IL MUNICIPAL RETIREMENT FUND |  |
| 103-119-260 | SOCIAL SECURITY | 260,000 |
| 103-119-270 | RETIREMENT | 200,000 |
|  | IL MUNICIPAL RETIREMENT | 460,000 |
|  |  |  |
|  | PUBLIC LIABILITY INSURANCE FUND |  |
| 104-133-446 | INSURANCE | 350,000 |
|  | PUBLIC LIABILITY INSURANCE FUND | 350,000 |
|  |  |  |
|  | EMERGENCY SERVICES & DISASTER AGENCY |  |
| 105-322-320 | OPERATING SUPPLIES | 3,000 |
| 105-322-330 | REPAIRS & MAINTENANCE | 250 |
| 105-322-331 | REPAIRS & MAINTENANCE-EQUIPMENT | 2,500 |
| 105-322-332 | REPAIRS & MAINT/VEHICLES/STREETS | 1,000 |
| 105-322-342 | TELEPHONE & PAGER EXPENSE | 3,500 |
| 105-322-344 | GASOLINE & DIESEL FUEL | 750 |
| 105-322-352 | MISCELLANEOUS | 500 |
| 105-322-410 | PROFESSIONAL SERVICES | 500 |
|  | EMERGENCY SERVICES & DISASTER AGENCY | 12,000 |
|  |  |  |
|  | MOTOR FUEL TAX FUND |  |
| 107-535-352 | MISCELLANEOUS | 576,500 |
|  | MOTOR FUEL TAX FUND | 576,500 |
|  |  |  |
|  | FOREIGN FIRE INSURANCE FUND | 19,000 |
|  |  |  |
|  | PLAYGROUND & RECREATION FUND |  |
| 109-187-120 | ADMINISTRATIVE | 14,000 |
| 109-187-140 | CLERICAL | 5,000 |
| 109-187-16001 | OTHER/P&R/PLAYGROUNDS | 31,000 |
| 109-187-16002 | OTHER/P&R/SOFTBALL | 32,000 |
| 109-187-16004 | OTHER/P&R/BASKETBALL | 7,800 |

City of Ottawa                                       EXHIBIT A                                        5/7/03

|  |  | Budget |
|---|---|---:|
| 109-187-16005 | OTHER/P&R/TENNIS | 8,500 |
| 109-187-16006 | OTHER/P&R/EVENING | 6,000 |
| 109-187-16009 | OTHER/P&R/SUMMER CAMPS AND PROGRAM | 20,000 |
| 109-187-260 | FICA | 9,000 |
| 109-187-310 | OFFICE SUPPLIES | 300 |
| 109-187-320 | OPERATING SUPPLIES | 3,500 |
| 109-187-32001 | CONCESSION SUPPLIES | 10,500 |
| 109-187-330 | REPAIRS & MAINTENANCE | 500 |
| 109-187-331 | REPAIRS & MAINTENANCE-EQUIPMEN | 500 |
| 109-187-342 | TELEPHONE & PAGER EXPENSE | 1,000 |
| 109-187-345 | PUBLISHING | 2,500 |
| 109-187-352 | MISCELLANEOUS | 500 |
| 109-187-35201 | MISC/P&R/PLAYGROUNDS | 300 |
| 109-187-35202 | MISC/P&R/SOFTBALL | 6,300 |
| 109-187-35203 | MISC/P&R/MINOR LEAGUE | 1,500 |
| 109-187-35204 | MISC/P&R/BASKETBALL | 3,750 |
| 109-187-35205 | MISC/P&R/TENNIS | 600 |
| 109-187-35206 | MISC/P&R/EVENING | 100 |
| 109-187-35207 | MISC/P&R/CRAFT | 3,200 |
| 109-187-35208 | MISC/P&R/YOUTH ORGANIZATIONS | 16,000 |
| 109-187-35209 | MISC/P&R/SPECIAL | 15,400 |
| 109-187-35210 | MISC/P&R/SENIOR CITIZENS | 4,150 |
| 109-187-410 | PROFESSIONAL SERVICES | 1,000 |
| 109-187-740 | EQUIPMENT | 2,000 |
| 109-187-750 | CONSTRUCTION IN PROGRESS | 100,000 |
|  | PLAYGROUND & RECREATION FUND | 306,900 |
|  |  |  |
|  | LIBRARY FUND |  |
| 110-189-120 | ADMINISTRATIVE | 80,000 |
| 110-189-160 | OTHER EMPLOYEES | 85,000 |
| 110-189-170 | PART TIME | 105,000 |
| 110-189-180 | OVERTIME | 3,000 |
| 110-189-240 | DUES, EDUCATION, SEMINARS | 3,000 |
| 110-189-250 | HEALTH & LIFE INSURANCE | 25,000 |
| 110-189-310 | OFFICE SUPPLIES | 12,000 |
| 110-189-320 | OPERATING SUPPLIES | 73,000 |
| 110-189-330 | REPAIRS & MAINTENANCE | 9,240 |
| 110-189-342 | TELEPHONE & PAGER EXPENSE | 3,000 |
| 110-189-343 | POSTAGE | 2,000 |
| 110-189-344 | GASOLINE & DIESEL FUEL | 1,500 |
| 110-189-349 | UTILITIES | 23,000 |
| 110-189-352 | MISCELLANEOUS | 28,800 |
| 110-189-410 | PROFESSIONAL/CONTRACTUAL SERVICE | 20,000 |
| 110-189-41205 | CONTRACTUAL REPAIRS/BLDG/OTHER | 6,000 |
| 110-189-446 | INSURANCE | 10,000 |
| 110-189-450 | LEGAL FEES | 2,000 |
| 110-189-740 | EQUIPMENT | 10,000 |
|  | LIBRARY FUND | 501,540 |
|  |  |  |
|  | INDUSTRIAL DEVELOPMENT COMMISSION FUND |  |
| 111-140-352 | MISCELLANEOUS | 1,000 |
|  | INDUSTRIAL DEVELOPMENT COMMISSION FU | 1,000 |
|  |  |  |
|  | POLICE DEPT DRUG EDUCATION FUND |  |
| 112-190-240 | DUES, EDUCATION, SEMINARS | 2,000 |
| 112-190-310 | OFFICE SUPPLIES | 1,000 |
| 112-190-320 | OPERATING SUPPLIES | 1,000 |
| 112-190-410 | PROFESSIONAL SERVICES | 25,000 |
| 112-190-740 | EQUIPMENT | 100,000 |
|  | POLICE DEPT DRUG EDUCATION FUND | 129,000 |

911 EMERGENCY PHONE SYSTEM FUND

City of Ottawa    EXHIBIT A    5/7/03

|  |  | Budget |
|---|---|---|
| 113-191-240 | DUES, EDUCATION, SEMINARS | 1,500 |
| 113-191-310 | OFFICE SUPPLIES | 1,000 |
| 113-191-320 | OPERATING SUPPLIES | 1,000 |
| 113-191-331 | REPAIRS & MAINTENANCE-EQUIPMENT | 20,000 |
| 113-191-342 | TELEPHONE & PAGER EXPENSE | 22,000 |
| 113-191-410 | PROFESSIONAL SERVICES | 20,000 |
| 113-191-450 | LEGAL FEES | 5,000 |
| 113-191-740 | EQUIPMENT | 69,500 |
|  | 911 EMERGENCY PHONE SYSTEM FUND | 140,000 |
|  |  |  |
|  | FIRE DEPT FIRST AID FUND |  |
| 115-192-320 | OPERATING SUPPLIES | 2,000 |
| 115-192-410 | PROFESSIONAL SERVICES | 1,000 |
| 115-192-740 | EQUIPMENT | 2,000 |
|  | FIRE DEPT FIRST AID FUND | 5,000 |
|  |  |  |
|  | POLICE D.A.R.E. FUND |  |
| 116-193-320 | OPERATING SUPPLIES | 6,015 |
|  | POLICE D.A.R.E. FUND | 6,015 |
|  |  |  |
|  | REVOLVING LOAN FUND |  |
| 117-143-352 | MISCELLANEOUS | 13,000 |
|  | REVOLVING LOAN FUND | 13,000 |
|  |  |  |
|  | POLICE FEDERAL DRUG FUND |  |
| 118-194-320 | OPERATING SUPPLIES | 500 |
|  | POLICE FEDERAL DRUG FUND | 500 |
|  |  |  |
|  | MAIN STREET LOAN FUND |  |
| 119-146-352 | MISCELLANEOUS | 1,300 |
|  | MAIN STREET LOAN FUND | 1,300 |
|  |  |  |
|  | WASHINGTON PARK STATUE FUND |  |
| 129-183-352 | MISCELLANEOUS | 17,500 |
|  | WASHINGTON PARK STATUE FUND | 17,500 |
|  |  |  |
|  | WEST LAFAYETTE ST PROJECT FUND |  |
| 130-184-352 | MISCELLANEOUS | 10 |
|  | WEST LAFAYETTE ST PROJECT FUND | 10 |
|  |  |  |
|  | ILLINOIS AVE SEWER SEPARATION FUND |  |
| 131-185-352 | MISCELLANEOUS | 100 |
|  | ILLINOIS AVE SEWER SEPARATION FUND | 100 |
|  |  |  |
|  | POLICE DRUG LAB FUND |  |
| 132-195-320 | OPERATING SUPPLIES | 500 |
| 132-195-410 | PROFESSIONAL SERVICES | 500 |
|  | POLICE DRUG LAB FUND | 1,000 |
|  |  |  |
|  | POLICE PENSION FUND | 208,500 |
|  | FIREMEN'S PENSION FUND | 362,304 |
|  |  |  |
|  | DUI EQUIPMENT FUND |  |
| 135-149-310 | OFFICE SUPPLIES | 500 |
| 135-149-320 | OPERATING SUPPLIES | 2,500 |
| 135-149-410 | PROFESSIONAL/CONTRACTUAL SERVICE | 500 |
| 135-149-450 | LEGAL FEES | 500 |
| 135-149-740 | EQUIPMENT | 10,000 |
|  | DUI EQUIPMENT FUND | 14,000 |
|  |  |  |
|  | PUBLIC BENEFIT FUND |  |
| 202-540-352 | SIDEWALK PROGRAM | 100,000 |

City of Ottawa          EXHIBIT A          5/7/03

| | | Budget |
|---|---|---|
| 202-540-410 | PROFESSIONAL/CONTRACTUAL SERVICE | 5,000 |
| 202-540-450 | LEGAL FEES | 5,000 |
| | PUBLIC BENEFIT FUND | 110,000 |
| | | |
| | CORP PURPOSE BOND & INT FUND | |
| 206-810-410 | PROFESSIONAL SERVICES | 8,000 |
| 206-810-910 | PRINCIPAL | 278,437 |
| 206-810-920 | INTEREST | 67,178 |
| | CORP PURPOSE BOND & INT FUND | 353,615 |
| | | |
| | TIF DRAINAGE BOND & INT FUND | |
| 207-166-410 | PROFESSIONAL/CONTRACTURAL SERVICE | 250 |
| 207-166-910 | PRINCIPAL | 78,250 |
| 207-166-920 | INTEREST | 20,000 |
| | TIF DRAINAGE BOND & INT FUND | 98,500 |
| | | |
| | SERIES 2001 BOND & INTEREST FUND | |
| 209-210-910 | PRINCIPAL | 166,000 |
| 209-210-920 | INTEREST | 52,642 |
| | SERIES 2001 BOND & INTEREST FUND | 218,642 |
| | | |
| | STEVENSON ROAD IMPROVEMENT FUND | |
| 319-160-920 | INTEREST | 175 |
| | STEVENSON ROAD IMPROVEMENT FUND | 175 |
| | | |
| | ANITA DRIVE PAVING FUND | |
| 320-161-750 | INTEREST | 475 |
| | ANITA DRIVE PAVING FUND | 475 |
| | | |
| | KANSAS STREET PAVING FUND | |
| 321-162-920 | INTEREST | 500 |
| | KANSAS STREET PAVING FUND | 500 |
| | | |
| | PINE STREET PAVING FUND | |
| 322-163-920 | INTEREST | 150 |
| | PINE STREET PAVING FUND | 150 |
| | | |
| | TIF DRAINAGE CAP PROJECT FUND | |
| 323-164-920 | INTEREST | 400 |
| | TIF DRAINAGE CAP PROJECT FUND | 400 |
| | | |
| | MAUDELLE ADDITION PAVING FUND | |
| 324-169-920 | INTEREST | 375 |
| | MAUDELLE ADDITION PAVING FUND | 375 |
| | | |
| | ILL ELM PAVING FUND | |
| 325-170-920 | INTEREST | 75 |
| | ILL ELM PAVING FUND | 75 |
| | | |
| | PORTER STREET PAVING FUND | |
| 326-171-920 | INTEREST | 125 |
| | PORTER STREET PAVING FUND | 125 |
| | | |
| | ELM KANSAS PAVING FUND | |
| 327-172-920 | INTEREST | 85 |
| | ELM KANSAS PAVING FUND | 85 |
| | | |
| | FIFTH AVENUE SANITARY SEWER FUND | |
| 328-173-920 | INTEREST | 200 |
| | FIFTH AVENUE SANITARY SEWER FUND | 200 |
| | | |
| | CATHERINE STREET SPEC ASSMNT FUND | |

EXHIBIT A

| | | Budget |
|---|---|---|
| 329-176-920 | INTEREST | 750 |
| | CATHERINE STREET SPEC ASSMNT FUND | 750 |
| | | |
| | HURON STREET ROADWAY FUND | |
| 330-179-920 | INTEREST | 675 |
| | HURON STREET ROADWAY FUND | 675 |
| | | |
| | FOX RIVER PARK PROJECT FUND | |
| 331-201-750 | CONSTRUCTION IN PROGRESS | 15,000 |
| | FOX RIVER PARK PROJECT FUND | 15,000 |
| | | |
| | BELLEVUE AVE ROADWAY FUND | |
| 332-186-352 | MISCELLANEOUS | 4,850 |
| | BELLEVUE AVE ROADWAY FUND | 4,850 |
| | | |
| | SERIES 2001 PROJECT FUND | |
| 333-201-410 | PROFESSIONAL SERVICES | 22,083 |
| | SERIES 2001 PROJECT FUND | 22,083 |
| | | |
| | OTTAWA VISITORS CENTER | |
| 334-202-170 | PART TIME | 64,550 |
| 334-202-240 | DUES, EDUCATION, SEMINARS | 7,300 |
| 334-202-310 | OFFICE SUPPLIES | 3,000 |
| 334-202-320 | OPERATING SUPPLIES | 1,400 |
| 334-202-342 | TELEPHONE & PAGER EXPENSE | 4,700 |
| 334-202-343 | POSTAGE | 6,600 |
| 334-202-34501 | PUBLISHING-PROMOTIONS | 36,883 |
| 334-202-352 | MISCELLANEOUS | 9,117 |
| 334-202-410 | PROFESSIONAL/CONTRACTUAL SERVICES | 900 |
| 334-202-447 | ALLOCATIONS & SUBSIDIES | 32,568 |
| 334-202-44801 | OVC/BRUSH WITH HISTORY | 10,000 |
| 334-202-451 | EQUIPMENT LEASE | 1,500 |
| 334-202-453 | OPERATING LEASE | 5,100 |
| 334-202-910 | PRINCIPAL | 20,000 |
| | OTTAWA VISITORS CENTER | 203,618 |
| | | |
| | TIF 1 I-80 North | |
| 501-167-450 | LEGAL FEES | 7,000 |
| 501-167-567 | TRANSFER TIF SALES TAX | 45,000 |
| 501-167-568 | TRANSFER PROPERTY TAX | 200,000 |
| 501-167-569 | SCHOOL TAX REIMBURSEMENT | 200,000 |
| 501-167-750 | CONSTRUCTION IN PROGRESS | 276,000 |
| | TIF 1 I-80 North | 728,000 |
| | | |
| | TIF 2 RTE 6 EAST | |
| 502-177-450 | LEGAL FEES | 5,000 |
| 502-177-567 | TRANSFER TIF SALES TAX | 135,000 |
| 502-177-568 | TRANSFER PROPERTY TAX | 100,000 |
| 502-177-710 | LAND & OPTIONS | 163,500 |
| | TIF 2 RTE 6 EAST | 403,500 |
| | | |
| | TIF 3 DOWNTOWN | |
| 503-150-450 | LEGAL FEES | 2,000 |
| 503-150-710 | LAND & OPTIONS | 23,000 |
| | TIF 3 DOWNTOWN | 25,000 |
| | | |
| | WATER & SEWER FUND | |
| 601-610-120 | ADMINISTRATIVE | 60,000 |
| 601-610-140 | CLERICAL | 33,000 |
| 601-610-160 | OTHER EMPLOYEES | 270,000 |
| 601-610-170 | PART TIME | 15,000 |
| 601-610-180 | OVERTIME | 25,000 |

City of Ottawa                                                EXHIBIT A                                                      5/7/03

|  |  | Budget |
|---|---|---|
| 601-610-230 | CLOTHING ALLOWANCE | 3,650 |
| 601-610-240 | DUES, EDUCATION, SEMINARS | 7,000 |
| 601-610-250 | HEALTH & LIFE INSURANCE | 100,000 |
| 601-610-310 | OFFICE SUPPLIES | 5,000 |
| 601-610-320 | OPERATING SUPPLIES | 125,000 |
| 601-610-330 | REPAIRS & MAINTENANCE | 200,000 |
| 601-610-331 | REPAIRS & MAINTENANCE-EQUIPMEN | 50,000 |
| 601-610-337 | REPAIRS & MAINT/VEHICLES/WATER | 10,000 |
| 601-610-342 | TELEPHONE & PAGER EXPENSE | 15,000 |
| 601-610-343 | POSTAGE | 15,000 |
| 601-610-344 | GASOLINE & DIESEL FUEL | 10,000 |
| 601-610-345 | PUBLISHING | 8,000 |
| 601-610-349 | UTILITIES | 250,000 |
| 601-610-352 | MISCELLANEOUS | 5,000 |
| 601-610-410 | PROFESSIONAL SERVICES | 90,000 |
| 601-610-417 | CONTRACTUAL REPAIRS/BLDG/WATER | 25,000 |
| 601-610-446 | INSURANCE | 15,000 |
| 601-610-450 | LEGAL FEES | 7,500 |
| 601-610-740 | EQUIPMENT | 120,000 |
| 601-610-750 | CONSTRUCTION | 2,088,000 |
| 601-610-910 | PRINCIPAL | 500,000 |
|  | WATER | 4,052,150 |

|  | SEWER |  |
|---|---|---|
| 601-620-120 | ADMINISTRATIVE | 60,000 |
| 601-620-140 | CLERICAL | 33,000 |
| 601-620-160 | OTHER EMPLOYEES | 301,500 |
| 601-620-170 | PART TIME | 15,000 |
| 601-620-180 | OVERTIME | 15,000 |
| 601-620-230 | CLOTHING ALLOWANCE | 4,050 |
| 601-620-240 | DUES, EDUCATION, SEMINARS | 10,000 |
| 601-620-250 | HEALTH & LIFE INSURANCE | 100,000 |
| 601-620-310 | OFFICE SUPPLIES | 3,000 |
| 601-620-320 | OPERATING SUPPLIES | 30,000 |
| 601-620-330 | REPAIRS & MAINTENANCE | 350,000 |
| 601-620-338 | REPAIRS & MAINT/VEHICLES/SEWER | 8,000 |
| 601-620-342 | TELEPHONE & PAGER EXPENSE | 11,000 |
| 601-620-343 | POSTAGE | 13,000 |
| 601-620-344 | GASOLINE & DIESEL FUEL | 11,000 |
| 601-620-349 | UTILITIES | 125,000 |
| 601-620-352 | MISCELLANEOUS | 3,000 |
| 601-620-410 | PROFESSIONAL SERVICES | 272,000 |
| 601-620-418 | CONTRACTUAL REPAIRS/BLDG/SEWER | 15,000 |
| 601-620-740 | NEW EQUIPMENT | 135,000 |
| 601-620-750 | CONSTRUCTION | 185,000 |
|  | SEWER | 1,699,550 |

|  | W&S TIF PROJ BOND & INTEREST |  |
|---|---|---|
| 601-660-410 | PROFESSIONAL SERVICES | 500 |
| 601-660-910 | PRINCIPAL | 100,000 |
| 601-660-920 | INTEREST | 25,000 |
|  | W&S TIF PROJ BOND & INTEREST | 125,500 |

|  | WATER & SEWER FUND | 5,877,200 |
|---|---|---|

|  | SWIMMING POOL |  |
|---|---|---|
| 603-196-120 | ADMINISTRATIVE | 10,500 |
| 603-196-160 | OTHER EMPLOYEES | 60,000 |
| 603-196-180 | OVERTIME | 2,500 |
| 603-196-260 | FICA | 4,500 |
| 603-196-310 | OFFICE SUPPLIES | 250 |
| 603-196-320 | OPERATING SUPPLIES | 20,000 |

City of Ottawa                                        EXHIBIT A                                        5/5/03

|  |  | Budget |
|---|---|---|
| 603-196-32001 | CONCESSION SUPPLIES | 15,000 |
| 603-196-330 | REPAIRS & MAINTENANCE | 25,000 |
| 603-196-342 | TELEPHONE & PAGER EXPENSE | 2,000 |
| 603-196-345 | PUBLISHING | 200 |
| 603-196-349 | UTILITIES | 12,000 |
| 603-196-410 | PROFESSIONAL/CONTRACTUAL SERVICES | 1,000 |
| 603-196-740 | EQUIPMENT | 5,000 |
| 603-196-750 | CONSTRUCTION IN PROGRESS | 20,000 |
|  | SWIMMING POOL | 177,950 |
|  |  |  |
|  | CANAL RENTAL & PURCHASE FUND |  |
| 604-141-410 | PROFESSIONAL/CONTRACTUAL SERVICE | 3,200 |
| 604-141-453 | OPERATING LEASE | 250 |
|  | CANAL RENTAL & PURCHASE FUND | 3,450 |
|  |  |  |
|  | FRIENDLY CITY RIVERFEST FUND |  |
| 605-118-352 | MISCELLANEOUS | 325,250 |
|  | FRIENDLY CITY RIVERFEST FUND | 325,250 |
|  |  |  |
|  | HOTEL MOTEL TAX FUND |  |
| 606-145-44701 | ALLOCATIONS/READERS THEATER | 300 |
| 606-145-44702 | ALLOCATIONS/CRUISE NIGHT | 1,900 |
| 606-145-44709 | ALLOCATIONS/CITY BLOCK PARTY | 1,250 |
| 606-145-44712 | ALLOCATIONS/THUNDER ON THE RIVER | 3,000 |
| 606-145-44713 | ALLOCATIONS/SCARECROW FESTIVAL | 1,000 |
| 606-145-44714 | ALLOCATIONS/MARBLE SHOW | 1,000 |
| 606-145-44715 | ALLOCATIONS/FESTIVAL/LIGHTS/PARADE | 4,200 |
| 606-145-44716 | ALLOCATIONS/FESTIVAL.LIGHTS/TOUR | 200 |
| 606-145-44717 | ALLOCATIONS/MUSIC IN THE PARK | 1,500 |
| 606-145-44718 | ALLOCATIONS/FISHING TOURNAMENT | 500 |
| 606-145-44722 | ALLOCATIONS/FRISBEE TOURNAMENT | 900 |
| 606-145-44723 | ALLOCATIONS/BRUSH WITH HISTORY | 300 |
| 606-145-44752 | ALLOCATIONS/CONTINGENCY | 5,150 |
| 606-145-563 | PERMANENT TRANSFERS | 183,540 |
|  | HOTEL MOTEL TAX FUND | 204,740 |

### Recapitulation

| | |
|---|---|
| CROSSING GUARD FUND | 36,050 |
| AUDITING FUND | 42,500 |
| IL MUNICIPAL RETIREMENT | 460,000 |
| PUBLIC LIABILITY INSURANCE FUND | 350,000 |
| EMERGENCY SERVICES & DISASTER AGENCY | 12,000 |
| MOTOR FUEL TAX FUND | 576,500 |
| FOREIGN FIRE TAX FUND | 19,000 |
| PLAYGROUND & RECREATION FUND | 306,900 |
| LIBRARY FUND | 501,540 |
| INDUSTRIAL DEVEL. COMMISSION FUND | 1,000 |
| POLICE DEPT DRUG EDUCATION FUND | 129,000 |
| 911 EMERGENCY PHONE SYSTEM FUND | 140,000 |
| FIRE DEPT FIRST AID FUND | 5,000 |
| REVOLVING LOAN FUND | 13,000 |
| POLICE D.A.R.E. FUND | 6,015 |
| POLICE FEDERAL DRUG FUND | 500 |
| MAIN STREET LOAN FUND | 1,300 |
| WASHINGTON PARK STATUE FUND | 17,500 |
| WEST LAFAYETTE STREET PROJECT FUND | 10 |
| ILL AVENUE SEWER SEPARATION FUND | 100 |
| POLICE DRUG LAB FUND | 1,000 |
| POLICE PENSION FUND | 208,500 |
| FIREMEN'S PENSION FUND | 362,304 |
| DUI EQUIPMENT FUND | 14,000 |
| PUBLIC BENEFIT FUND | 110,000 |

City of Ottawa

EXHIBIT A

5/8/03

| | Budget |
|---|---|
| CORP PURPOSE BOND & INT FUND | 353,615 |
| TIF DRAINAGE BOND & INT FUND | 98,500 |
| SERIES 2001 BOND & INTEREST FUND | 218,642 |
| STEVENSON ROAD IMPROVEMENT FUND | 175 |
| ANITA DRIVE PAVING FUND | 475 |
| KANSAS STREET PAVING FUND | 500 |
| PINE STREET PAVING FUND | 150 |
| TIF DRAINAGE CAP PROJECT FUND | 400 |
| MAUDELLE ADDITION PAVING FUND | 375 |
| ILL ELM PAVING FUND | 75 |
| PORTER STREET PAVING FUND | 125 |
| ELM KANSAS PAVING FUND | 85 |
| FIFTH AVENUE SANITARY SEWER FUND | 200 |
| CATHERINE ST SPEC ASSMNT FUND | 750 |
| HURON STREET ROADWAY FUND | 675 |
| FOX RIVER PARK PROJECT FUND | 15,000 |
| BELLEVUE AVENUE ROADWAY FUND | 4,850 |
| SERIES 2001 PROJECT FUND | 22,083 |
| OTTAWA VISITORS CENTER FUND | 203,618 |
| TIF 1 I-80 North | 728,000 |
| TIF 2 RTE 6 EAST | 403,500 |
| TIF 3 DOWNTOWN | 25,000 |
| WATER & SEWER FUND | 5,877,200 |
| SWIMMING POOL | 177,950 |
| CANAL RENTAL & PURCHASE FUND | 3,450 |
| FRIENDLY CITY RIVERFEST FUND | 325,250 |
| HOTEL MOTEL TAX FUND | 204,740 |
| | |
| SPECIAL REVENUE FUNDS | 11,979,102 |
| GENERAL CORPORATE FUND | 9,738,582 |
| | |
| TOTAL ALL FUNDS | 21,717,684 |



## IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
## LASALLE COUNTY, ILLINOIS

| | | |
|---|---|---|
| John Colt Landreth, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 07-L-17 |
| | ) | |
| City of Ottawa, Illinois, | ) | |
| a municipal corporation, | ) | |
| | ) | |
| Defendant. | ) | |

### AFFIDAVIT

I, Shelly L. Munks, swear and affirm that if called to testify I would competently testify to the following:

1. I am the duly appointed and now acting Clerk of the City of Ottawa, Illinois

2. As Clerk, I am the official custodian of all records of the City of Ottawa.

3. A true copy of the Consulting, Development and Marketing Agreement Between the City of Ottawa, Illinois and John Colt Landreth (the "Agreement") is attached to Plaintiff's Complaint as Exhibit A.

4. Exhibit A of the Defendant's Motion To Dismiss is a true copy of the Budget & Appropriation of the City of Ottawa for the fiscal year ending April 30, 2004.

5. The fiscal year of the City of Ottawa commences on May 1 and ends on April 30.

6. The Budget & Appropriation of the City of Ottawa for the fiscal year ending April 30, 2004 did not contain an appropriation for the Agreement or any expense related thereto.

7. On September 6, 2005 the Council of the City of Ottawa adopted Resolution No. 106-2005 authorizing the execution of an agreement between the City of Ottawa and Plaintiff, a copy of said Resolution is attached hereto as Exhibit 1.

8. The agreement authorized by Resolution No. 106-2005 was never executed by the Plaintiff, and on information and belief, the Plaintiff declined to execute the agreement.

9. On December 6, 2005 the Council of the City of Ottawa adopted Resolution No. 137-2005 repealing Resolution No. 106-2005, a true copy of Resolution No. 137-2005 is attached hereto as Exhibit 2.

**EXHIBIT B**

Further, Affiant sayeth not.


_Shelly L Munks_
Shelly (L) Munks


Sworn and Subscribed before me this 29th day of March 2007.


_Nicole M. Conrad_
Notary Public

OFFICIAL SEAL
NICOLE M CONRAD
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/01/09


L:\Docs\ottawa\Landreth v. Ottawa\Pleadings\Munks Affidavit.docx

2

RESOLUTION NO. $\underline{106}$ -2005

## A RESOLUTION AUTHORIZING THE EXECUTION OF A CONSULTING, DEVELOPMENT AND MARKETING AGREEMENT BETWEEN THE CITY OF OTTAWA AND JOHN COLT LANDRETH
### (Ottawa Industrial Park Conservation TIF District)

BE IT RESOLVED BY THE COUNCIL OF THE CITY OF OTTAWA, ILLINOIS,

AS FOLLOWS:

Section One: That the Mayor and City Clerk of the City of Ottawa, Illinois, be, and they are

hereby authorized and directed to execute a Consulting, Development and Marketing Agreement

between the City of Ottawa and John Colt Landreth, a copy of which is attached hereto and

incorporated herein by reference.

Section Two: That all Resolutions or parts thereof which are in conflict herewith are hereby

repealed.

Section Three: That this Resolution shall be in full force and effect from and after its passage

and approval as required by law.

Passed and Approved this 6th day of September, 2005.


_____
Robert M. Eschbach, Mayor

ATTEST:

_____
Shelly L. Munks, City Clerk

L:\Docs\ottawa\Resolutions\Agreements\Agreement - Colt Landreth - OIP - 2005.doc


## EXHIBIT 1

## CONSULTING, DEVELOPMENT AND MARKETING AGREEMENT
## BETWEEN THE CITY OF OTTAWA, ILLINOIS
## AND JOHN COLT LANDRETH

**Whereas**, the City of Ottawa (the "City") is an Illinois municipal corporation and body politic operating under the provisions of the Illinois Municipal Code, (65 ILCS 5/1-1-1 *et seq.*) (the "Code"), and

**Whereas**, the Code authorizes the City to acquire, develop, and convey real property and to sell and convey such property within a redevelopment area, and

**Whereas**, the City is attempting to promote the commercial, industrial and economic development and welfare of the City, and

**Whereas**, the City encourages the increase of industry and commerce within the City and the State of Illinois, and

**Whereas**, the City now owns certain real property within the Ottawa Industrial Park Conservation TIF District ("OIP"), and

**Whereas**, the City has caused said real property to be platted and developed as an industrial park, and

**Whereas**, John Colt Landreth ("Landreth") is an individual with expertise in the development and marketing of industrial real property, and

**Whereas**, the specific and primary purposes for which OIP was created were to stimulate the promotion of industrial development within the City and to interest industry to locate in and about the City by the establishment of a comprehensive real estate marketing and development program (the "Program"), and

**Whereas**, the establishment of the program will further the public health, safety and welfare by the creation of jobs within the City, and

**Whereas**, Landreth has developed an expertise and experience with respect to the program and with regard to general economic development within the territory of the City, and

**Whereas**, the continued commercial and industrial development of the City is one of the primary corporate purposes of the City, and

**Whereas**, the Council of the City believes that it is in the best interest of the City to utilize Landreth as the primary economic development organization for the City, and

**Whereas**, efforts for the continued economic development of the City will require funds for all of the necessary development activity, including the appropriate marketing of the City as a viable location for potential commercial and industrial prospects, and

**Whereas**, Landreth and the City entered into a Consulting, Development And Marketing Agreement in 2003 and said agreement has expired, and

**Whereas**, Landreth is willing to continue to act as the primary economic development organization of the City and devote one-half (1/2) of his time thereto any and all time which is reasonably and necessarily required therefore.

**WITNESSETH:**

FOR AND IN CONSIDERATION of the mutual promises and undertakings herein set forth and other good and valuable considerations, the sufficiency of which is hereby acknowledged, the **CITY** and **LANDRETH** agree as follows:

1.    <u>Incorporation of Recitals</u>. All of the foregoing recitals are incorporated herein by reference and are acknowledged as true and correct.

2.    <u>Term of Agreement</u>. The initial term of this agreement shall be for six (6) twenty-four (24) months commencing on the date hereof. The initial term may be extended by mutual, written agreement of the parties.

3.    <u>Obligations of City</u>. In order to provide a continuous and reliable source of funding for economic development within the City and OIP:

(a)    The City shall pay to Landreth the sum of $5,000.00 upon the execution of this agreement and the further sum of $5,000.00 on the same day of each succeeding month during the term of this agreement; said sum shall be for Landreth's monthly retainer; together with an additional monthly amount not to exceed $2,000.00 for Chicago support staff, travel, telephone and similar items of reasonable and necessary expense.

(b) The further and additional sum of not to exceed $28,900.00 annually for web hosting and web modifications, broker events, CoreNet/SIOR dues, advertising, brochures and miscellaneous (wats line); and

(c)    The further and additional sum equal to 1 ½% of the actual project cost of all industrial developments occurring within the City during the term or any extension of this agreement. Such sum shall be paid one-half (1/2) upon the commencement of construction based upon the estimate of project cost as submitted by a developer and approved by the City, and the balance shall be paid upon completion of construction as soon as the total project cost is determined, and approved by the City. The phrase "project cost" shall include the cost of land, direct and indirect building costs, and site preparation as shown on the building permit, but shall not include machinery, equipment or any item of personal property. Compensation for industrial developments, which occur outside existing TIF Districts, will be negotiated on a case-by-case

basis and mutually agreed upon. Notwithstanding any of the foregoing to the contrary, the obligation of the City under this paragraph (c) shall be limited solely to industrial developments that result from the marketing efforts of Landreth and not from other sources.

(d)     The projects known as Murph-Haines, Galaxy, Bedrock, Burton and PetSmart shall not be eligible for compensation under paragraph (c) above.

Landreth shall provide a monthly statement to the City for the items of expense set forth in paragraphs (a) and (b) above; such statements shall contain reasonable detail for each item of expense, including receipts or copies of invoices, and such statements shall separate the items of expense as set forth in paragraphs (a) and (b) above.

4.     Services of Landreth. During the term of this Agreement Landreth shall provide to the City consulting, development and marketing services which shall be designed to increase and promote the commercial, industrial and economic base of the City, including, but not limited to the following:

(a)     Advertise and otherwise promote the City and OIP;
(b)     Develop and implement a marketing strategy for the City and OIP;
(c)     Develop and implement a master plan for OIP in conjunction with the City;
(d)     Develop and implement a strategic plan for OIP which shall include a a statement of mission and goals, as well as financial considerations and projections;
(e)     Develop community relations and public awareness on behalf of the City;
(f)     Identify and rank potential users and companies for location within OIP;
(g)     Coordinate and cooperate with other units of government and industry, as well as other economic development agencies;
(h)     Field and respond to all inquiries, and provide all necessary information to all prospects;
(i)     Coordinate activities and work with industrial real estate brokers in the Chicago metropolitan area;
(j)     Maintain and operate an office within the City of Chicago for the promotion and development of OIP;
(k)     Provide regular written reports to the City, but not less frequently than quarterly, of all economic development activity including the names of all industrial prospects.
(k)     Perform all other services as outlined and contained in the written proposal of Plaza Property Advisors dated March 17, 2003; and
(l)     Perform such other services as the City may reasonably require to accomplish the objective of increasing the job base within the City by attracting industry and distribution centers to the City.

5.     Independent Contract. Landreth understands and agrees that his obligation under this Agreement is to serve the City for the promotion and development of commercial and industrial development. It is understood and agreed between the parties that all persons working for Landreth under this Agreement, if any, shall be employees of Landreth and shall be in no

3

way considered employees of the City. Should any liability arise under the Illinois Worker's Compensation Act during any time that employees are working for Landreth, said employees are covered by the Illinois Worker's Compensation Act and are the employees of Landreth. Neither Landreth nor his employees shall hold himself or themselves out to be employees, agents, or servants of the City.

6.    Best Efforts. Landreth agrees to devote his best efforts to the City's interest and to endeavor in every way to make successful the promotion of the City as a significant commercial and industrial location.

7.    Revocation. The City understands the long-term nature of this Agreement and the long-term nature of economic development. Therefore, the City agrees and covenants not to revoke or rescind this agreement or to institute any proceeding or action to challenge the validity of this agreement or in any way to rescind, modify or alter said agreement, understanding that Landreth is relying upon the representations and financial commitment contained herein and has every right to do so. Notwithstanding the foregoing or any other provision of this agreement to the contrary, either party to this agreement my cancel this agreement for any reason by providing the other party with not less than thirty (30) days prior, written notice of cancellation.

8.    Waiver. Waiver by either party of a breach of any term, condition or covenant herein shall not be deemed a waiver of any other term or condition or covenant.

9.    Breach. Upon a breach of any term or provision of this Agreement, the non-breaching party shall immediately provide a written notice to the other party describing the nature of the breach and a request for its immediate cure. In the event that said breach has not been cured within thirty (30) days of the issuance of written notice as aforesaid, then the non-breaching party may take such action as it deems necessary for the specific performance of this Agreement or its termination.

Upon termination of this agreement, Landreth shall provide the City with a list of all industrial prospects within thirty days of termination. Said list will serve as a registration of prospects with the City. In the event that any of these prospects shall purchase land in a City TIF district or future TIF district (or any other location as mutually determined) within one year 180 days of the termination of this agreement, then Landreth shall be paid a fee in accordance with Section 3(d) hereof. In the event that any of the prospects purchases land as aforesaid within the period of 13 to 24 months following termination of this agreement, then Landreth shall be paid 75% of the fee provided in Section 3(d) hereof.

10.    Assignability. It is agreed that neither party shall have the right to assign this Agreement, in whole or in part, without the written consent of the other party.

11.    Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective assessors or assigns.

12.    Warranties. The parties warrant and represent that :

4

a.  Each of the undersigned representatives of such party has been duly authorized by such party to execute this Agreement on behalf of such party;

b.  This Agreement is binding, valid and specifically enforceable according to its terms against each party;

c.  This Agreement does not violate any presently existing provision of law or any applicable order, writ, injunction or decree of any court or governmental department, commission, board, bureau, agency or instrumentality to which such party may be subject;

d.  This Agreement does not constitute a default under any indenture, mortgage, deed of trust, agreement or contract of any kind to which such party may be bound;

e.  There are no pending legal proceedings by any party against the other party.

13.  <u>Headings</u>. The headings of the sections of this Agreement are for convenience and reference only and in no way define, extend, limit or describe the scope or intent of this Agreement or any provision hereof.

14.  <u>Execution and Counterparts</u>. This Agreement may be executed in multiple identical counterparts and all of said counterparts shall, taken together, constitute the same agreement.

15.  <u>Disclosure</u>. The parties have jointly utilized the law firm of Pool, Leigh & Fabricius with respect to this Agreement, and each party acknowledges this fact and hereby expressly authorizes such joint representation. Each party also waives any claim against said law firm or its individual attorneys because of any conflict of interest or any apparent conflict of interest resulting from said joint representation.

Executed in duplicate this _____ day of _____, 2005, by authority of a resolution of the Council of the City and by Landreth.

**City of Ottawa, Illinois**

By: _____          _____
      **Robert M. Eschbach, Mayor**                    **John Colt Landreth**

**Attest:**

_____
      **Shelly L. Munks, City Clerk**
F:\Docs\ottawa\Contracts-Agreements\Landreth Consulting 8-05.doc

5

State of Illinois          )
                           )          SS
County of LaSalle          )


I, the undersigned, a notary public, in and for the County and State as aforesaid, do hereby certify that Robert M. Eschbach, personally known to me to be the Mayor of the City of Ottawa, Illinois, and Shelly L. Munks, personally known to me to be the Clerk of said City, and personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and severally acknowledged that as Mayor and Clerk of said City, they signed and delivered said instrument in their official capacities as caused the corporate seal of said City be affixed thereto, pursuant to authority given by the Council said City, as the free and voluntary act and deed of said City, for the uses and purposes therein set forth.

Given under my hand and notarial seal this _____ day of _____, 2005.


_____
                                 Notary Public

State of Illinois        )
                         )        SS
County of LaSalle        )


    I, the undersigned, a notary public, in and for the County and State as aforesaid, do hereby certify that John Colt Landreth, personally known to me to be the same person whose names is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered said instrument as his free and voluntary act and deed for the uses and purposes therein set forth.

    Given under my hand and notarial seal this _____ day of _____, 2005.


_____
                 Notary Public

F:\Docs\ottawa\Contracts-Agreements\Landreth Consulting 8-05.doc

7

# RESOLUTION NO. 137 -2005

## A RESOLUTION REPEALING RESOLUTION NO. 106-2005

**WHEREAS**, on September 6, 2005, the Council of the City of Ottawa, Illinois adopted Resolution No. 106-2005 authorizing the execution of a Consulting, Development and Marketing Agreement between the City of Ottawa and John Colt Landreth, and

**WHEREAS**, the Mayor of the City of Ottawa did, pursuant to said Resolution, execute the Consulting, Development and Marketing Agreement as aforesaid, and

**WHEREAS**, the John Colt Landreth has not executed the Consulting, Development and Marketing Agreement, and

**WHEREAS**, John Colt Landreth has proposed different terms and conditions with respect to the Consulting, Development and Marketing Agreement, and

**WHEREAS**, there has been no meeting of the minds with respect to the agreement as previously authorized by virtue of the adoption of Resolution No. 106-2005.

**NOW, THEREFORE, BE IT RESOLVED BY THE COUNCIL OF THE CITY OF OTTAWA, ILLINOIS, AS FOLLOWS:**

**Section One:** That the foregoing preambles are incorporated herein by reference as if set forth verbatim.

**Section Two:** That Resolution No. 106-2005 adopted September 6, 2005, be, and the same is hereby repealed.

**Section Three:** That all Resolutions or parts thereof which are in conflict herewith are hereby repealed.

**Section Four:** That this Resolution shall be in full force and effect immediately after its passage and approval as required by law.

Ayes: _____5_____

Nays: _____0_____

Absent: _____0_____

Passed and Approved this 6th day of December, 2005.

Robert M. Eschbach, Mayor

ATTEST:

Shelly L. Munks, City Clerk

**EXHIBIT 2**

L:\Docs\ottawa\Resolutions\Repeal 106-2005 Landreth Agreement.doc

EXHIBIT O

(SC28) ORDER - PROOF OF SERVICE                                                    ORDPRFS (12/99)

# UNITED STATES OF AMERICA
## STATE OF ILLINOIS        COUNTY OF LASALLE
## IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT

*LANDRETH*

FILED

FEB 2 8 2008

- VS -

*City of Ottawa* LASALLE COUNTY CIRCUIT CLERK 07-L-17
THIRTEENTH JUDICIAL CIR. Case No. _____

## ORDER

For the reasons stated on the record in open court after hearing arguments of counsel,

IT IS ORDERED that plaintiffs Complaint be, and it is hereby, DISMISSED WITH PREJUDICE, the Court finding that Section 8-1-7 of the Illinois Municipal Code bars the action because (1) there was no prior appropriation for the contract sought to be enforced and (2) the Contract sought to be enforced, or the financial obligations thereunder, would extend beyond the term of the Mayor in office at the time the contract was executed.

Dated:  2-28-08

_____
Judge

## PROOF OF SERVICE

I hereby certify that a copy hereof was duly served upon:

Name: _____        Name: _____
Address: _____        Address: _____
_____        _____

Name: _____        Name: _____
Address: _____        Address: _____
_____        _____

on the _____ day of _____ ,20 _____.        By personal service ☐    U.S. Mail ☐

Signed: _____
Title: _____

KPL