# UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| John Colt Landreth, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No.  08-CV-01654 |
| | ) | |
| Keith R. Leigh,  Pool, Leigh & Kopko, | ) | Judge Charles R. Norgle |
| P.C. (formerly known as Pool & Leigh, | ) | |
| P.C.), an Illinois professional | ) | Magistrate Judge Sidney I. Schenkier |
| corporation,  Robert M. Eschbach, | ) | |
| and the City of Ottawa, Illinois, | ) | |
| a municipal corporation, | ) | |
| | ) | |
| Defendants. | ) | |

---

### PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

Richard J. Berry – ARDC #198269
Stephen C. Myers
Sheryl H. Kuzma
Myers, Berry, O'Conor & Kuzma, Ltd.
130 E. Madison Street
Ottawa, Illinois   61350
Ph.  815-434-6206
Fax 815-434-6203

## Table of Contents

Table of Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

*Introduction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*What this Case is Not About* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*What this Case Is About* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Standard for Ruling on a Fed. R. Civ. P. 12(b)(6) Motion to Dismiss* . . . . . . . . . . . . . . . . . . . 5

**I. LANDRETH HAS A PROTECTABLE PROPERTY RIGHT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*A Professional's Time, Advice and Services is a Protectable Property Right* . . . . . . . . . . . . . . 6

*Landreth's Property Right Does Not Depend on the Consulting Agreement* . . . . . . . . . . . . . . . 7

*Distinction Between Right to be Fairly Compensated*
*for Services Performed and Right to Continued Employment* . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**II. ALTHOUGH PERHAPS INARTFULLY PLEADED THE COMPLAINT**
**ADEQUATELY SETS OUT THAT LANDRETH WAS DEPRIVED OF RIGHTS**
**SECURED BY THE UNITED STATES CONSTITUTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**A. Procedural Due Process** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**B. Substantive Due Process** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Landreth Had Absolutely No State Remedy* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**C. Takings Clause** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**III. SINCE THE CITY'S CONDUCT WAS NEITHER RANDOM NOR**
**UNAUTHORIZED, IT MATTERS NOT WHETHER A POST-DEPRIVATION**
**HEARING WAS AVAILABLE OR ADEQUATE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Procedural Due Process* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Substantive Due Process* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**IV. RES JUDICATA** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Res Judicata Does Not Defeat Landreth's Complaint* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Res Judicata Should Not be Applied Because it Would Be Inequitable,*
*Given the City's Conduct to Deny Landreth His Day in Court* . . . . . . . . . . . . . . . . . . . . . . . . . 22

**V.  LANDRETH HAD "EVERY RIGHT" TO RELY ON THE CITY'S REPRESENTATIONS** . . . . . . . 23

*Landreth Presumed to Know the Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**VI.  LANDRETH'S CLAIMS ARE NOT BARRED BY**
**SECTION 8-101 OF THE TORT IMMUNITY ACT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*The Pendent State Law Claims are Not Barred by Section 8-101 of the Tort Immunity Act* . . . 26

**VII.  NEITHER SECTION 2-106 NOR SECTION 2-210 OF THE TORT IMMUNITY ACT APPLY** . . 27

*Section 2-106* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Section 2-210* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**VIII.  THE FAILURE TO SEEK RELIEF AGAINST MAYOR ESCHBACH WAS INADVERTENT**
**AND PLAINTIFF SEEKS LEAVE TO AMEND THE COMPLAINT ACCORDINGLY** . . . . . . . . . . . . 27

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## Table of Cases

*Cler v. Illinois Education Association*, 423 F.3d 726 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . 5

*Echevarria v. Chicago Title & Trust Company,* 256 F.3d 623 (7th Cir. 2001) . . . . . . . . . . . . . . 5

*Board of Regents of State Colleges v. Roth*,
408 U.S. 564, 92 S.Ct. 2701 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 13

*State ex rel. Stephan v. Smith*, 242 Kan. 336, 747 P.2d 816 (1987) . . . . . . . . . . . . . . . . . . . . . 7

*In re Estate of McWain*, 77 Ill.App.2d 359, 222 N.E.2d 576 (4th Dist. 1966) . . . . . . . . . . . . . 7

*Midcoast Aviation, Inc. v. General Electric Credit Corp.*,
907 F.2d 732 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Walters v. Village of Colfax*, 466 F.Supp.2d 1046 (C.D. Ill. 2006) . . . . . . . . . . . . . . . . . . . . . . . 8

*Stahelin v. Board of Education, School Dist. No. 4, DuPage County*,
87 Ill.App.2d 28, 230 N.E.2d 465 (2d Dist. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

*Shlay v. Montgomery,* 802 F.2d 918 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652 (1950) . . . . . . . . . 9

*Logan v. Zimmerman Brush Company*, 455 U.S. 422, 102 S.Ct. 1148 (1982) . . . . . . . . . . . . . 10

*McKesson Corporation v. Division of Alcoholic Beverages and Tobacco, etc.*,
496 U.S.18, 110 S.Ct. 2238 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Tun v. Witticker*, 398 F.3d 899 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*New Burnham Prairie Homes, Inc. v. Village of Burnham*, 910 F.2d 1474 (7th Cir. 1990) . . . . 12

*Allen v. Treat*, 72 Ill.App.2d 466, 218 N.E.2d 250 (4th Dist. 1966) . . . . . . . . . . . . . . . . . . . . . 12

*McGovern v. City of Chicago*, 281 Ill. 264, 118 N.E. 3 (1917) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*People ex rel. Stead v. Spring Lake Drainage and Levee Dist.*,
253 Ill. 479, 97 N.E. 1042 (1912) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Bond County Community School Dist. No. 2 v. Indiana Insurance Company*,
269 Ill.App.3d 488, 647 N.E.2d 293 (5th Dist. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Nielsen -Massey Vanillas, Inc. v. City of Waukegan*,
276 Ill.App.3d 146, 657 N.E.2d 1201 (2d Dist. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Monell v. Department of Social Services of City of New York*,
436 U.S. 658, 98 S.Ct. 2018 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Wilson v. Civil Town of Clayton, Indiana*, 839 F.2d 375 (7th Cir. 1988) . . . . . . . . . . . . . . . . . 16

*McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Fuller Family Holdings, LLC v. The Northern Trust Co.*,
371 Ill.App.3d 605, 863 N.E.2d 743 (1st Dist. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Saxon Mortgage, Inc. v. United Financial Mortgage Corp.*,
312 Ill.App.3d 1098, 728 N.E.2d 537 (1st Dist. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Peregrine Financial Group, Inc. v. Martinez*,
305 Ill.App.3d 571, 712 N.E.2d 861 (1st Dist. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*City of Rolling Meadows v. National Advertising Co.*,
228 Ill.App.3d 737, 593 N.E.2d 551 (1st Dist. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Nowak v. St. Rita High School*, 197 Ill. 2d 381, 757 N.E.2d 471 (2001) . . . . . . . . . . . . . . . . . . 22

*F:AJ. Kikson v. Underwriters Laboratories*,
2005 WL 736651 (N.D. Ill. March 31, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Los Amigos Supermarket, Inc. v. Metropolitan Bank and Trust Company*,
306 Ill.App.3d 115, 713 N.E.2d 686 (1st Dist. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Ganley v. City of Chicago,* 18 Ill.App.3d 248, 309 N.E.2d 653 (1st  Dist. 1974) . . . . . . . . . . . 25

*People ex rel. McWard v. Wabash R. Co.*, 395 Ill. 243, 70 N.E.2d 36 (1946) . . . . . . . . . . . . . 25

*Charles Deleuw & Co. v. City of Charleston*,
298 Ill. App. 403, 19 N.E.2d 207 (3rd Dist. 1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*iv*

*Continental Illinois Nat'l. Bank & Trust Co. of Chicago v. Village of Park Forest*,
4 Ill.App.3d 811, 282 N.E.2d 167 (3rd Dist. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Warnock v. Karm Winand & Patterson*,
376 Ill.App.3d 364, 876 N.E.2d 8 (1st Dist. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*v*

Plaintiff **John Colt Landreth** ("Landreth"), by his attorneys, Myers, Berry, O'Conor & Kuzma, Ltd., responds to the defendants' Motion to Dismiss as follows:

*Introduction*

Plaintiff respectfully submits at the outset that this case presents an issue which has never before been considered – whether the City of Ottawa, Illinois (the "*City*") can perform and accept the benefits of a contract its City Council *specifically authorized* it to execute and then, when a substantial amount becomes payable thereunder, disavow the contract, asserting that it is void and unenforceable because – and only because – of the City's unlawful act. Several critical facts make this case completely unprecedented: (i) the party disavowing the contract (the City) actually caused the contract to be void and wholly unenforceable – by failing to comply with a state statute; (ii) the party disavowing the contract expressly warranted and represented that the agreement was "binding, valid and specifically enforceable according to its terms against each party" and that it "[did] not violate any presently existing provision of law . . ."; and (iii) the City's attorney purported to represent both the City and Landreth with respect to the agreement.

This case is the ultimate "catch 22." The City wants to promote commercial and industrial development within Ottawa and, in particular, within the Ottawa Industrial Park (the "*OIP*"). The City recognizes the need to hire Landreth –"an individual with expertise in the development and marketing of industrial real property."[1] The City negotiates a written agreement with Landreth (the "*Consulting Agreement*") – which the City's own law firm (*while "jointly representing" Landreth*) prepares. The City Council by Resolution specifically authorizes and directs the Mayor and City

---

[1] Consulting Agreement, p. 1. (The Consulting Agreement is Exhibit "B" to the Complaint.)

Clerk to execute the Consulting Agreement on behalf of the City. The City explicitly warrants and represents that the agreement is "*binding, valid and specifically enforceable according to its terms*" and "*does not violate any presently existing provision of law*." The City acknowledges "that Landreth is relying upon the representations and financial commitment contained [in the Consulting Agreement]," and assures him that he has "every right to do so." The City expressly promises Landreth that it will not do anything "to challenge the validity" of the agreement. *Significantly, the agreement requires Landreth to devote one-half of his time to the City of Ottawa.*

For 27 months, the City required Landreth to perform his obligations under the contract – and for 27 months the City accepted Landreth's services, paid Landreth a monthly retainer of $5,000.00 and reimbursed his expenses, as required by Section 3(a), and paid Landreth additional compensation, as required under Section 3(d). The City even obtained a $50,000.00 "Opportunity Returns" Grant (the "grant") from the State of Illinois Department of Commerce and Economic Opportunity ("DCEO"), representing to the State of Illinois that the grant would be used to "retain the services of a marketing agent" for the OIP. In fact, the City used the majority of the grant money to pay Landreth. When the City's use of the grant was subsequently reviewed by the State, the City Council – in order to retain the grant money – passed a Resolution which specifically authorized and directed the Mayor to execute an amendment to the Consulting Agreement. This Resolution was passed on *October 18, 2005*.[2] It is interesting, to say the least, that on October 25, 2005 – the day after the City received notification from the State DCEO that the Amendment was satisfactory – Attorney Leigh wrote to Landreth and stated that the Consulting Agreement had "expired by its own

---

[2] See, Exhibit "E" to the Complaint (Resolution No. 126-2005 and the Amendment to the Consulting Agreement).

terms" *on August 5, 2005*.

Even after the Consulting Agreement had "expired by its own terms," the City was attempting to enforce the agreement. Attorney Keith Leigh twice – on October 25, 2005 and on December 13, 2005 – wrote to Landreth and demanded compliance with Section 9 of the agreement.[3] Interestingly, in his December 13, 2005 letter to Landreth, Leigh three times mentions Landreth's possible "entitlement to future compensation under the agreement" in order to induce Landreth to provide additional prospect information to the City.

Despite the City's promise not to challenge the validity of the contract, when Landreth was forced to sue the City to recover the amounts he was entitled to be paid under the Consulting Agreement, the City asserted for the first time – more than three and a half years after the contract was signed – that the contract was void.  Why?  *Because the City had not complied with Section 8-1-7 of the Illinois Municipal Code*. Gotcha!

It cannot be overstated that the reason – *the sole reason* – Landreth has no remedy for the City's breach of the Consulting Agreement is because of the *City's conduct*.  Nothing that Landreth did or failed to do caused that contract to be void. How ironic, then, that the City – which caused the invalidity of the contract, thereby potentially depriving Landreth of hundreds of thousands of dollars – now brazenly boasts its own *unlawful act* as the basis for denying Landreth his day in court.

---

[3]  See, Exhibits "F" and "G" to the Complaint.  Section 9 of the Consulting Agreement required Landreth to provide the City with a list of prospects within 30 days after termination of the agreement.

*What this Case is Not About*

This case is not an attempt to use Section 1983 to redress an ordinary breach of contract dispute. If Landreth indeed had a state court remedy to redress the City's breach of the Consulting Agreement, this case would never have been filed. This case was only filed after Landreth – because of the City's deceitful conduct – was left without a remedy. Despite the defendants' efforts to characterize this case as another attempt by Landreth to enforce the Consulting Agreement, the only nexus between this case and the Consulting Agreement is that the defendants' duplicitous and unlawful conduct deprived Landreth of the right to have his day in court to seek to enforce the contract.

---

*What this Case Is About*

The very essence of this case is the City's duplicitous and unlawful conduct which deprived Landreth of a protectable property interest (the value of the time, advice, counsel and professional services he provided to the City) (i) without affording him *any* procedural due process guaranteed by the Fourteenth Amendment, (ii) without affording him access to the courts, (iii) through arbitrary irrational, deceitful and illegitimate conduct, thereby denying him of his Fourteenth Amendment right to substantive due process, and (iv) without just compensation in derogation of the Fifth Amendment (as applicable to the states through the Fourteenth Amendment). In Oliver Wendell Holmes, Jr.'s oft-quoted article, <u>The Path of the Law</u>, he wrote: "The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it – and nothing else. If you commit a tort, you are liable to pay a compensatory sum. If you commit a contract, you are

liable to pay a compensatory sum unless the promised event comes to pass, and that is all the difference."[4]  But what if a municipality can have its cake and eat it too – neither keep its promises nor pay damages? That is precisely what the City has done and is what this case is all about.

---

*Standard for Ruling on a Fed. R. Civ. P. 12(b)(6) Motion to Dismiss*

Defendants have filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  It is well-settled that a Rule 12(b)(6) motion challenges the legal sufficiency of the complaint and dismissal is appropriate "only if 'no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Cler v. Illinois Education Association*, 423 F.3d 726, 729 (7th Cir. 2005) (quoting from *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000)).  In ruling on a motion to dismiss, all well-pleaded allegations are taken as true and all reasonable inferences from those facts are drawn in the plaintiff's favor.  *Echevarria v. Chicago Title & Trust Company,* 256 F.3d 623, 625 (7th Cir. 2001) ("Dismissal for failure to state a claim is proper only where the court is convinced, beyond a reasonable doubt, that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.").

---

## I.     LANDRETH HAS A PROTECTABLE PROPERTY RIGHT.

As the Supreme Court has stated, the concepts of "liberty" and "property" are not to be defined narrowly.  They are dynamic – not static – concepts which of necessity evolve and gain meaning over time:

---

[4] The Path of the Law, 10 Harvard Law Review 457 (1897).

'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposefully left to gather meaning from experience. . . . (T)hey relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged.' (*citation omitted*) For that reason, the Court has fully and finally rejected the wooden distinction between 'rights' and 'privileges' that once seemed to govern the applicability of procedural due process rights. The Court has also made clear that property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money. . . .

*Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 571-572, 92 S.Ct. 2701, 2706 (1972).



### *A Professional's Time, Advice and Services Is a Protectable Property Right*

Landreth has a protectable property right in (i) the expertise and professional services he provided to the City and (ii) the out-of-pocket expenses he incurred in connection with providing those services. In a thoughtful and well-reasoned opinion, the Kansas Supreme Court addressed the question of whether professional services constitute "property" for due process and takings clause purposes:

Our analysis of the Fifth Amendment arguments is this: Attorneys, like the members of any other profession, have for sale to the public an intangible – their time, advice, and counsel. Architects, engineers, physicians, and attorneys ordinarily purvey little or nothing which is tangible. It is their learned and reflective thought, their recommendations, suggestions, directions, plans, diagnoses, and advice that is of value to the persons they serve. It is not the price of paper on which is written the plan for a building or a bridge, the prescription for medication, or the will, contract, or pleading which is of substantial value to the client; it is the professional knowledge which goes into the practice of the profession which is valuable.

Attorneys are licensed by the state to practice their profession; but so are other professionals, such as architects, engineers, and physicians. One who practices his profession has a property interest in that pursuit which may not be taken from him or her at the whim of the government without due process. . . .

Attorneys make their living through their services. Their services are the means of their livelihood. We do not expect architects to design public buildings, engineers to design highways, dikes, and bridges, or physicians to treat the indigent without compensation. When attorneys' services are conscripted for the public good, such a taking is akin to the taking of food or clothing from a merchant or the taking of services from any other professional for the public good and certainly when attorneys are required to donate funds out-of-pocket to subsidize a defense for an indigent defendant, the attorneys are deprived of property in the form of money. We conclude that attorneys' services are property, and are thus subject to Fifth Amendment protection.

*State ex rel. Stephan v. Smith*, 242 Kan. 336, 369-370, 747 P.2d 816 (1987).

---

### *Landreth's Property Right Does Not Depend on the Consulting Agreement*

Regardless of the Consulting Agreement, Landreth has a legitimate claim of entitlement to be fairly compensated for his expertise and the professional services he provided to the City *at the City's request*. Landreth's legitimate claim of entitlement to be fairly compensated for the work he performed does not depend on the Consulting Agreement – because it is *not Landreth's interest in the void contract that is the basis of the property interest*. Rather, his property interest derives from the services he provided to the City – services the City requested, accepted and benefitted from, but refused to pay for. Under Illinois law, when services are provided at the request of another, there is a right to be paid the reasonable value of those services. *In re Estate of McWain (Huddleston v. Hoggatt)*, 77 Ill.App.2d 359, 365-366, 222 N.E.2d 576, 579 (4th Dist. 1966) ("Where no kin or family relationship exists between the parties, and one accepts and retains the beneficial results of another's services which were rendered at his own insistence and request and which he had no reason to suppose were gratuitous, the law will imply liability for such services in such an amount as they are reasonably worth. In such a situation a claim can be established by an implied

contract.").

Similarly, Illinois law recognizes that one who provides services may have a right to recover under the theory of a "quasi-contract" or "contract implied in law." Essentially, a restitutionary remedy, "[a] claim in quasi-contract is established when 'the defendant has unjustly retained a benefit to the plaintiff's detriment, and … defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.'" *Midcoast Aviation, Inc. v. General Electric Credit Corp.*, 907 F.2d 732, 736-737 (7th Cir. 1990) (quoting from *HPI Health Care Services, Inc. v. Mt. Vernon Hospital*, 131 Ill.2d 145, 545 N.E.2d 672, 679 (1989)).

---

*Distinction Between Right to be Fairly Compensated*
*for Services Performed and Right to Continued Employment*

*Walters v. Village of Colfax*, 466 F.Supp.2d 1046 (C.D. Ill. 2006), recognizes the distinction between an interest in a void contract and an interest in being compensated for *work already performed*. In *Walters*, after the termination of plaintiff's employment as village police chief (or the failure to reappoint him to that position), the plaintiff brought a Section 1983 action against the Village of Colfax, alleging he had a protectable property interest in his *continued employment* by virtue of a 10-year employment contract which he and the municipality had entered into two years previously. The district court held that since Section 8-1-7(b) of the Illinois Municipal Code rendered the employment contract void *ab initio*, plaintiff had no protectable property interest in his continued employment with the village.[5] However, the *Walters* court expressly recognized "that

---

[5] Section 8-1-7(b) applies to contracts which extend beyond the term of the mayor then in office.

there is a cognizable difference between estopping a municipality from gaining an unconscionable advantage by refusing to pay for services that had already been performed and estopping it from denying a contract that it never had authority to make. *Stahelin*[6] would be far more helpful to Walters, and *his injury truly unconscionable, if the Village were refusing to pay him for services that he had already rendered.*" 466 F.Supp.2d at 1056-1057 (emphasis added).  In the instant case, Landreth only seeks to be fairly compensated for the consulting services he performed over 27 months at the City's request.

Defendants' reliance on *Shlay v. Montgomery,* 802 F.2d 918 (7th Cir. 1986), is misplaced. Just like *Walters*, in *Shlay* the plaintiff was asserting a right to *continued employment* (plaintiff contended he was orally given a "career contract") – not compensation for services performed. Moreover, *Shlay* is distinguishable from the instant case in which the City by a legislative act of its City Council specifically authorized the execution of the Consulting Agreement and the Mayor signed it.

---

## II.  ALTHOUGH PERHAPS INARTFULLY PLEADED THE COMPLAINT ADEQUATELY SETS OUT THAT LANDRETH WAS DEPRIVED OF RIGHTS SECURED BY THE UNITED STATES CONSTITUTION.

### A.    Procedural Due Process.

The Supreme Court has recognized that a cause of action is a species of property protected by the due process clause of the Fourteenth Amendment.  *Mullane v. Central Hanover Bank & Trust*

---

[6]  *Stahelin v. Board of Education, School Dist. No. 4, DuPage County*, 87 Ill.App.2d 28, 230 N.E.2d 465 (2d Dist. 1967).

*Co.*, 339 U.S. 306, 70 S.Ct. 652 (1950).

*Logan v. Zimmerman Brush Company*, 455 U.S. 422, 102 S.Ct. 1148 (1982), vividly illustrates how Landreth has been deprived of his federal right to procedural due process.  Five days after he was fired, Logan timely filed a charge with the Illinois Fair Employment Practices Commission (the "Commission"), claiming that he had been unlawfully terminated from his job because of his physical handicap (a short left leg).  By statute, the Commission had 120 days after Logan filed the charge within which to convene a fact finding conference.  The Commission scheduled the conference on March 18, 1980 – 5 days after the expiration of the statutory 120-day period to convene the conference. The employer successfully sought a writ of prohibition from the Illinois Supreme Court, that court finding the 120-day period to be mandatory and that the failure to comply deprived the Commission of jurisdiction to hear the employee's charge.  Logan argued that terminating his cause of action because the Commission failed to timely schedule a conference violated his rights to due process and equal protection.  The Illinois Supreme Court rejected Logan's Constitutional claims.  Not surprisingly, the United States Supreme Court had no difficulty reversing the Illinois Supreme Court, finding that the termination of Logan's claim violated his right to due process.  "To put it as plainly as possible, the State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement." *Logan*, 455 U.S. at 434.

Logan was deprived of his day in court – his cause of action was terminated –  through no fault of his own.  Through no fault of his own – and certainly without any due process – Landreth's cause of action for breach of contract was terminated and he, too, was denied his day in court. If anything, the facts in this case beg for justice even more than the facts in *Logan*.  In *Logan*, the

employer was not responsible for the untimely scheduling of the fact finding conference – although the employer certainly attempted to exploit it.  Here, the City is solely responsible for denying Landreth his day in court.

The case before this Court has striking similarities to *McKesson Corporation v. Division of Alcoholic Beverages and Tobacco, etc.*, 496 U.S.18, 110 S.Ct. 2238 (1990).  *McKesson* dealt with whether or not the due process clause required the State of Florida to refund excise taxes it had collected pursuant to a statute held to be unconstitutional.  The Florida Supreme Court, while affirming the trial court's determination that the tax scheme violated the commerce clause, nevertheless refused to provide McKesson Corporation with a refund or any other form of relief for the taxes it had previously paid.  The United States Supreme Court reversed, specifically holding that, where taxes have been unlawfully collected, in order to satisfy the requirements of the due process clause a state must provide taxpayers with a  " 'clear and certain remedy' . . .  for any erroneous or unlawful tax collection to ensure that the opportunity to contest the tax is a meaningful one." *Id.* at 39, 110 S.Ct. at 2251.  Not unlike the excise taxes unlawfully collected by the State of Florida, the City of Ottawa has unlawfully obtained valuable consulting and real estate development services from Landreth.  While it is obvious that the City cannot "refund" those services to Landreth, it can – and *McKesson* holds that the due process clause requires the City to – pay Landreth the fair and reasonable value of those services.

### B.        Substantive Due Process.

The notion that government should act honestly and fairly and not engage in deceitful conduct would seem to be implicit in any concept of ordered liberty.  We need look no further than

the Declaration of Independence to satisfy ourselves that abhorrence of, and refusal to tolerate, arbitrary, capricious, and dishonest behavior by government officials is a principle that is "deeply rooted" in our nation's history.  The Complaint more than adequately details a continuing course of arbitrary and irrational conduct and abuse of power, sanctioned at every turn by the Mayor and City Council.  As the Seventh Circuit noted in *Tun v. Witticker*, 398 F.3d 899, 902 (7th Cir. 2005), "[t]he essence of due process is the 'protection of the individual against arbitrary action of government.'  Substantive due process involves the exercise of governmental power without reasonable justification.  It is most often described as an abuse of government power which 'shocks the conscience.'"  (*citations omitted*)[7]

The Seventh Circuit recognizes that substantive due process claims may be brought where property rights are alleged to have been abridged.  *New Burnham Prairie Homes, Inc. v. Village of Burnham*, 910 F.2d 1474 (7th Cir. 1990).  In such cases, in addition to alleging that the conduct complained of was arbitrary and irrational, the plaintiff must also allege "either a separate constitutional violation or the inadequacy of state law remedies."  *Id.* at 1481.  It is respectfully submitted that the plaintiff has done both.  If not, then leave is sought to amend the Complaint as necessary.

Municipal corporations, as well as private corporations and individuals, are bound by principles of common honesty and fair dealing. *Stahelin v. Board of Education, School Dist. No. 4, DuPage County*, 87 Ill.App.2d 28, 42, 230 N.E.2d 465, 472 (2d Dist. 1967); *Allen v. Treat*, 72 Ill.App.2d 466, 476, 218 N.E.2d 250, 255 (4th Dist. 1966);  *McGovern v. City of Chicago*, 281 Ill.

---

[7]  It is not entirely clear whether the "shocks the conscience" or "deliberate indifference" standard applies in substantive due process cases.

264, 284, 118 N.E. 3 (1917); *People ex rel. Stead v. Spring Lake Drainage and Levee Dist.*, 253 Ill.

479, 501, 97 N.E. 1042 (1912). "The idea that a governmental body should be able to renege or

avoid its contractual obligations is certainly repugnant to the concept that a government should serve

its citizens." *Bond County Community School Dist. No. 2 v. Indiana Insurance Company*, 269

Ill.App.3d 488, 492, 647 N.E.2d 293, 296 (5th Dist. 1995).

Justice Marshall in his dissenting opinion in *Roth* wrote:

> The prior decisions of this Court, discussed at length in the opinion of the Court, establish
> a principle that is as obvious as it is compelling – i.e., federal and state governments and
> governmental agencies are restrained by the Constitution from acting arbitrarily with respect
> to employment opportunities that they either offer or control. Hence, it is now firmly
> established that whether or not a private employer is free to act capriciously or unreasonably
> with respect to employment practices, at least absent statutory or contractual controls, a
> government employer is different. The government may only act fairly and reasonably.

*Roth*, 408 U.S. at 588.

This would be a much different case if it were not for the City's deceit – if the City had not

affirmatively represented to Landreth that the Consulting Agreement was "binding, valid and

specifically enforceable according to its terms against each party" and "does not violate any

presently existing provision of law . . . to which [the City] may be subject." This would be a much

different case if the City had not provided Landreth with the further assurance that it would not take

any action to challenge the validity of the agreement because it understood that Landreth was

"relying  upon the representations and financial commitment contained [in the Consulting

Agreement] *and has every right to do so*." This would be a much different case if the City had not

represented month after month after month after month that the Consulting Agreement was valid by

paying Landreth his retainer and expenses – each payment itself an unlawful act. Indeed, it is the

City's duplicitous conduct which distinguishes this case from every other case where Section 8-1-7

denied the plaintiff a remedy. And finally, this Court should not lose sight of the fact that an

experienced municipal attorney drafted the contract while representing both the City and Landreth.[8]

---

### *Landreth Had Absolutely No State Remedy*

Landreth has alleged the inadequacy of his state law remedies.[9] By not appropriating for the

---

[8] Paragraph 15 of the Consulting Agreement provides:

"15.    Disclosure. The parties have jointly utilized the law firm of Pool, Leigh & Fabricius
with respect to this Agreement, and each party acknowledges this fact and hereby expressly
authorizes such representation. . . ."

[9] Paragraph 137 alleges:

> 137.    The City's policy has the direct effect of absolutely
> precluding a party who contracts with the City to provide goods or services
> from seeking any redress in the state court for breach of contract if the City
> subsequently decides – for any reason or no reason – that it doesn't want to
> pay for the goods or services.

Paragraph 149 alleges:

> 149.    Because the Illinois courts have strictly interpreted Section
> 8-1-7 so as to absolutely preclude any action for breach of a contract which
> does not comply with Section 8-1-7, by inducing Landreth to enter into a
> contract that the City knew did not comply with Section 8-1-7 and was,
> therefore, void *ab initio* and unenforceable, the City was able to obtain
> valuable services from Landreth and yet refuse to pay for those services
> with impunity. Landreth's state court remedies were thus rendered
> inadequate.

Consulting Agreement, the City afforded itself an opportunity to reap the benefits of Landreth's services and whenever it saw fit – for any reason or no reason at all – refuse to pay for them. Under Illinois law, by not appropriating for the Consulting Agreement before it was executed, the contract was void *ab initio*.[10] The City itself – through Attorney Leigh – argued in the state court that there simply is no remedy available to Landreth in situations where the lack of a prior appropriation renders the contract void. Neither estoppel nor ratification are available to a contracting party who has dealt with a municipality which failed to make a prior appropriation. *Nielsen -Massey Vanillas, Inc. v. City of Waukegan*, 276 Ill.App.3d 146, 153, 657 N.E.2d 1201, 1207 (2nd Dist. 1995).

When was Landreth deprived of his property interest? When the City decided to play its "hole card" – that it had failed to appropriate for the Consulting Agreement in its May 1, 2003 – April 30, 2004 budget. Of course, Landreth had absolutely no way of knowing and, more importantly, no reason to suspect, that the City held this card because of (i) the City's representations to the contrary and (ii) the fact that the City faithfully paid Landreth the $5,000 monthly retainer specified by the agreement, reimbursed his expenses and paid a portion of the Section 3(d) fee attributable to the MTC project. Landreth had no remedy when the City decided – some three and a half years after the Consulting Agreement was executed – to play its "hole card" and assert that the agreement was void. He learned, to his detriment, on February 28, 2008, that his breach of contract action was barred by the City's failure to comply with Section 8-1-7.

---

[10] Curiously, the City did *specifically* appropriate for the Consulting Agreement in the City's next two fiscal years (May 1, 2004 – April 30, 2005 and May 1, 2005 – April 30, 2006). Attorney Leigh argued – and the state court judge agreed – that these appropriations were not sufficient to validate the contract.

**C.    Takings Clause.**

Simply put, the City took and used to its advantage the time, advice, skills, experience and expertise that Landreth provided to the City *at its request* without just compensation to Landreth. Worse, the City obtained Landreth's services by its deceitful conduct – by, among other things, misrepresenting the validity of the Consulting Agreement.   The City's conduct violated the Fifth Amendment's proscription that "private property [not] be taken for public use, without just compensation."

---

**III.    SINCE THE CITY'S CONDUCT WAS NEITHER RANDOM NOR UNAUTHORIZED, IT MATTERS NOT WHETHER A POST-DEPRIVATION HEARING WAS AVAILABLE OR ADEQUATE.**

*Procedural Due Process*

The conduct of which Landreth complains was neither random nor unauthorized.   The offending acts in this case – as clearly alleged – are acts which the municipality officially sanctioned.   Landreth's Section 1983 action is brought pursuant to the *Monell* doctrine.[11] As the Seventh Circuit has explained, when a municipality is being sued under *Monell*, "the tortious loss of property can never be the result of a random and unauthorized act.   Therefore, a complaint asserting municipal liability under *Monell* by definition states a claim to which *Parratt* is inapposite." *Wilson v. Civil Town of Clayton, Indiana*, 839 F.2d 375, 380 (7th Cir. 1988). Accordingly, due process is not satisfied by a post-deprivation hearing.

---

[11]   *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018 (1978).

_____

*Substantive Due Process*

Where a substantive due process violation exists, even adequate post-deprivation remedies will not serve to bar Section 1983 relief.  <u>See</u>, *e.g., McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994).

_____

## IV.    RES JUDICATA.

*Res Judicata Does Not Defeat Landreth's Complaint*

Defendants correctly set forth the elements of *res judicata* and properly recognize that Illinois courts apply the "transactional test" to determine if a "subsequent action arises from the same set of operative facts as the original action."  *Fuller Family Holdings, LLC v. The Northern Trust Co.*, 371 Ill.App.3d 605, 617, 863 N.E.2d 743, 756 (1st Dist. 2007), citing *River Park Inc. v. City of Highland Park*, 184 Ill.2d 290, 309, 703 N.E.2d 883 (1998).  In applying this transactional test, however, defendants' adopt an overly simplistic view of the facts and issues raised in this proceeding, as well as the doctrine of *res judicata*.  That is, defendants argue that both the prior state court action and the present action "arise out of the Consulting Agreement and the City's alleged breach of contract.  In both of the complaints, the claims are all centered around the Agreement; whether they focus on the making or the alleged breach of the contract."[12]

Defendants – without referencing any allegations of either the present complaint or the state court complaint – gratuitously assert that the "factual allegations in the Plaintiff's federal and state

_____

[12]     Defendants' Memorandum, p. 9.

complaints are almost identical and the damages sought are the same."[13]  That the defendants fail

to set forth any allegations in support of this contention is hardly surprising – a cursory review of

the two complaints demonstrates the operative facts of each complaint are radically different.  The

state court action was premised upon the existence of a valid contract which the City breached when

it failed to pay Landreth amounts due pursuant to the express contract terms.[14]

        In contrast to the state court complaint, the cornerstone of the present action is the City's

deceitful conduct which deprived Landreth of his day in court to prove his breach of contract claim.

None of the facts pleaded in this action as to the City's deceitful conduct were remotely relevant to

the state court breach of contract action.  Consequently, *none* of those facts were pled in the state

court action.

        The superficial nature of the defendants' *res judicata* argument is revealed when considered

in light of Illinois decisions which reject the argument that two claims originating from the same

agreement and overlapping time periods are amenable to dismissal on *res judicata* grounds.  *Saxon*

*Mortgage, Inc. v. United Financial Mortgage Corp.*, 312 Ill.App.3d 1098, 728 N.E.2d 537 (1st Dist.

2000) is such an example.[15]  Saxon entered into a sales and servicing agreement to purchase

---

[13]      *Id.*, p. 10.

[14]      Complaint, Exh. M.

[15]

        To support their *res judicata* argument, the defendants almost exclusively rely on cases concerning
employees who were denied benefits (*i.e.*, pension, disability, pre-termination hearings) in a state court
proceeding and then filed suit in federal court claiming that the very same conduct constituted some sort of
unlawful discrimination or due process violation.  The other case relied upon by defendants, *Highway J
Citizen Group v. U.S. Dept. of Transportation*, concerned efforts by environmental groups to stop the
expansion of highways.  Finding that *res judicata* applied to the second suit filed by the environmental groups
was made easier, noted the Seventh Circuit, by the environmental groups' admission in the first suit that the
highway projects at issue were "intricately interlinked."  456 F.3d 734, 742 n. 13 (7th Cir. 2006).

residential mortgages from UFM.  Saxon filed an action in state court alleging that UFM breached the parties' agreement when UFM failed to reimburse Saxon for premiums paid for mortgages that were paid off within 180 days. Before filing the state court breach of contract case, Saxon had filed a seven-count complaint against UFM in federal court concerning the investment quality of the loans sold by UFM to Saxon, alleging claims for intentional misrepresentation, negligent misrepresentation, breach of contract, breach of implied covenant of good faith and fair dealing, breach of express warranty and express indemnification.  Saxon prevailed on a summary judgment motion in federal court.  In the subsequent state court proceeding, UFM filed a motion to dismiss on *res judicata* grounds.

The appellate court rejected UFM's argument that *res judicata* applied because both the state and federal court action involved the mortgage purchase agreement:

> The fact that the same underlying master Agreement was involved in both cases does not establish that they are the same cause of action; they involve separate transactions, factual situations, time periods, obligations, issues, damages and claims for relief and invoke different provisions of the underlying master Agreement in order to meet the nature and character of each distinctive grievance.

*Saxon*, 312 Ill.App.3d at 1107, 728 N.E.2d at 544.

In the same vein as *Saxon*, a *res judicata* argument was rejected in *Peregrine Financial Group, Inc. v. Martinez*, 305 Ill.App.3d 571, 712 N.E.2d 861 (1st Dist. 1999).  Peregrine, a commodity brokerage firm, sued for breach of a customer account agreement and fraud to recover margin deficits related to the defendants' customer account.  After Peregrine filed its state court action, the defendants filed a demand for arbitration and a complaint against Peregrine with the National Futures Association ("NFA"), alleging breach of fiduciary duty, breach of contract and misrepresentation.   Peregrine's state court action was stayed during the pendency of the arbitration

proceeding. The defendants were awarded $1,020.00 in "compensatory damages" in the arbitration case.

While its motion to modify was pending before the arbitration panel, Peregrine moved for summary judgment in the state court action.  The defendants argued that Peregrine was not entitled to a judgment in light of the arbitration award in their favor and that the state court case concerned the same agreement that was at issue in the arbitration proceeding.   Recognizing that "arbitration awards have the same *res judicata* and collateral estoppel effect as court judgments," the Appellate Court nonetheless rejected the claim that *res judicata* applied to bar Peregrine's state court action. *Peregrine*, 305 Ill.App.3d at 578, 712 N.E.2d at 867.   The court reasoned:

> While both actions involved the same transaction, the customer account agreement, the causes of action were different.  The arbitration proceeding adjudicated the rights and claims of the Martinezes, namely, breach of contract, breach of fiduciary duties, and negligent misrepresentation by Peregrine, while the circuit court action adjudicated Peregrine's rights and claims, namely, breach of contract and fraud. Peregrine did not file a counterpetition in arbitration to interpose its claims against the Martinezes, nor was it required to do so.

*Id.* at 580, 712 N.E.2d at 868.

The mere fact that a subsequently filed lawsuit has some factual connections to a prior case is an insufficient basis for invoking *res judicata*.  Accordingly, in *City of Rolling Meadows v. National Advertising Co.*, 228 Ill.App.3d 737, 593 N.E.2d 551 (1st Dist. 1991), *res judicata* did not bar a city's state court action to enforce restrictive covenants banning billboards in an industrial park even though a prior federal suit between the same parties concerned attempts to erect billboards in the same industrial park.  In the federal court action, National successfully argued that a Rolling Meadows zoning ordinance regulating the size and height of billboards was preempted by the Highway Advertising Control Act.  Thereafter, Rolling Meadows amended its zoning ordinance and

National applied for, and received, permits to erect two billboards in the industrial park. National then began construction of the billboards.

Within a month of issuing the permits to National, Rolling Meadows learned of a restrictive covenant applicable to the industrial park which prohibited improvements over a certain height and allowed only on-premises billboards. Rolling Meadows also owned property in the industrial park. Relying upon the restrictive covenant, the City then filed a state court action to enjoin construction of the billboards. National argued that the previous federal litigation operated as *res judicata* to Rolling Meadows' attempt to enforce the restrictive covenant in state court. Applying the "transactional" test, the appellate court rejected National's *res judicata* argument. The court concluded, "[a]lthough both actions involve National's attempt to erect billboards in the park, they stemmed from different conduct at different times." *Rolling Meadows*, 228 Ill.App.3d at 744, 593 N.E.2d at 557.

As in *Saxon*, *Peregrine* and *Rolling Meadows*, this federal proceeding, although it makes reference to the Consulting Agreement, is far from the same action as Landreth's state court breach of contract case. This action concerns facts, time periods, issues and obligations that were not remotely relevant to the simple breach of contract action Landreth brought in the state court. This action is premised upon the fact that the Consulting Agreement was void and unenforceable – a premise completely at odds with the state court breach of contract action. Neither the events leading up to the signing of the Consulting Agreement nor the misrepresentations contained therein were pleaded in the state court case, as those allegations were not in any way relevant to the breach of contract claim. The relationship between and among Attorney Leigh and Pool, Leigh & Kopko and the City was not relevant to the state court proceeding. The fraudulent, misleading and deceitful

nature of the City's conduct before the Consulting Agreement was signed and which continued for more than two years while Landreth provided valuable services and incurred out of pocket expenses on behalf of the City was not alleged in the contract action – *nor could such allegations have been made.*

---

*Res Judicata Should Not Be Applied Because It Would*
*Be Inequitable, Given the City's Conduct to Deny Landreth His Day in Court*

Illinois law also recognizes that, under certain circumstances, it is inequitable to apply *res judicata* so as to deny a party their day in court.  As succinctly stated by the Illinois Supreme Court, "[*r*]*es judicata* will not be applied where it would be fundamentally unfair to do so." *Nowak v. St. Rita High School*, 197 Ill.2d 381, 390, 757 N.E.2d 471, 477 (2001).  The equity and fairness of applying *res judicata* was addressed by the court in *Saxon*.  Saxon argued that it would be unfair and inequitable to apply *res judicata* to bar its claims in light of UFM's conduct.  UFM was aware of Saxon's claims for premium reimbursements (for loans paid within 180 days) while the federal suit (related to the investment quality of another loan purchased by Saxon from UFM) was pending. In resisting the application of *res judicata*, Saxon argued it should not be denied its day in court on the reimbursement claims because UFM agreed to reduce the amounts owed to Saxon through future transactions and repeatedly reassured Saxon it would do so.  The court agreed and concluded, "it would be inequitable and unfair to apply *res judicata* here, particularly in light of UFM's conduct." *Id.* at 312 Ill.App.3d at 1112, 728 N.E.2d at 547.

Here, too, it would be inequitable and unfair to deny Landreth his day in court in light of the

defendants' duplicitous conduct.  Month after month and year after year, the City gave Landreth every reason to believe that the Consulting Agreement was a valid contract.  The City made monthly payments to Landreth, reimbursed his expenses and even paid him premiums for projects developed within the industrial park.[16]  The City also advised Landreth that the Consulting Agreement had "expired" by its own terms.[17]  The City went so far as to affirmatively represent to the State of Illinois that the Consulting Agreement was a binding obligation so as to retain grant funds.[18]  It was not until Landreth actually filed suit to enforce the Consulting Agreement that the City, *for the first time*, asserted that the Consulting Agreement was void *ab initio* because, the City claimed, it had not specifically appropriated for the contract in its FY 2004 budget.  Ironically, it was only *after* the circuit court ruled that Section 8-1-7 rendered the Consulting Agreement void *ab initio* that Landreth's claims for fraud, negligent misrepresentation and for relief under § 1983 became viable. If the circuit court had ruled that the Consulting Agreement was valid, the breach of contract action would have proceeded and there never would have been (nor could there have been a basis for) this federal action.

---

## V.    LANDRETH HAD "EVERY RIGHT" TO RELY ON THE CITY'S REPRESENTATIONS.

The defendants contend that plaintiff has failed to state a cause of action for common law fraud because, as a matter of law,  Landreth "cannot justifiably rely on any statements made by any

---

[16]    Compl., Exh. M, ¶¶ 67-74.

[17]    Compl., Exh. M, ¶ 105.

[18]    Exh. M, ¶¶ 88-103.

city officials."[19]  A curious argument indeed, especially since the City expressly acknowledged that Landreth "had every right to [rely on the representations in the Consulting Agreement]."  Defendants cite no authority for this outlandish proposition.  Whether Landreth's reliance was justifiable is a question of fact – not something which can or should be determined at the pleadings stage.  This principle is aptly illustrated in *F:AJ. Kikson v.  Underwriters Laboratories*, 2005 WL 736651 (N.D. Ill.  March 31, 2005), a case cited in the defendants' Memorandum.[20]  A plaintiff's reliance is justifiable where – as here –  the defendant has created a "false sense of security."  *Los Amigos Supermarket, Inc. v. Metropolitan Bank and Trust Company*, 306 Ill.App.3d 115, 128,  713 N.E.2d 686, 695 (1st Dist. 1999).

---

### Landreth Presumed to Know the Law

It is fair to say that Landreth is presumed to know the law.  He is presumed to know that Section 8-1-7 requires a prior appropriation. He reads the Consulting Agreement – which unequivocally states that the agreement is binding, valid and enforceable and not violative of any existing provision of law.  Is he not entitled to rely on those representations – especially when the City states that he has "every right to do so"?  Is he presumed to know that the City's representations are false?  That the City has lied to him? Duped him into devoting half of his time to promoting the City of Ottawa and its industrial park?  Is he presumed to know that each time the City paid him his

---

[19]        Memorandum, p. 12.

[20]

*F:AJ. Kikson* is a summary judgment case which did not even discuss whether the plaintiff's reliance on the allegedly false statement (that plaintiff's chimney liner product was being tested according to UL standards) was justified.  The court found that there was sufficient evidence to submit the fraud claim to the trier of fact and accordingly denied the defendant's motion for summary judgment on the fraud count.

monthly retainer the City was committing an unlawful act?  That Pool, Leigh & Kopko – which "jointly represented" him and the City – failed to tell him that the contract was a sham?  What was Landreth to do?  Should he have filed a declaratory judgment action before he performed any work under the Consulting Agreement to seek a judicial determination as to the validity of the agreement?

It cannot be emphasized too strongly that the representations made by the City in this case are not the statements of some low-level "ministerial officer."  (See, e.g., Ganley v. City of Chicago, 18 Ill.App.3d 248, 309 N.E.2d 653 (1st  Dist. 1974)) These representations are contained in a contract the City's corporation counsel prepared, the City's legislative body by specific resolution authorized and directed the City to execute, and the City's Mayor signed.

The City has not cited any authority – and none is believed to exist – for the proposition that a person dealing with a municipality has a duty to determine whether the municipality has complied with Section 8-1-7.  Likewise, no authority exists for the proposition that a municipality may with impunity falsely represent its compliance with Section 8-1-7.[21]

---

[21]

It must be noted that ascertaining whether a municipality has complied with Section 8-1-7 is no mean feat.  There is a significant body of case law which holds that the "prior appropriation" requirement of Section 8-1-7 is satisfied by something less than a specific identification of the expenditure.  See, People ex rel. McWard v. Wabash R. Co., 395 Ill. 243, 247-48, 70 N.E.2d 36, 39 (1946); Charles Deleuw & Co. v. City of Charleston, 298 Ill.App. 403, 19 N.E.2d 207, 209 (3rd Dist. 1939); Continental Illinois Nat'l. Bank & Trust Co. of Chicago v. Village of Park Forest, 4 Ill.App.3d 811, 282 N.E.2d 167, 174 (3rd Dist. 1972).

The City's FY 2004 Appropriation Ordinance (Exhibit "N" to the Complaint), within its "TIF 2 RTE 6 EAST" fund, sets forth a general appropriation for "Land & Options."  This generalized designation contemplates several purposes – not the least of which is the development and marketing of land within the Ottawa Industrial Park.

## VI.    LANDRETH'S CLAIMS ARE NOT BARRED BY SECTION 8-101 OF THE TORT IMMUNITY ACT.

*The Pendent State Law Claims Are Not Barred by Section 8-101 of the Tort Immunity Act*

The plaintiff did not have a cause of action for fraud until February 28, 2008 – when the state court trial judge ruled that "Section 8-1-7 of the Illinois Municipal Code bars the action because (1) there was no prior appropriation for the contract sought to be enforced and (2) the contract sought to be enforced, or the financial obligations thereunder, would extend beyond the term of the mayor in office at the time the contract was executed." *Warnock v. Karm Winand & Patterson*, 376 Ill.App.3d 364, 876 N.E.2d 8 (1st Dist. 2007), is directly in point.  In *Warnock*, the Appellate Court held that a cause of action for legal malpractice did not accrue until the circuit court had ruled against the plaintiffs in a prior action brought by the purchasers of their home to recover $342,750 in earnest money.  The Appellate Court held that the "plaintiffs had no actionable damages prior to an adverse judgment from the circuit court."  *Id.* at 371, 876 N.E.2d at 15.  The Appellate Court noted that "plaintiffs could not have known that Patterson's letter agreements were faulty until the circuit court granted the [purchasers'] motion for summary judgment."  *Id.* at 369, 876 N.E.2d at 13. The same is true here.  Not until the circuit court ruled against Landreth by granting the City's motion to dismiss did Landreth have a cause of action under Section 1983 or for fraud or negligent misrepresentation.

---

## VII.  NEITHER SECTION 2-106 NOR SECTION 2-210 OF THE TORT IMMUNITY ACT APPLY.

*Section 2-106*

Section 2-106 of the Tort Immunity Act provides that "[a] local public entity is not liable for an injury caused by an *oral promise or misrepresentation* of its employee, whether or not such promise or misrepresentation is negligent or intentional."  None of the alleged misrepresentations in this case are oral.

*Section 2-210*

The Complaint alleges that Attorney Leigh drafted the Consulting Agreement *as an employee or agent of Pool, Leigh & Kopko*.[22]  The Complaint further alleges that Leigh drafted the Consulting Agreement "for the benefit of both the City and Landreth."[23]  The defendants have cited no authority for the proposition that Pool, Leigh & Kopko, a corporation, is a "public employee" within the meaning of Section 2-210.  Whether Attorney Leigh was a "public employee" at any relevant time is an issue that cannot properly be decided on the pleadings.

---

## VIII.  THE FAILURE TO SEEK RELIEF AGAINST MAYOR ESCHBACH WAS INADVERTENT AND PLAINTIFF SEEKS LEAVE TO AMEND THE COMPLAINT ACCORDINGLY.

The failure to specifically seek relief against Mayor Eschbach was inadvertent.  Plaintiff respectfully seeks leave to amend the Complaint so as to seek relief against him.  Whether Mayor Eschbach is entitled to qualified immunity is an issue that cannot be determined at this stage of

---

[22]  Complaint, ¶ 171.

[23]  Complaint, ¶ 172.

litigation.  In fact, as the defendants have noted in their Memorandum, whether a public official is entitled to qualified immunity "is fact-specific and 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'"[24]

---

### CONCLUSION

For the reasons stated, plaintiff, John Colt Landreth, respectfully requests that defendants' Motion to Dismiss be denied and that they be ordered to answer the Complaint.  Alternatively, should the Court find that some or all of the defendants' motion is well taken, he seeks leave to amend his Complaint.

**John Colt Landreth**, Plaintiff

By:    ___s/ Richard J. Berry_____
       Richard J. Berry ARDC #198269
       Member of Trial Bar
       MYERS, BERRY, O'CONOR & KUZMA, LTD.
       130 East Madison Street
       Ottawa, IL 61350
       E-mail address: rberry@mdbok.com
       Tel.  815-434-6206

---

[24] Memorandum, p. 13.

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, one of the attorneys of record herein, hereby certifies that on July 18, 2008, the foregoing **Plaintiff's Response to Defendants' Motion to Dismiss** was electronically filed with the Clerk of the U.S. District Court using the CM/ECF System, which will send notification of such filing to the following: William W. Kurnik at bkurnik@khkklaw.com and Misha Desai at mdesai@khkklaw.com.

> s/ Richard J. Berry
> Richard J. Berry ARDC #198269
> Member of Trial Bar
> MYERS, BERRY, O'CONOR & KUZMA, LTD.
> 130 East Madison Street
> Ottawa, IL 61350
> E-mail address: rberry@mdbok.com
> Tel. 815-434-6206